IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Consumer Financial Protection Bureau, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) Case No. 2:24-cv-01301 |
| Reliant Holdings, Inc. and Robert Kane, | ) ) ) ) |
| *Defendants*. | ) ) |

**COMPLAINT**

The Consumer Financial Protection Bureau (Bureau) brings this action against Reliant Holdings, Inc. (Reliant) (also d/b/a Horizon Card Services), and Robert Kane (Kane) for (1) deceptive and abusive acts or practices that violate the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), and (2) violations of the Truth in Lending Act (TILA), 15 U.S.C. § 1637, and its implementing Regulation Z, 12 C.F.R. § 1026.52. The Bureau alleges as follows.

**INTRODUCTION**

1. Reliant, under the direction of its founder, owner and CEO Robert Kane, targeted financially vulnerable, subprime consumers with advertisements that promised a credit card with a specified credit limit (often $500) that required no credit check.

2. While Defendants' advertisements appeared to offer consumers a general-purpose credit card, in reality, Reliant charged consumers substantial mandatory fees to access a membership program that included (1) a credit card that could be used only to make purchases from Reliant's Horizon Outlet, an online store selling a paltry, rotating selection of often over-

priced or off-brand goods, and (2) ancillary products, like a prescription card and roadside assistance, that had limited value and were rarely used by consumers.

3. Because of Defendants' deceptive conduct and the extremely limited utility of Reliant's products, most customers quickly dropped out of the membership program without using either Reliant's credit card or any ancillary products, thereby paying fees to Reliant and receiving nothing of value in return. For example, between at least 2017 and 2021, only 6% of consumers ever used their cards and only 1-3% of customers used an ancillary product.

4. In addition to deceiving consumers into paying for a nearly useless product, Reliant also has charged consumers fees well in excess of the legally allowed limits. For some consumers the mandatory fees cost up to 60% of the consumer's credit limit, an amount that violated TILA.

5. Reliant has also made it unreasonably difficult for consumers to cancel their memberships and obtain refunds.

6. Despite promises that it would take "less than a minute" to receive a full refund, Reliant routinely made consumers endure a series of offers for discounted pricing and third-party products. And even after consumers survived this gauntlet, Reliant refused to provide full refunds unless consumers threatened to seek relief from their banks or the Better Business Bureau.

## JURISDICTION AND VENUE

7. This court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

8. Venue is proper because Defendants reside and transact business in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PARTIES

9. The Bureau is an independent agency of the United States. 12 U.S.C. § 5491. The Bureau is charged with enforcing "Federal consumer financial law." 12 U.S.C. §§ 5563, 5564. TILA is an "enumerated consumer law" and thus a "Federal consumer financial law." 12 U.S.C. §§ 5481(12)(O), (14). The Bureau has independent litigating authority, 12 U.S.C. §§ 5564(a)-(b), including the authority to enforce TILA, 15 U.S.C. § 1607(a)(6).

10. Reliant is a Pennsylvania corporation based in Indiana, Pennsylvania, and, at all times material to this Complaint, it transacted business in this District and nationwide.

11. Robert Kane, who resides in this District, is the sole shareholder, owner, and Chief Executive Officer of Reliant. At all material times, Kane managed, directed, controlled or had authority to control, had managerial responsibility for, and materially participated in Reliant's conduct.

## FACTUAL ALLEGATIONS

12. Kane formed Reliant in Pennsylvania in 2005, and Reliant began offering its primary product, the Horizon Card Services Membership, to consumers by 2007.

13. The Horizon Card Services Membership gave consumers access to an unsecured, open-end line of credit, typically starting at $500 or $750.

14. The line of credit could be used only to purchase a limited selection of mostly off-brand goods at Reliant's online store, the Horizon Outlet.

15. Reliant has marketed its credit line under numerous brand names, including Boost Platinum Card, Freedom Gold Card, Group One Platinum Card, Horizon Gold Card,

Independence Gold Card, Innovation Platinum Card, Merit Platinum Card, Net First Platinum Card, Principal Platinum Card, and Focus Gold Card.

16. In addition to the line of credit and access to the Horizon Outlet, the membership includes the Horizon Benefits Plan with the following ancillary products: My Privacy Protection (credit monitoring); My Universal RX (purported discounts on covered prescription medications); My Roadside Protect (roadside assistance); and My Legal Assistance (one free 30-minute consultation with a legal professional for civil cases).

17. Reliant attracted consumers through advertising affiliates and affiliate networks that use websites, emails, push notifications, and text messages to reach millions of consumers across the country.

18. Reliant's advertisements were placed on websites where consumers could shop for and compare credit products (such as credit.com, finder.com, and creditkarma.com), and were sent to consumers via mass-email marketing.

19. Since 2010, many of Reliant's advertisements (including images, text, and content like those below) gave the impression that Reliant offered a general-purpose credit card. Many of Reliant's advertisements did not, or did not adequately, disclose that the credit line was restricted for use only at the Horizon Outlet:



 

20. Consumers who clicked on one of these advertisements were redirected to a Reliant website.

21. Reliant has maintained multiple websites corresponding with its credit-line brand names, including: Boost Platinum Card at www.boostplatinum.com; Focus Gold Card at www.focusgoldcard.com; Freedom Gold Card at www.freedomgoldonline.com; Group One Platinum Card at www.grouponefreedomcard.com; Horizon Gold Card at www.horizongoldcard.com and www.horizoncardservices.com; Independence Gold Card at

www.independencegoldcard.com; Innovation Platinum Card at www.innovativeplatinum.com; Merit Platinum Card at www.meritplatinum.com; and Net First Platinum Card at www.netfirstplatinum.com.

22. These websites linked to identical or substantially similar (1) application and enrollment pages and (2) terms and conditions.

23. Consumers were required to fill out an application online and all enrollment has occurred online.

24. Reliant required consumers to enroll in the Horizon Card Services Membership program to obtain access to one of its branded cards and the credit line.

25. Enrolled consumers received access to shop at the Horizon Outlet as well as to the ancillary products.

26. Reliant typically charged consumers $24.95 a month or $299.40 annually for the membership.

27. The monthly membership fee was auto-debited from the consumer's bank account or charged to an alternate credit card—it could not be paid from the credit made available under the terms of Reliant's credit line.

28. Consumers who enrolled in the membership program were sent a physical credit card within 5 to 14 days of account activation.

29. Upon account activation, cardholders were charged a one-time card-issuance-and-account-validation fee of $5 and automatically enrolled in the Horizon Benefits Plan.

30. Reliant has also charged processing fees as well as a $6.00 monthly maintenance fee that is purportedly waived for all active Horizon Card Services members.

### The Horizon Outlet Line of Credit

31. Through its membership program, Reliant extended consumers an unsecured line of credit of typically $500 or $750 that can potentially be increased once every 3-5 months up to a $3,000 limit.

32. The line of credit could be used only to make purchases from the Horizon Outlet.

33. The Horizon Outlet offered a limited selection of home goods, toys, pet supplies, and clothing.

34. Much of the merchandise offered has been "off brand," or in the case of name-brand merchandise, priced higher than on other websites.

35. Until around late 2016 or early 2017, consumers could not view the Horizon Outlet's available merchandise and pricing until enrolling in the membership program. Although the Horizon Outlet website has since been made public, and consumers have been able to view the available merchandise without a membership, the merchandise continued to be limited and changed daily.

36. Photographs of the Horizon Outlet show that it is little more than a storage room:



37. When a customer purchased merchandise from the Horizon Outlet, Reliant charged a $2 to $3.50 delivery charge, shipping and handling fees, and processing fees (e.g., 5% of the retail price of the items in the order).

38. Customers were required to pay these fees by using a separate debit or credit card account.

### Few Customers Used the Membership Products

39. The membership program's usage rate has been exceedingly low. For example, customer data from 2017 to 2021 shows that 93% of Reliant's customers never used a product—only 6% of customers used the credit line to make a purchase from the Horizon Outlet, and only 1-3% of customers used an ancillary product.

40. The same data also shows that most of Horizon's customers quickly dropped out of the membership. Nearly 50% of its customers dropped out of the program after paying just the enrollment fee, and another 25% of its customers paid no more than the enrollment fee and two monthly payments. Only 15% of its customers remained by the time the fifth monthly payment was due.

41. Consumers routinely complained that they believed that they had signed up for a standard, general-purpose credit card and did not realize that they could only use Reliant's card at the Horizon Outlet.

42. Reliant's data shows that the Horizon Outlet has operated at a loss and most of Reliant's revenues and profits have been generated through membership fees.

## Canceling Enrollment in the Membership

43. Reliant's terms and conditions stated that customers could request a refund within 30 days of billing, but it engaged in practices designed to prevent consumers from cancelling enrollment or obtaining refunds.

44. For example, from at least March 2019 to October 2020, Reliant's "Welcome Package" included an insert instructing dissatisfied customers to call a toll-free number to cancel enrollment and receive a full refund through a process that takes "less than a minute" rather than seeking a bank or credit card chargeback:

### CANCELLATION - REFUND INSTRUCTIONS

Not the right card for you? Not a problem. The process for canceling and getting a full refund is simple and takes less than a minute.

**Call us today at 1-800-822-9316 to cancel and receive an immediate refund!**




**Special Notice Regarding Chargebacks and Fraudulent Transactions**

You do not need to file a Chargeback through your bank or credit card to obtain a refund. As part of our commitment to total customer satisfaction we proudly honor 100% of refund requests for charges within the past 30 days, no questions asked.

In regard to customers initiating a Chargeback by claiming "unauthorized use", "fraud" or "unknown transaction", please know that it is company policy to conduct a comprehensive investigation including the tracking and determination of the IP address used when accessing our websites. With this IP address, the physical location of the device used to communicate with our websites is revealed. Chargebacks with claims of fraud or unknown use that are proven false (as most are) are then added to a database that can and likely will complicate or restrict future attempts to complete online purchases. It is illegal to refute a purchase and initiate a chargeback by making claims that are untrue. Additionally fraud claims, on many occasions, are reported to local cybercrime authorities and Police departments.

Again, our company has a very liberal refund policy. We will happily refund charges made within the last 30 days by simply calling customer service at 1-800-822-9316. If you are calling after hours, you will have the option of leaving a message. By including your full name, account number and address, we will cancel and refund your account. Call customer service today to receive your refund at 1-800-822-9316.

45. Reliant's policies, scripts, and training materials show that the cancellation process was time consuming and obtaining full refunds was difficult.

46. When customers called Reliant to cancel membership enrollment, the process could take 20 to 40 minutes because Reliant required its employees to:

a. read lengthy scripts to customers who request to cancel their cards, reiterating the "benefits" of the membership and offering the membership at a discounted price;

b. make at least three different offers with rebuttals to customers;

c. transfer customers to supervisors before a membership can be canceled;

d. read multiple end-of-call offers for third-party companies, such as debt-relief companies, auto-title companies, and payday lenders; and

e. provide prorated refunds rather than refunds for the full 30 days unless the customer insists multiple times or uses "red flag language" (e.g., consumers threaten to contact their bank or the Better Business Bureau).

### Robert Kane

47. Kane founded Reliant and serves as its highest officer and sole shareholder.

48. Kane has been responsible for determining the direction of Reliant, and he has provided general oversight of Reliant's day-to-day operations.

49. Kane has had the authority to control Reliant's advertising practices and the scripts used by its customer-service employees.

50. Kane has been in charge of hiring employees, has been involved in setting consumer fees, has reviewed consumer complaints, and has received reports about chargebacks and credit-line usage.

51. Kane owns the building that Reliant occupies—Reliant has paid Kane for maintenance of and improvements on the building and has paid monthly rent to Kane.

52. Kane has used company funds to pay for his personal expenses, including club memberships, automobiles, and travel and entertainment expenses.

## COUNT I
### Deceptive Acts or Practices That Violate the CFPA
### (against Reliant and Kane)

53. The allegations in paragraphs 1-52 are incorporated here by reference.

54. Under the CFPA it is unlawful for any covered person to engage in a deceptive act or practice in connection with any transaction with a consumer for or the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

55. Reliant is a "covered person" under the CFPA because it offers a consumer-financial product or service, specifically the extension of credit to consumers. 12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(i).

56. Kane is (1) a director, officer, and controlling shareholder of Reliant and (2) he materially participated in the conduct of the affairs of Reliant, and thus is a "related person" to Reliant. As a related person, Kane is also a "covered person." 12 U.S.C. § 5481(6), (25)(B)-(C)(i), (ii).

57. An act or practice is deceptive when (1) there is or was a representation, (2) the representation is or was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation is or was material.

58. In numerous instances in connection with the extension of credit to consumers Defendants represented to consumers, directly or indirectly, expressly or by implication, that:

   a. Reliant offers and provides a general-purpose credit card to consumers; and

   b. customers could cancel their membership by phone in less than a minute and receive a full refund.

59. These representations were false and misleading because:

    a. instead of providing a general-purpose credit card to consumers, Reliant enrolled consumers in its membership program that required the payment of monthly fees to access a line of credit that could be used only to make purchases from Reliant's Horizon Outlet;

    b. Reliant's process for cancelling membership enrollment took much longer than the minute it promised because when customers called Reliant to cancel, it required its customer-service agents to make at least three different offers with rebuttals, make multiple offers for third-party products and services, and transfer the call to a supervisor before cancelling a membership; and

    c. Reliant typically provided partial or prorated refunds to customers and provided full refunds only to customers who threatened to take additional action against Reliant (e.g., seek a chargeback or file a complaint with their bank or the Better Business Bureau).

60. These representations were likely to mislead consumers acting reasonably under the circumstances because consumers were reasonable to rely on the impression conveyed by Reliant's solicitations that its credit card could be used anywhere that accepts credit cards, and its express claims that cancelling was simple and would take less than a minute.

61. These representations were material because Reliant's solicitations implied that a Reliant card could be used anywhere that accepted credit cards, which was likely to affect consumers' decisions to do business with Reliant, and Reliant's express cancellation and refund claims are presumed material and were also likely to affect consumers' decisions to do business with the Company.

62. Defendants, therefore, engaged in deceptive acts or practices that violated the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

### COUNT II
### Abusive Acts or Practices That Violate the CFPA
### (against Reliant and Kane)

63. The allegations in paragraphs 1-62 are incorporated here by reference.

64. Under the CFPA, it is unlawful for any covered person, in connection with a consumer-financial product or service or the offering thereof, to take unreasonable advantage of the inability of a consumer to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. §§ 5531(a), (d)(2)(B), 5536(a)(1)(B).

65. Reliant is a "covered person" under the CFPA because it offers a consumer-financial product or service, specifically the extension of credit to consumers. 12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(i).

66. Kane is (1) a director, officer, and controlling shareholder of Reliant and (2) he is a person who materially participated in the conduct of the affairs of Reliant, and thus is a "related person" to Reliant and a "covered person." 12 U.S.C. § 5481(6), (25)(B)-(C)(i), (ii).

67. Through various actions, Defendants made it unreasonably difficult for consumers to cancel enrollment in its membership program and to obtain refunds from Reliant.

68. Reliant's cancellation process at times took 20 to 40 minutes on the phone, while consumers were forced to listen to customer service employees go through a series of solicitations for discounts and third-party products.

69. Reliant often would not provide refunds unless consumers threatened to take further action with their bank or the Better Business Bureau.

14

70. Reliant took unreasonable advantage of consumers' inability to free themselves from, or to obtain refunds for fees paid toward unwanted membership enrollment. Reliant financially profited from consumers' inability to protect their interests by cancelling enrollment in or obtaining refunds of payments for unwanted products.

71. Defendants, therefore, engaged in abusive acts or practices that violated the CFPA. 12 U.S.C. §§ 5531(a), (d)(2)(B), 5536(a)(1)(B).

## COUNT III
## Substantially Assisting Violations of the CFPA
### (against Kane)

72. The allegations in paragraphs 1-71 are incorporated here by reference.

73. Under the CFPA it is unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person engaging in deception, unfairness, or abusiveness. 12 U.S.C. §§ 5536(a)(3), 5531.

74. Reliant is a "covered person" under the CFPA and in numerous instances it violated the CFPA by engaging in deceptive and abusive acts and practices. 12 U.S.C. §§ 5481(5)(A), (6)(A), (15)(A)(i), 5531(a), (d)(2)(B), 5536(a)(1)(B).

75. Kane knowingly or recklessly provided substantial assistance to Reliant in connection with its deceptive and abusive acts and practices because he founded Reliant and conceived of its consumer offerings, he participated in its operations, and had authority to control Reliant's business practices, including its advertising and customer-service conduct, and knew or was reckless to Reliant's advertising and customer-service conduct.

76. Therefore, Kane substantially assisted Reliant's deceptive and abusive acts or practices in violation of the CFPA. 12 U.S.C. § 5536(a)(3).

## COUNT IV
## Violations of TILA and Regulation Z
## (against Reliant)

77.	The allegations in paragraphs 1-76 are incorporated here by reference.

78.	The Truth in Lending Act, 15 U.S.C § 1601 et seq., sets standards applicable to the initial issuance of subprime or "fee harvester" cards, by placing limitations on the amount of fees that can be charged to consumers in the first year during which a credit card account under an open-end consumer credit plan is opened. 15 U.S.C § 1637(n). Regulation Z was promulgated to implement TILA. 12 C.F.R. § 1026.1.

79.	Reliant has extended credit to consumers, specifically a credit card and credit card account under an open-end (not home-secured) consumer credit plan that envisioned repeated transactions and credit replenishment after payment of outstanding balances. 12 C.F.R. § 1026.2(a)(12), (14), (15)(i)&(ii), (20).

80.	Reliant is a creditor because it has regularly (more than 25 times per year) extended consumer credit, consumer's obligations under the credit extended have been payable to Reliant, and the credit has been subject to a finance charge, namely the numerous fees charged by Reliant, including a card-issuance-and-account-validation fee, processing fees, and a monthly maintenance fee. 12 C.F.R. §§ 1026.2(17)(i) & (v), 1026.4(a).

81.	Reliant is a card issuer because it has issued a credit card. 12 C.F.R. § 1026.2(a)(7).

82.	Regulation Z restricts the amount of credit-card fees that can be charged to consumers as follows:

> the total amount of fees a consumer is required to pay with respect to a credit card account under an open-end (not home-secured) consumer credit plan during the

16

first year after account opening must not exceed 25 percent of the credit limit in effect when the account is opened.

12 C.F.R. § 1026.52(a)(1).

83.     From January 2015 until January 2021, Reliant charged customers newly enrolled in a credit card account at least $299.40 a year while its introductory credit line associated with the credit card was $500.

84.     Thus, the fees charged to consumers with a new credit card account totaled approximately 60% of the credit line during the first year after a customer's account was opened.

85.     By requiring consumers to pay fees more than 25% of the credit limit during the first year after account opening, Reliant violated TILA and Regulation Z. 15 U.S.C § 1637(n); 12 C.F.R. § 1026.52(a)(1).

## COUNT V
## TILA Violations Constitute Violations of the CFPA
### (against Reliant)

86.     The allegations in paragraphs 1-85 are incorporated here by reference.

87.     Under the CFPA, it is unlawful for any covered person or service provider to commit any act or omission that violates a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

88.     Reliant is a covered person under, and therefore subject to, the CFPA. 12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(i).

89.     The CFPA defines "Federal consumer financial law" as, in relevant part, the statute's "enumerated consumer laws" and "any rule or order prescribed by the Bureau under . . . an enumerated consumer law." 12 U.S.C. § 5481(14).

90. The CFPA sets forth a list of "enumerated consumer laws," which includes TILA. And as TILA's implementing regulation, Regulation Z is a rule prescribed under an enumerated consumer law. 12 U.S.C. § 5481(12)(O), (14).

91. Therefore, a violation of TILA or Regulation Z by a covered person is also a violation of the CFPA.

92. Because Reliant is a covered person and committed an act or omission that violated TILA and Regulation Z, those violations also constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## DEMAND FOR RELIEF

As permitted by 12 U.S.C. § 5565, the Bureau requests that the Court:

a. impose appropriate injunctive relief against Defendants for their violations of the CFPA, TILA, and Regulation Z;

b. grant additional injunctive relief as the Court deems just and proper;

c. award monetary relief against Defendants, including the refund of monies paid, restitution, disgorgement of ill-gotten gains, or compensation for unjust enrichment;

d. impose civil money penalties against Defendants; and

e. award the costs of bringing this action, as well as such other and additional relief as the Court determines to be just and proper.

Respectfully submitted,
Attorneys for Plaintiff
Consumer Financial Protection Bureau

ERIC HALPERIN
Enforcement Director

ALUSHEYI J. WHEELER
Deputy Enforcement Director

JADE A. BURNS
Assistant Litigation Deputy

   */s/ Mark Ladov*
Mark Ladov
E-mail: mark.ladov@cfpb.gov
Phone: 212-328-7026

Kristina D. Betts
E-mail: kristina.betts@cfpb.gov
Phone: 312-610-8962

Colleen Fewer
E-mail: colleen.fewer@cfpb.gov
Phone: 202-435-5291

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7722