## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA
### (Pittsburgh Division)

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                       Plaintiff,<br><br>    vs.<br><br>RELIANT HOLDINGS, INC., and ROBERT KANE,<br><br>                   Defendants. | Civil Action No. 2:24-cv-01301<br><br>The Honorable Robert J. Colville |

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR MORE DEFINITIVE STATEMENT

Defendants, by their undersigned counsel, hereby submit this Brief in Support of their Joint

Motion to Dismiss or, Alternatively, Motion for More Definitive Statement (ECF _).

Respectfully submitted,

Dated: December 27, 2024

*/s/ Ronald L. Hicks, Jr.*

Ronald L. Hicks, Jr., Esq. (PA #49520)
ronald.hicks@nelsonmullins.com
Thomas S. Jones, Esq. (PA #71636)
thomas.jones@nelsonmullins.com
Benjamin J. Sitter, Esq. (PA #317382)
ben.sitter@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
One PPG Place, Suite 3200
Pittsburgh, Pennsylvania 15222
Tel:    412-730-4050

*Counsel for Defendants*

## TABLE OF CONTENTS

I.     Introduction ................................................................................................... 1

II.     Factual Background ........................................................................................ 4

    A.     The Parties. ............................................................................................ 4

    B.     Reliant's Business And Its Membership Program For Those Seeking To
    Rebuild Their Credit. ............................................................................. 4

    C.     The CFPB's Claims Against Reliant. .................................................... 8

    D.     The CFPB's Claims Against Mr. Kane .................................................. 10

    E.     The CFPB's Funding Status. ................................................................. 11

III.     Applicable Legal Standards ........................................................................... 11

IV.     Argument ........................................................................................................ 15

    A.     The CFPB Fails To State A Claim Against Reliant For CFPA Deceptive
    Practices (Count I). ................................................................................ 15

        1.     The CFPB does not plausibly allege Reliant represented to
        consumers that the Reliant Card was a "general-purpose" credit
        card............................................................................................... 15

        2.     The CFPB has not plausibly alleged Reliant made false or material
        representations regarding its cancellation process before the
        consumers purchased a Membership. ........................................ 20

    B.     The "Abusive" Practices Claim (Count II) Fails Because The CFPB Has
    Not Plausibly Alleged That Reliant's Cancellation Process Took
    "Unreasonable Advantage" Of A Consumer's "Inability" To Protect Their
    Interests. ................................................................................................. 22

        1.     The CFPB has not plausibly alleged Reliant's cancellation process
        is "abusive." ............................................................................... 23

        2.     The CFPB does not plausibly allege Reliant's refund program is
        "abusive." ................................................................................... 24

    C.     The CFPB's Deceptive And Abusive Practices Claims Against Mr. Kane
    Fail As A Matter Of Law. ...................................................................... 25

    D.     The CFPB Has Not Sufficiently Alleged That Mr. Kane "Substantially
    Assisted" Violations Of The CFPA To Support Count III. .................... 27

        1.     Its substantial assistance claim must be dismissed because the
        CFPB has not adequately alleged an underlying violation of the
        CFPA........................................................................................... 28

        2.     The CFPB has not pled the requisite scienter for its substantial
        assistance claim............................................................................ 28

      3.      The CFPB has not pled "substantial assistance." ...................................... 29

E.      The CFPB's TILA Claims Fail Because TILA and Reg. Z Do Not Apply To The Reliant Card As A Matter Of Law. ........................................................ 30

F.      The CFPB's Claims Are Barred By The Applicable Statutes Of Limitations. ....................................................................................................... 33

      1.      The CFPB has failed to bring its deceptive and abusive practices and substantial assistance claims against Defendants in a timely manner. ................................................................................................ 33

      2.      The CFPB's TILA claims under Counts IV and V of the Complaint are subject to a 1-year statute of limitations and are untimely. ................ 35

G.      This Court Lacks Federal Question Jurisdiction. ...................................... 36

      1.      The CFPB's current funding method violates both the Appropriations Clause and the Dodd-Frank Act. .................................... 36

      2.      The CFPB's Lacks Any Statutory Authority To Declare Cancellation And Refund Call Times A UDAAP. .................................. 38

H.      Alternatively, The CFPB Should File A More Definitive Statement. ................. 39

V.      Conclusion ....................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 13, 21

*Bergeron v. Select Comfort Corp.*,
2016 WL 155088 (W.D. Tex. Jan. 11, 2016) ...................................................................... 33

*Boyer v. LeHigh Valley Hosp. Ctr., Inc.*,
1990 WL 94038 (E.D. Pa. Jul. 2, 1990) .............................................................................. 39

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ................................................................................................ 6

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) ............................................................................................... 38

*CFPB v. Commonwealth Equity Grp., LLC*,
554 F. Supp. 3d 202 (D. Mass. 2021) ............................................................................ 14, 28

*CFPB. v. Consumer Advoc. Ctr. Inc.*,
2023 WL 5162392 (C.D. Cal. July 7, 2023) ................................................................. 29, 30

*CFPB v. Daniel A. Rosen, Inc.*,
2022 WL 1514439 (C.D. Cal. Apr. 5, 2022) ...................................................................... 29

*CFPB v. Frederick J. Hanna & Assoc., P.C.*,
114 F. Supp. 3d 134 (N.D. Ga. 2015) ................................................................................. 15

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ............................................................................................ 16

*CFPB v. Intercept Corp.*,
2017 WL 3774379 (D.N.D. Mar. 17, 2017) ................................................................. 24, 25

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) ................................................................................. 36

*CFPB v. Nationwide Biweekly Admin., Inc.*,
2017 WL 3948396 (N.D. Cal. Sept. 8, 2017), *vacated and remanded on
other grounds* 2023 WL 566112 (9th Cir. Jan. 27, 2023) .................................................. 17

*CFPB v. NDG Fin. Corp.*,
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ...................................................................... 34

*CFPB v. Prime Mrktg. Holdings, LLC*,
    2016 WL 10516097 (C.D. Cal. Nov. 15, 2016)..................................................................13

*CFPB v. Univ. Debt & Payment Sols., LLC*,
    2019 WL 1295004 (N.D. Ga. Mar. 21, 2019)....................................................................28

*Chamber of Commerce of US of Am. v. CFPB*,
    691 F. Supp. 3d 730 (E.D. Tex. 2023)...............................................................................38

*Chester-Cambridge Bank & Trust Co. v. Rhodes*,
    31 A.2d 128 (Pa. 1943).....................................................................................................26

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021).......................................................................................................38

*Disabled in Action of Pa. v. S.E. Pa. Transp. Auth.*,
    539 F.3d 199 (3d Cir. 2008)..............................................................................................33

*Dolan v. PHL Variable Ins. Co.*,
    2016 WL 6879622 (M.D. Pa. Nov. 22, 2016)....................................................................14

*Eagle Props., Ltd. v. KPMG Peat Marwick*,
    912 S.W.2d 825 (Tex. App. 1995).....................................................................................22

*Feldman v. Google, Inc.*,
    513 F. Supp. 2d 229 (E.D. Pa. 2007).................................................................................19

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009)..............................................................................................13

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007)..............................................................................................14

*FTC v. NHS Sys., Inc.*,
    936 F. Supp. 2d 520 (E.D. Pa. 2013).................................................................................22

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)...............................................................................19

*G.L. v. Ligonier Valley School Dist. Auth.*,
    802 F.3d 601 (3d Cir. 2015)..............................................................................................34

*Georges v. Bank of Amer., N.A.*,
    845 Fed. Appx. 490 (9th Cir. 2021)...................................................................................30

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    730 F.3d 494 (6th Cir. 2013).............................................................................................18

*Hartig Drug Co. v. Senju Pharmaceutical Co. Ltd.*,
    836 F.3d 261 (3d Cir. 2016)......................................................................................13, 14

*Kirkham v. TaxAct, Inc.*,
    2024 WL 1143481 (E.D. Pa. Mar. 15, 2024) ................................................................19

*Korinko v. Come Ready Nutrition, LLC*,
    2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) ...............................................................13

*Lapcevic v. Strive Enter., Inc.*,
    2010 WL 1816752 (W.D. Pa. Apr. 8, 2010) ..................................................................15

*Longenecker v. Commonwealth*,
    596 A.2d 1261 (Pa. Commw. Ct. 1991) ..................................................................26, 27

*Loper Bright Enter. v. Raimondo*,
    144 S. Ct. 2244 (2024)...................................................................................................23

*Merck & Co., Inc. v. Reynolds*,
    559 U.S. 633 (2010)........................................................................................................34

*Miller v. Indiana Hosp.*,
    562 F. Supp. 1259 (W.D. Pa. 1983) ...............................................................................39

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016) ...........................................................................................36

*Schmidt v. Ford Motor Co.*,
    972 F. Supp. 2d 712 (E.D. Pa. 2013) ............................................................................14

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014)...........................................................................................33

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020).........................................................................................4, 11, 36

*Shay v. Flight C Helicopter Services, Inc.*,
    822 A.2d 1 (Pa. Super. Ct. 2003)....................................................................................26

*Silo Restaurant Inc. v. Allied Prop. & Cas. Ins. Co.*,
    420 F. Supp. 3d 562 (W.D. Tex. 2019)...........................................................................33

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ......................................................................................37

*West Virginia v. Envir. Prot. Agency*,
    597 U.S. 697 (2022)........................................................................................................39

*Wicks v. Milzoco Builders, Inc.*,
    470 A.2d 86 (Pa. 1983) ........................................................................................26

*Wiggins v. Lab'y Corp. of Am. Holdings*,
    2024 WL 4476646 (E.D. Pa. Oct. 11, 2024).......................................................20

*Zubik v. Zubik*,
    384 F.2d 267 (3d Cir. 1967).........................................................................26, 27

**Rules**

Fed.R.Civ.P. 8(a) ...................................................................................................14

Fed.R.Civ.P. 9(b) .......................................................................................13, 14, 28

Fed.R.Civ.P. 10(b) .................................................................................................39

Fed.R.Civ.P. 12(b)(1)........................................................................................14, 15

Fed.R.Civ.P. 12(b)(6)..................................................................................... *passim*

Fed.R.Civ.P. 12(e) ...........................................................................................15, 39

**Statutes**

12 U.S.C. § 289 ................................................................................................11, 37

12 U.S.C. § 5497 ..............................................................................................11, 37

12 U.S.C. § 5531 ...........................................................................4, 8, 9, 23, 27

12 U.S.C. § 5536 ...............................................................................4, 8, 9, 27

12 U.S.C. § 5564 ..............................................................................................33, 36

15 U.S.C. § 1601 ......................................................................................................2

15 U.S.C. § 1602 ..............................................................................................3, 31

15 U.S.C. § 1640 ..............................................................................................35, 36

U.S. Const. Art. I, § 9, cl. 7..................................................................................36

**Other Authorities**

12 C.F.R. 1026.1 ......................................................................................................2

12 C.F.R. 1026.4 ....................................................................................................32

12 C.F.R. § 1026.2 ..........................................................................................................3, 31

12 C.F.R. § 1026.52 ........................................................................................................9, 31

## I.    <u>INTRODUCTION</u>

As the self-described government agency "charged with enforcing 'Federal consumer financial law,'" the Consumer Financial Protection Bureau ("CFPB"), as the sole plaintiff, has launched this action against Defendants Reliant Holdings, Inc. ("Reliant"), and its sole shareholder, Robert Kane ("Mr. Kane"), contending they engaged in misleading and deceptive practices covering a decade and a half of public conduct. However, something is not false or misleading simply because a party willfully blinds itself to public and known, or easily knowable, facts. Nor can a federal agency torture a statute into a cause of action by the application of an *ipse dixit*-infused interpretation. Indeed, as Ranking Member United States Senator Tim Scott (R.S.C.) has recognized, "the CFPB has operated in blind pursuit of additional power and has become the hallmark of government overreach – to the point where … the [CFPB] is doing more harm to consumers than good."[1] This matter presents a stark example of Senator Scott's observations.

This action must be dismissed because the CFPB has not plausibly alleged facts that support any of its claims against each of the Defendants of ongoing or imminent conduct, and, troublingly, because the CFPB intentionally omits key facts—of which it is and was aware—that completely exculpate them from the sweeping injunctive relief, unspecified consumer monetary remedies, and unquantified civil money penalties the CFPB seeks. Also, it is bad enough that the CFPB has sued Reliant based on nothing more than conclusory allegations barely tethered to any concrete facts. But to sue Mr. Kane, in his individual capacity, based on little more than the fact

---

[1] *See* T. Scott: "*The CFPB's actions don't match up with its mandate*, " United States Committee on Banking, Housing, and Urban Affairs (Nov. 30, 2023) ("Senator Scott's 11/30/23 Statement"), available at *https://www.banking.senate.gov/newsroom/minority/scott-the-cfpbs-actions-dont-match-up-with-its-mandate* (last visited Dec. 20, 2024), and attached as Exhibit 1 to the Declaration of Ronald L. Hicks, Jr. ("Hicks Decl.") (ECF # 27-1) filed contemporaneously herewith and referred to and incorporated herein by reference.

that he owns Reliant is an untenable overreach. Indeed, the CFPB seeks to hold Mr. Kane, a known corporate officer, personally liable based on nothing more than cookie-cutter legal conclusions.

Contrary to the Complaint's unadorned conclusory statements, it is undisputed that Reliant clearly disclosed to consumers that they were not applying for a general-purpose credit card but instead were enrolling in a merchandise shopping club with an introductory $500 credit line that could be used exclusively at Reliant's online store. Moreover, by clicking an acknowledgement box, consumers affirmatively indicated their understanding of what they were receiving before any of them were enrolled, such that those who became members did so willingly and knowingly.

Further, the CFPB's Complaint alleges no false or misleading statement that each of the Defendants made *before* the consumers agreed to purchase a membership regarding Reliant's cancellation process. Instead, all the CFPB claims is that, at unspecified times in the last 14 years, some unidentified consumers took between 20-to-40 minutes to cancel their membership when, between March 2019 and October 2020, Reliant represented in a Welcome Package insert sent *after* the consumers purchased their membership that Reliant's cancellation and refund process "is simple and takes less than a minute."

The conclusory allegations in the CFPB's Complaint ignore the reality of how Reliant's online offer was presented to and perceived by reasonable consumers and are not entitled to any favorable inferences. Absent such inferences, the CFPB's claims of deceptive and abusive practices and of substantial assistance to commit such practices under Counts I through III of the Complaint fail to state claims upon which relief can be granted and must be dismissed.

Furthermore, the CFPB's claims under Counts IV and V for alleged violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*. ("TILA"), and its implementing regulation, Regulation Z, 12.C.F.R. § 1026.1 ("Reg. Z"), fail as a matter of law. TILA and Reg. Z apply only to an "open

end credit plan" which, by definition, provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. 15 U.S.C. § 1602(j); 12 C.F.R. § 1026.2(15)(ii). Imposition of a membership fee is not a finance charge. Consequently, Counts IV and V of the CFPB's Complaint fail to state legally-viable claims for relief.

Additionally, the CFBP does not allege any conduct by Defendants that has occurred within the requisite three- or one-year period before it filed its Complaint, while the allegations in the Complaint establish the CFPB had actual or constructive notice of its claims well before then. As such, the CFPB's claims are untimely and not supported by the express language of the statutes the CFPB seeks to enforce.

Finally, the CFPB is a federal agency of limited jurisdiction with statutory enforcement authority over only certain causes of action under certain statutes. And there is no indication that Congress delegated to the CFPB unfettered discretion to declare any practice—including the amount of time it takes or how to process a refund or cancel a membership—a CFPA violation and thereby impose potentially crippling, and in the case of Mr. Kane, financially ruinous, penalties for engaging in that otherwise commercially acceptable business practice. Further, as the United States Supreme Court recently ruled, the CFPB's funding mechanism is constitutional only so long as the Federal Reserve System ("Federal Reserve") recognizes a surplus to fund the CFPB which, since 2022, the Federal Reserve has not done. As such, the CFPB lacks constitutional and statutory standing to sue, thereby depriving this Court of federal question jurisdiction.

The CFPB has completely overstepped its bounds in this litigation. This Court should stop this action from proceeding by dismissing with prejudice the CFPB's Complaint in its entirety. Alternatively, the CFPB's Complaint requires more specificity if any of its claims are allowed to proceed.

## II.    FACTUAL BACKGROUND[2]

### A.    *The Parties.*

Congress created the CFPB in July 2010 when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5301-5641 ("Dodd-Frank Act"). *See* CFPB, *Building the CFPB*, available at *https://www.consumerfinance.gov/data-research/research-reports/building-the-cfpb/* (last visited Dec. 20, 2024).[3] The CFPB is a federal "independent" agency and is responsible for overseeing nineteen consumer protection statutes, eighteen of which, including TILA, other agencies previously administered. Compl., ¶ 9; *Seila Law LLC v. CFPB*, 591 U.S. 197, 207 (2020). The final consumer protection statute the CFPB administers is the Consumer Financial Protection Act ("CFPA"), which authorizes the CFPB to bring enforcement actions for "unfair, deceptive, or abusive act[s] or practice[s]" subject to constitutional and statutory constraints. 12 U.S.C. §§ 5531(a), (c) & (d), 5536(a)(1)(B).

Based in Indiana, Pennsylvania, Reliant is a Pennsylvania corporation which transacts business nationwide. Compl., ¶ 10. Reliant's sole shareholder and CEO is Mr. Kane. *Id.*, ¶¶ 11-12.

### B.    *Reliant's Business And Its Membership Program For Those Seeking To Rebuild Their Credit.*

In 2007, two years after Mr. Kane formed Reliant, it began offering to consumers an online membership called the "Horizon Card Services Membership" (the "Membership"). Compl., ¶¶ 12-13. The Membership offers numerous benefits, including: (1) a line of credit (the "Reliant Card") to purchase products at Reliant's online store, the Horizon Outlet; (2) a privacy protection/credit

---

[2] Except where otherwise indicated, the following recitation is drawn from the Complaint's allegations. As is required on a Rule 12(b)(6) motion, Reliant accepts well-pled facts as true for purposes of this motion only (as it must) but disputes the veracity of the CFPB's claims.

[3] *See* Hicks Decl., Ex. 2 (ECF # 27-2).

monitoring service; (3) a prescription-discount program; (4) a roadside assistance service; and (5) a 30-minute free consultation with a legal professional. *Id.*, ¶¶ 13, 14, 16.

Through an online application and enrollment process, consumers can apply for the Membership and obtain the Reliant Card and its minimum $500 credit limit with no credit check. *Id.*, ¶¶ 19, 23–26. Once enrolled, consumers are charged a monthly membership fee[4] and are able to make purchases with their credit line at the Horizon Outlet, which provides a rotating selection of home goods, toys, pet supplies, and clothing. *Id.*, ¶¶ 19, 27, 33.

Reliant makes potentially interested consumers aware of its Membership through advertising affiliates and affiliate networks that use websites, emails, push notifications, and text messages to reach potential consumers. *Id.*, ¶ 17. Also, Reliant's advertisements are placed on websites where consumers can shop for and compare credit products (such as credit.com, finder.com, and creditkarma.com), and are sent to consumers via email marketing. *Id.*, ¶ 18.

In its advertisements, Reliant has never represented to consumers that the Reliant Card is a "general-purpose" credit card, and the Complaint does not make this allegation. *Id.*, ¶ 19. Nor do its advertisements include the typical trappings of credit card advertisements such as the "Visa" or "Mastercard" logo, any reference to worldwide acceptance, an APR, or a rewards program. *Id.* Instead, since 2010, Reliant's advertisements have represented that, with no credit or employment check, consumers can get a "$500 unsecured credit limit" which would be reported to a "major bureau" and help establish or re-establish the consumer's credit. *Id.*

Reliant's advertisements include a hyperlink for consumers to access the Membership application. *Id.*, ¶ 19. Consumers cannot access the credit line or Membership without completing

---

[4] Throughout the Membership's existence, the membership fee has varied. Between January 2015 and January 2021, the monthly membership fee was $24.95. Compl., ¶83.

an online application, and clicking on Reliant's advertisements brings consumers to a landing page with the online application and enrollment pages and the Membership's terms and conditions disclosure. *Id.*, ¶¶ 20-23. As part of the enrollment process, every single Reliant customer is presented with the following substantially similar prominent disclosure and must (as an express condition of enrollment) click a box confirming they understand that the Reliant Card can only be used at the Horizon Store Outlet:[5]



*See* Declaration of Richard McDonald ("McDonald Decl.") (ECF # 28), ¶¶ 7-14, filed contemporaneously herewith and referred to and incorporated herein by reference.

---

[5] Despite the Complaint's references to and reliance on Reliant's websites, their online application and enrollment pages, and the Membership's terms and conditions, the CFPB omits from its pleading both these documents and the disclosures they make to consumers before their decision to purchase a Membership. Compl., ¶¶ 21-23. However, this Court may consider these documents under the incorporation by reference or completion doctrine. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Also, as part of its consideration of this Motion, this Court may take judicial notice of the contents of Reliant's websites and its disclosures and of court opinions, government documents, and similar matters of public record for the reasons stated in Defendants' Request to Take Judicial Notice (ECF # 29) which has been filed contemporaneously herewith and referred to and incorporated herein by reference.

As can be seen in the above image, to activate an application, a consumer must first input their contact information and zip code. McDonald Decl., ¶ 15. Then, before a consumer can "Continue Activation," he or she is required to click a box next to a disclosure that reads: "By checking this box, I understand the Horizon Gold Merchandise Card credit line may only be used online at thehorizonoutlet.com." *Id.*, ¶ 16. A contrasting orange hyperlink to the Horizon Outlet is located right next to the box the user is required to check. *Id.*, ¶ 18. Also, in that box, the Membership's "terms and conditions" are hyperlinked and, when clicked, reiterate that the Horizon Gold Merchandise Card credit line can only be used online at thehorizonoutlet.com and is not a general-purpose credit card. *Id.*, ¶21. Importantly, a consumer cannot proceed with their application without affirmatively checking the box in this disclosure. *Id.*, ¶19. All of Reliant's customers are presented with "identical or substantially similar" disclosures as part of the application process. Compl., ¶ 22; McDonald Decl., ¶¶12, 14, 23, & 26. Thus, as part of the enrollment process, each Reliant consumer is advised and understands that that the Reliant Card is not a general-purpose credit card and is advised and affirmatively acknowledges that the Reliant Card "may only be used online at thehorizonoutlet.com." McDonald Decl., ¶¶ 20 & 30.

To cancel one's Membership, Reliant's terms and conditions state that customers can request a refund within thirty days of billing by calling Membership Services. Compl., ¶ 43; McDonald Decl., ¶31. Nothing in Reliant's terms and conditions includes a promise for how long the cancellation process will take. McDonald Decl., ¶32. However, the CFPB alleges that, between March 2019 and October 2020, Reliant included an insert in its "Welcome Package" that was sent *after* consumers had enrolled in the Membership stating that dissatisfied customers could call a toll-free number to cancel enrollment and receive a full refund in a process that takes "less than a minute." Compl., ¶44. According to the CFPB, the process "could take 20 to 40 minutes" because

based on its policies, scripts, and training materials, Reliant required its employees to advise already enrolled customers of the Membership's benefits and to offer them discounts, third-party offers, and other rebuttals to convince them to retain their Membership. *Id.*, ¶¶ 45-46.

    **C.**    ***The CFPB's Claims Against Reliant.***

Premised solely on federal question jurisdiction, the CFPB has sued Defendants under five counts. Compl., ¶¶ 7, 53-92. Four of those counts are asserted against Reliant. *Id.*, ¶¶ 53-62 (Count I), ¶¶ 63-71 (Count II), ¶¶ 77-85 (Count IV), & ¶¶ 86-92 (Count V).

In Count I of its Complaint, the CPFB alleges Reliant has engaged in "deceptive acts or practices" in violation of CFPA Sections 5531(a) and 5536(a)(1)(B), 12 U.S.C. §§ 5531(a) & 5536(a)(1)(B). Compl., ¶ 54. Specifically, the CFPB claims that Reliant misled consumers to believe that: (1) Reliant offered a "general-purpose" credit card; and (2) customers could cancel their membership by phone in less than a minute and receive a full refund. *Id.*, ¶ 58.

As the primary basis for its allegations of deception regarding Reliant's credit product, the Complaint cites several alleged advertisements, freely available online from public websites, as examples of marketing practices the CFPB contends Reliant has engaged in since 2010. *Id.*, ¶¶ 19-23. The CFPB does not allege any specific misrepresentation made by Reliant concerning the nature of the Membership or the Reliant Card; instead, the CFPB asserts that because Reliant's advertisements were placed on websites where consumers could shop for and compare credit products or were sent to consumers via mass email marketing, Reliant purportedly "gave the impression that Reliant offered a general purpose credit card[.]" *Id.*, ¶¶ 18-19, 59(a).

As for its cancellation policy deception claim, the CFPB relies solely upon the March 2019/October 2020 "Welcome Package" insert. *Id.*, ¶¶ 44, 58(b). According to the CFPB, the statements in that insert were false and misleading because "Reliant's process for cancelling membership enrollment took much longer than the minute it promised" due to Reliant's customer-

service agents making offers to try to retain the consumers or sell third-party products and services. *Id.*, ¶ 59(b).

In Count II of its Complaint, the CFPB asserts that Reliant has engaged in "abusive acts or practices" in violation of CFPA Section 5531(a) and (d)(2)(B), and CFPA Section 5536(a)(1)(B), 12 U.S.C. §§ 5531(a), (d)(2)(B), & 5536(a)(1)(B). *Id.*, ¶ 64. Here, the CFPB asserts that although Reliant's terms stated that customers could request a refund within thirty days of billing, Reliant "made it unreasonably difficult for consumers to cancel enrollment in its membership program and to obtain refunds from Reliant." *Id.*, ¶ 67. Specifically, the CFPB asserts that Reliant's cancellation process "at times took 20-to-40 minutes on the phone, while consumers were forced to listen to customer service employees go through a series of solicitations for discounts and third-party products," and that "Reliant often would not provide refunds unless consumers threatened to take further action with their bank or the Better Business Bureau." *Id.*, ¶¶ 68-69.

In Counts IV and V of the Complaint, the CFPB alleges Reliant violated TILA, asserting that the Reliant Card membership fees constitute a finance charge in violation of Reg. Z (Count IV), and that this alleged TILA violation also supports a separate claim of an alleged CFPA violation (Count V). *Id.*, ¶¶ 77-92. Specifically, the CFPB asserts that Reg. Z restricts consumer credit-card fees to no more than "25 percent of the credit limit in effect when the account is opened," 12 C.F.R. § 1026.52(a)(1), and that Reliant's membership fee of $299.40 a year represents a fee of approximately 60% of the introductory $500 credit line in purported violation of that TILA restriction. *Id.*, ¶¶ 82-85.

The CFPB does not allege any conduct by Reliant that occurred later than January 2021. *Id.*, ¶¶ 12, 19, 35, 39, 44 & 83. Moreover, the CFPB acknowledges that its TILA claims against Reliant occurred from January 2015 through January 2021. *Id.*, ¶ 83.

-9-

### D.    *The CFPB's Claims Against Mr. Kane.*

The CFPB brings three claims against Mr. Kane: (1) deceptive acts or practices in violation of the CFPA (Count I); (2) abusive acts or practices in violation of the CFPA (Count II); and (3) "substantial assistance" of violations of the CFPA (Count III). *Id*, ¶¶ 53–76. The CFPB does not assert any claims against Mr. Kane related to its TILA claims against Reliant. *Id*, ¶¶ 77-92.

Like its deceptive and abusive practices claims against Reliant, the CFPB does not allege any specific conduct by Mr. Kane that occurred later than January 2021. *Id.*, ¶¶ 12, 19, 35, 39, & 44. Moreover, the CFPB does not allege he personally committed any of the deceptive or abusive practices. Instead, the CFPB asserts Mr. Kane is "a director, officer, and controlling shareholder of Reliant" and that "he managed, directed, controlled or had authority to control, had managerial responsibility for, and materially participated in Reliant's conduct" and affairs. *Id.*, ¶¶ 11, 56 & 66. The CFPB also asserts Mr. Kane "founded Reliant and serves as its highest officer and sole shareholder" and that he "has been responsible for determining the direction of Reliant" and has provided "general oversight of Reliant's day-to-day operations." *Id.*, ¶¶ 11, 47-48. However, the Complaint does not allege what Mr. Kane's actual authority, managerial responsibility, or general oversight entails. *Id.*, ¶¶ 11, 47-48, 56, & 66.

And while its Complaint asserts that Mr. Kane "had the authority to control Reliant's advertising practices and the scripts used by its customer-service employees" and "knowingly or recklessly provided substantial assistance to Reliant in connection with its deceptive and abusive practices," the CFPB does not aver how he actually did so. *Id.,* ¶¶ 49 & 75. Also, the CFPB asserts that Mr. Kane "has been in charge of hiring employees, has been involved in setting consumer fees, has reviewed consumer complaints, and has received reports about chargebacks and credit-line usage." *Id.,* ¶ 50. But its Complaint offers no details as to how or in what manner Mr. Kane oversaw or was involved in setting consumer fees; what consumer fees Mr. Kane allegedly

oversaw or was involved with; when or how often Mr. Kane reviewed or received consumer complaints or reports about chargebacks and credit-line usage; or what those complaints or reports said. Instead, the CFPB asserts only that Mr. Kane owns the building that Reliant occupies and he receives rent and other expense reimbursements from Reliant. *Id.,* ¶¶ 51-52.

E.    ***The CFPB's Funding Status.***

"Unlike most other agencies, the CFPB does not rely on the annual appropriations process for funding" but rather "receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Seila Law*, 591 U.S. at 207. Specifically, the CFPB each year may requisition from the earnings of the Federal Reserve System "the amount determined by the [CFPB's] Director to be reasonably necessary to carry out" its duties, subject only to a statutory cap of 12% of the Federal Reserve's total operating expenses (inflation adjusted). 12 U.S.C. § 5497(a)(1), (2)(A)(iii), & 2(B). Then, "[e]ach year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, [the Federal Reserve] shall transfer to the [CFPB] from the combined *earnings* of the Federal Reserve System, the amount … reasonably necessary to carry out the authorities of the [CFPB] … ." 12 U.S.C. § 5497(a)(1) (emphasis added). Absent the transfer to the CFPB, the Federal Reserve would otherwise remit earnings, *i.e.,* its excess funds, to the Treasury. 12 U.S.C. § 289(a)(3)(B).

In 2022, the Federal Reserve's expenses exceeded its income, resulting in a loss of earnings and the suspension of remittances to the Treasury.[6] Moreover, the Federal Reserve's lack of earnings

---

[6] *See Federal Reserve Board Releases Annual Audited Financial Statements* (March 24, 2023), available at *https://www.federalreserve.gov/newsevents/pressreleases/other20230324a.htm* (last visited Dec. 20, 2024), and attached as Hicks Decl., Ex. 3 (ECF # 27-3) (reporting that in the fall of 2022, the Reserve Banks "first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").

and the corresponding accumulation of the deferred asset has continued in 2023 and 2024, which saw the deferred asset increase to $200.3 billion as of September 30, 2024.[7] "The deferred asset represents the amount of net excess earnings the Reserve Banks will need to realize in the future before remittances to the Treasury resume." 9/30/2024 Federal Reserve's Unaudited Financial Statements, p. 25, Note (F). The prediction is that remittances to the Treasury will not resume until mid-2027.[8]

Despite the Federal Reserve's lack of earnings, the CFPB has continued to receive transfers from the Federal Reserve.[9] As such, the CFPB's operations are being funded from the Federal Reserve's deficit, not its combined earnings.

---

[7] *See Federal Reserve Board Releases Annual Audited Financial Statements* (March 26, 2024), available at *https://www.federalreserve.gov/newsevents/pressreleases/other20240326a.htm* (last visited Dec. 20, 2024), and attached as Hicks Decl., Ex. 4 (ECF # 27-4) (reporting the Federal Reserve's total expenses in 2023 exceeded earnings by $114.3 billion, resulting in a cumulative deferred asset of $133.3 billion); Federal Reserve, *Federal Reserve Banks Combined Quarterly Financial Report (Unaudited)* (Sept. 30, 2024) ("9/30/2024 Federal Reserve's Unaudited Financial Statements"), available at *https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20241122.pdf* (last visited Dec. 20, 2024), and attached as Hicks Decl., Ex. 5 (ECF # 27-5), p. 2 (reflecting the cumulative deferred asset in 2024 to be $200,346,000)

[8] *See* Federal Reserve Bank of St. Louis, *The Fed's Remittances to the Treasury: Explaining the 'Deferred Asset'* (Nov. 21, 2023), available at *https://www.stlouisfed.org/on-the-economy/2023/nov/fed-remittances-treasury-explaining-deferred-asset* (last visited Dec. 20, 2024), and attached as Hicks Decl., Ex. 6 (ECF # 27-6).

[9] *See, e.g.,* Federal Reserve, *Federal Reserve Board Announces Preliminary Financial Information For The Federal Reserve Banks' Income And Expenses In 2023* (Jan. 12, 2024), available at *https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm* (last visited Dec. 20, 2024), and attached as Hicks Decl., Ex. 7 (ECF # 27-7) (reporting that in 2023 the Reserve Banks were assessed "$0.7 billion to fund the operations of the [CFPB]"); Federal Reserve, *Federal Reserve Board Announces Reserve Bank Income And Expense Data And Transfers To The Treasury For 2022* (Jan. 13, 2023), available at *https://www.federalreserve.gov/newsevents/pressreleases/other20230113a.htm* (last visited Dec. 23, 2024), and attached as Hicks Decl., Ex. 8 (ECF # 27-8) (same for 2022)

III.   **APPLICABLE LEGAL STANDARDS**

"To survive a motion to dismiss [under Federal Rule of Civil Procedure 12(b)], a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Id*. at 678. Thus, "a complaint must do more than allege the plaintiff's entitlement to relief[;]" rather, "[a] complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). *See also Korinko v. Come Ready Nutrition, LLC*, 2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) (explaining an inference alone is not enough, "[t]he complaint must support the inference with facts to plausibly justify that inferential leap.").

In deciding a Rule 12(b)(6) motion, a court can consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Hartig Drug Co. v. Senju Pharmaceutical Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted). Moreover, while "the court is 'required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant,'" *id.* (citation omitted), allegations that are "no more than conclusions" are "not entitled to the assumption of truth." *Iqbal*, 556 U.S.at 679.

Claims under the CFPA that sound in fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Fed.R.Civ.P. 9(b) ("In alleging fraud …, a party must state with particularity the circumstances constituting fraud …"); *CFPB v. Prime Mrktg. Holdings, LLC*, 2016 WL 10516097, at *4 (C.D. Cal. Nov. 15, 2016) (applying Rule 9(b)'s heightened standard to

CFPA claim under deceptive act or practices prong); *CFPB v. Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d 202, 209 (D. Mass. 2021) (same).[10] Under Rule 9(b), a plaintiff must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). More importantly, "[a]s numerous courts have held, 'Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" *Dolan v. PHL Variable Ins. Co.*, 2016 WL 6879622, at *6 (M.D. Pa. Nov. 22, 2016) (citations omitted). "The purpose of Rule 9(b) is to provide [each] defendant with notice of the precise misconduct with which it is charged and to prevent false or unsubstantiated charges." *Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 720 (E.D. Pa. 2013) (citations omitted).

When a motion to dismiss includes a challenge to the court's subject matter jurisdiction under Rule 12(b)(1), the motion is like a Rule 12(b)(6) motion if the challenge is just a facial challenge (*i.e.*, "attack[ing] the complaint on its face without contesting its alleged facts"). *Hartig Drug*, 836 F.3d at 268. But when the Rule 12(b)(1) motion "attacks allegations underlying the assertion of jurisdiction in the complaint," then the defendant may present competing facts, and "[w]hen considering a factual challenge, 'the plaintiff [has] the burden of proof that jurisdiction does in fact exist,' the court 'is free to weigh the evidence and satisfy itself as to the existence of its power to

---

[10] No Third Circuit court has addressed whether Rule 9(b)'s heightened pleading standard applies to deception claims under the CPFA. To the extent this Court finds that Rule 9(b) does not apply, then the CFPB's allegations also fail to meet Rule 8(a)'s notice pleading requirements. Fed.R.Civ.P. 8(a)(2) ("A pleading that states a claim for relief must contain: … (2) a short and plain statement of the claim showing that the pleader is entitled to relief; …").

hear the case,' and 'no presumptive truthfulness attaches to [the] plaintiff's allegations ... .'" *Id.* (citation omitted). Moreover, "a court may weigh and consider evidence outside the pleadings" when addressing a Rule 12(b)(1) motion presenting a factual attack. *Id.* (citation omitted).

Finally, under Rule 12(e), a defendant may move for a more definite statement "[i]f a pleading ... is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed.R.Civ.P. 12(e). Accordingly, granting a Rule 12(e) motion is proper "when the pleading is 'so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith, without prejudice to itself.'" *Lapcevic v. Strive Enter., Inc.*, 2010 WL 1816752, at *7 (W.D. Pa. Apr. 8, 2010).

## IV.   ARGUMENT

### A.   *The CFPB Fails To State A Claim Against Reliant For CFPA Deceptive Practices (Count I).*

By its very nature, the CFPB's deceptive practices claim under Count I sounds in fraud as the CFPB alleges that Defendants misrepresented the nature of the Membership and Reliant Card by failing to disclose material facts. Yet, the CFPB does not meet the requisite heightened pleading standard that governs such claims.[11]

### 1.   The CFPB does not plausibly allege Reliant represented to consumers that the Reliant Card was a "general-purpose" credit card.

In its Complaint, the CFPB fails to plausibly allege facts to support its conclusory assertion that the Reliant Card was represented to be a "general-purpose" credit card. As the CFPB concedes, an act, practice, or omission is only deceptive where: (i) the practice misleads or is likely to mislead

---

[11] "The standard for a CFPA deception claim is the same as the standard under Section 5(a) of Federal Trade Commission Act." *CFPB v. Frederick J. Hanna & Assoc., P.C.*, 114 F. Supp. 3d 134 (N.D. Ga. 2015). Thus, courts review cases under the FTCA to determine whether CFPB's deception claims have merit.

the consumer; (ii) the consumer's interpretation is reasonable; and (iii) the representation, omission, or practice is material. *E.g*., Compl., ¶ 57. *See also CFPB v. Gordon,* 819 F.3d 1179, 1192 (9th Cir. 2016) (only "deceptive" or "abusive" conduct that "is likely to mislead consumers acting reasonably under the circumstances" offends the CFPA or its analogous FTCA provisions) (citations omitted). The CFPB has not sufficiently alleged either of the first two requirements.

The Complaint alleges: "Since 2010, many of Reliant's advertisements (including images, text and content like those below) gave the impression that Reliant offered a general-purpose credit card. Many of Reliant's advertisements did not, or did not adequately, disclose that the credit line was restricted for use only at the Horizon store." Compl., ¶ 19. The Complaint then reproduces several advertisements without stating when (or if) they were published to consumers, how many consumers saw them, or whether there is any evidence that any consumer viewed or was actually misled by the ads into believing that the Reliant Card was a general-purpose credit card. *Id.*, ¶19.

Notably, not a single one of the cited ads includes any affirmative representation(s) that the Reliant Card was a "general-purpose" credit card. *Id.* The CFPB does not explain what about the ads "g[i]ve the impression that Reliant offered a general-purpose credit card" other than an *ipse dixit* assertion to that effect. *Id.* None of the images include features one would expect in an advertisement for a "general-purpose" credit card, such as the logo of a major credit card company like Mastercard or Visa, mention of a rewards program, use of language like "world-wide acceptance," or statement of an APR or interest rate (because Reliant does not charge interest). *Id.* Without more, the CFPB's assertion that Reliant gave the impression that it offered a general-purpose credit card is unsupported, conclusory, and insufficient to withstand a motion to dismiss.

Even more concerning is what the Complaint *doesn't* mention. The CFPB concedes that Reliant's advertisements link to websites, that "these websites linked to identical or substantially

similar (1) application and enrollment pages and (2) terms and conditions," and that "consumers [a]re required to fill out an application online and all enrollment has occurred online." Compl., ¶¶ 20-23. But the CFPB fails to advise the Court that, as part of the "online application" and enrollment process it references, every single potential Reliant customer was presented with a prominent disclosure and had to—as an express condition of enrollment—click a box confirming that they understood that the Reliant Card could only be used at the Horizon Store Outlet.[12] McDonald Decl., ¶¶ 8-19. Hence, every single Reliant customer has affirmatively represented and agreed *before enrolling in the program* that they understand the Reliant Card is *not* a general-purpose credit card that can be used anywhere. *Id., ¶¶* 20 & 30.

It is ironic that a complaint alleging deception resorts to deception to falsely portray the reasonable consumer experience at issue. Contrary to the CFPB's conclusory allegations, Reliant informed *every consumer expressly,* as part of its sign-up process and as a condition of enrollment, that the Reliant Card "may only be used online at www.horizonoutlet.com" and is not a "general-purpose" credit card. *Id.*, ¶¶ 7-30. The CFPB's omission is material and deceptive, because the CFPB's selective and partial disclosure obscures what "net impression" Reliant's marketing actually conveys to a reasonable consumer. *See, e.g., CFPB v. Nationwide Biweekly Admin., Inc.,* 2017 WL 3948396, at *3 (N.D. Cal. Sept. 8, 2017), *vacated and remanded on other grounds* 2023 WL 566112 (9th Cir. Jan. 27, 2023) ("The concept that 'deception' requires something that misleads more than only the most gullible or inattentive is already embedded in the borrowed FTC

---

[12] Also, the CFPB fails to inform the Court of known or knowable facts regarding how many potential consumers declined to check the box on Reliant's enrollment application pages or otherwise declined to enroll in a Membership following receipt of Reliant's advertisements, thereby depriving this Court of pertinent facts concerning whether its deceptive practices claim is viable or otherwise valid.

definition—likely to mislead consumers acting reasonably under the circumstances."); *cf.* *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.,* 730 F.3d 494, 509 (6th Cir. 2013) (explaining that when considering the likelihood of consumer confusion, "the focus is on the typical buyer exercising ordinary caution, not the most obtuse consumer" (quotation marks and citation omitted))..

Indeed, Reliant's marketing closely follows the FTC's recommendations for "clear and conspicuous online disclosures." *See* FTC, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (March 2013), available at *https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf* (last visited on December 23, 2024).[13] The FTC—whose guidance on "deception" the CFPB instructs its examiners to follow[14]—expressly recognizes that "click-through web pages" must be considered in evaluating an ad's net impression. *See id.* at pp. 13, 17. And it specifically recommends that material disclosures in online ads should be "unavoidable" meaning "consumers should not be able to proceed further with a transaction, *e.g.*, click forward, without scrolling through the disclosure." *Id.* at 9.

Here, Reliant's disclosures plainly meet the FTC's test for "clear and conspicuous online disclosures," and, in fact, go well beyond its recommendations. The disclosure was prominent, set apart, unambiguous, and unavoidable, per the FTC's guidance. But more than that, it is a "clickwrap" agreement which courts almost universally recognize to be enforceable precisely

---

[13] *See* Hicks Decl., Ex. 9 (ECF # 27-9).

[14] *See* CFPB, UDAAP Examination Procedures Manual v.2, p.1, n.2 (Oct. 2012), available at *https://files.consumerfinance.gov/f/documents/cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures_2023-09.pdf* (last visited Dec. 26, 2024), and attached as Hicks Decl., Ex. 10 (ECF # 27-10).

because they unambiguously alert consumers to both the terms and the fact that they are agreeing to them plus require an affirmative act, the "click" of agreement, to affirm disclosure. *Kirkham v. TaxAct, Inc.*, 2024 WL 1143481, at *7 (E.D. Pa. Mar. 15, 2024) ("A 'clickwrap' agreement is one whereby 'a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating, 'I agree' in order to proceed.").

Clickwrap agreements have two key features that call terms to the consumer's attention and provide reasonable notice: (1) the terms to be enforced appear on the very screen the user is viewing, and (2) the interface requires the user to consent to the terms or condition by clicking on a dialogue box on the screen in order to proceed, thus ensuring that every user's attention will be drawn to the existence of the term and agreement. *E.g.*, *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (collecting cases). These features create a "mechanism that forces the user to actually examine the terms before assenting," and "ensures that 'potential [users] are presented with the proposed [user] terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012). "Structured properly, a clickwrap agreement would conclusively demonstrate notice and acceptance of the agreement's terms." *Kirkham*, 2024 WL 1143481, at *7.

Here, every Reliant customer received the unambiguous, unavoidable disclosure and was "force[d] . . . to *actually examine*" that disclosure before proceeding, because they had to check a box directly underneath the disclosure. That is precisely the type of disclosure that the FTC recommends as the gold standard for "clear and conspicuous online disclosures," and, moreover, by checking the box indicating they understand the nature of the card, every Reliant customer has entered into a binding clickwrap agreement that "conclusively demonstrate[s] notice and

acceptance of the agreement's terms." Reliant's terms and conditions were also prominently hyperlinked and reiterated that the Reliant Card is not a general-purpose credit card. McDonald Decl., ¶¶ 21-30. *See, e.g.*, *Wiggins v. Lab'y Corp. of Am. Holdings*, 2024 WL 4476646, at *7-9 (E.D. Pa. Oct. 11, 2024) (enforcing checkbox online contract with hyperlink to terms of use).

In its Complaint, the CFPB relies solely on a "net impression" theory but omits key aspects of Reliant's advertisements and enrollment process that confirm that the "net impression" is not as the CFPB represents. Notably, in its Complaint, the CFPB does not contend that Reliant's advertisements constitute an "abusive" practice. Nor does the CFPB assert that Reliant's enrollment process and its use of an affirmative check box and acknowledgement by its customers of the Reliant Card's limited nature is unreasonable. Thus, the CFPB's deceptive practices claim that the Reliant Card is a general-purpose credit card lacks merit and must be dismissed.

2.  **The CFPB has not plausibly alleged Reliant made false or material representations regarding its cancellation process before the consumers purchased a Membership.**

The CFPB also alleges that Reliant deceived consumers regarding its cancellation process because "from at least March 2019 to October 2020, Reliant's 'Welcome Package' included an insert instructing dissatisfied customers to call a toll-free number to cancel enrollment and receive a full refund through a process that takes 'less than a minute.'" Compl., ¶ 44. Even putting aside the limited duration during which the CFPB alleges Reliant made this representation, there are several problems with this aspect of the CFPB's deceptive practice claim.

First, the CFPB does not allege that Reliant made any representations to consumers regarding the ease of cancellation *before* they enrolled in the Membership. Notably, none of the four separate Reliant advertisements the CFPB selected for inclusion in the Complaint contains any reference whatsoever to the cancellation or refund process, let alone any representation that it would be "easy" or "take a minute." Compl., ¶ 19. Also, the Membership's Terms and Conditions

(which the CFPB acknowledges are pertinent but fails to attach to its Complaint) state only that customers can request a refund within thirty days of billing by calling Membership Services, but they do not contain any representation for how long the cancellation process will take. Compl., ¶ 43; McDonald Decl., ¶ 31. Instead, the only source the CFPB cites for a representation of the potential length of Reliant's cancellation process is an "insert" that appeared for a limited time (*i.e.*, March 2019 through October 2020) in Reliant's "Welcome Package." Compl., ¶ 44. A "Welcome Package," however, is something that consumers received *after* enrolling in the program, not before, as the name suggests. *Id*. Accordingly, by definition, the "Welcome Package" insert cannot serve as the basis for any consumer's decision to enroll in the Membership—they were already enrolled when they got it. The CFPB cites no other representations by Reliant that could possibly support this claim of alleged deception because they are none.

Second, the CFPB does not allege facts that support its conclusion that any representation in the "Welcome Package" insert concerning cancellation process between March 2019 and October 2020 is false. Instead, the only "fact" the CFPB alleges to support its conclusion is that the "cancellation process *at times* took 20 to 40 minutes on the phone ..." Compl., ¶ 68. *See also id*., ¶ 46 ("the process *could take* 20 to 40 minutes…") (emphasis added). The CFPB does not allege that the cancellation process "always" took 20 to 40 minutes or even that it "often," "generally," or "typically" took 20-40 minutes. *Id.*, ¶¶ 46 & 68. Nor is the statement that cancellation is "easy" and can generally take about a minute, inconsistent with the allegation that "at times" it "could take" 20 to 40 minutes, such that the CFPB's allegations, even if taken as true, do not "show" liability. *See Iqbal*, 556 U.S. at 678 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"). It appears the CFPB is arguing for an

improper and draconian rule that a single non-conforming incident can render a future prediction false by hindsight. No authority supports such an overreach.

*Third*, the CFPB does not allege, even in cursory fashion, that disclosures relating to the ease of cancellation (especially disclosures made after the customer already purchased the product) are "material" to consumers. Nor does it make intuitive sense that they would be. To be actionable, an allegedly deceptive representation must have been "material," which courts understand to mean that "it contains information that is important *to a consumer's purchasing decision*." *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013) (emphasis added). The only mention in the Complaint of materiality as to the cancellation and refund process is the CFPB's bare assertion that "Reliant's express cancellation and refund claims are presumed material and were also likely to affect consumers' decisions to do business with the Company." Compl., ¶ 61. But the Complaint fails to explain how a representation made for a limited time and only *after* consumers were already enrolled in the program could in any way "affect consumers' decision to do business with [Reliant]." Nonetheless, the alleged presumption defies logic because it would require an illogical theory of causality where an event occurring after an act causes that act. *Cf. Eagle Props., Ltd. v. KPMG Peat Marwick*, 912 S.W.2d 825, 827 (Tex. App. 1995) (representations made after purchase could not have been relied upon or material as a matter of law).

In sum, the CFPB has not alleged facts to support its conclusory claim that Reliant engaged in deceptive practices as to its cancellation or refund process. Thus, this claim must be dismissed.

**B.**    ***The "Abusive" Practices Claim (Count II) Fails Because The CFPB Has Not Plausibly Alleged That Reliant's Cancellation Process Took "Unreasonable Advantage" Of A Consumer's "Inability" To Protect Their Interests.***

The CFPB's attempt to repackage its deceptive practices claims regarding only the cancellation process under the "abusive practices" prong of the CFPA fares no better. The CFPB has failed to plausibly allege an "abusive" practice within the meaning of the CFPA, even under

its own policy guidelines. An act is "abusive" under the CFPA if it "takes unreasonable advantage of … the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product." 12 USC § 5531(d)(1)(B). The CFPA does not define what it means to "take unreasonable advantage" or what reflects "the inability of the consumer to protect" their interests. The CFPB, however, has advised that it considers "unreasonable advantage" to mean "exceeding the bounds of reason or moderation."[15] *See* CFPB Policy Statement on Abusiveness (Apr. 2, 2023), available at *https://files.consumerfinance.gov/f/documents/cfpb_policy-statement-of-abusiveness_2023-03.pdf* (last visited Dec. 26, 2024)[16] (citing Webster's Dictionary). The CFPB considers a consumer "unable" to protect their interest when the steps needed to protect their interests are unknown to them or "especially onerous," such that the "time, effort, cost, or risks associated with extricating oneself from the relationship with entities may effectively lock people into the relationship." *Id.* The CFPB has not met this standard, as it does not allege a single customer was unable to cancel the product or receive a refund.

### 1. The CFPB has not plausibly alleged Reliant's cancellation process is "abusive."

The CFPB fails to plausibly allege facts sufficient to show Reliant's cancellation process was an abusive practice. The only "fact" that the CFPB alleges to support that conclusion is that the "cancellation process *at times* took 20 to 40 minutes on the phone, while customers were forced to listen to customer service employees go through a series of solicitations for discounts and third-party products." Compl., ¶ 68; *see also id.* at ¶ 46 ("the process *could take* 20 to 40 minutes…")

---

[15] Reliant does not concede that the CFPB's policy statements are in any way binding on this Court. Post-*Chevron*, agency interpretations of statutes are no longer entitled to deference. *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("*Chevron* is overruled."). However, the CFPB's departure here from its own stated policies shows how far afield it is from statutory authority.

[16] *See* Hicks Decl., Ex. 11 (ECF # 27-11).

(emphasis added). As noted above, the CFPB does not allege that this experience was typical or commonplace. And the CFPB does not allege that a single customer was unable to cancel their card; it does not explain why or how a 20 to 40-minute cancellation process for a credit card "exceeds the bounds of reason" or renders a consumer unable to protect their interests; and it does not allege that 20-40 minutes it allegedly "at times" took unspecified customers to cancel their cards "effectively lock[ed] people into the relationship." Accordingly, the CFPB has not alleged facts consistent with an abusive practice even under its own internal policy guidelines, let alone under the common understanding of the word "abusive."[17] *See, e.g., CFPB v. Intercept Corp.*, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) (dismissing its claim under the CFPA for abusive practices because the CFPB failed to sufficiently identify "particular clients" whose actions would support a finding that the defendant interfered with consumers' ability to understand the terms of their dealings with defendant's clients or that would support a finding that the defendant took unlawful advantage of consumers).

2.    **The CFPB does not plausibly allege Reliant's refund program is "abusive."**

The CFPB also has not alleged facts to support its conclusion that Reliant's refund program was "abusive." Indeed, the only "fact" the CFPB alleges regarding the program is that "Reliant's [unidentified] policies, scripts, and training materials show that … obtaining full refunds was difficult" without explaining which materials or policies it refers to or how they made obtaining refunds "difficult," and that "Reliant often [at unspecified times] would not provide refunds unless

---

[17] It bears noting that, if the Court were to find the CFPB's threadbare allegations here sufficient to withstand dismissal, then essentially any consumer-facing company would be guilty of "abusive" practices, as virtually every, if indeed not all, companies would have to concede that their cancellation processes "at times" "could take" 20 to 40 minutes.

consumers threatened to take [unspecified] further action with their bank or the Better Business Bureau." *See* Compl., ¶ 69.

In addition to failing to allege any specific occasion on which a reasonable consumer had difficulty obtaining a refund or only obtained a refund after complaint, the CFPB also does not allege that it was Reliant's policy to deny refunds absent consumer complaints (it was not). And, critically, the CFPB does not allege that any of the unidentified consumers it references were ***actually entitled*** to a refund. While the "insert" referenced above (the one that Reliant only used for a limited time in 2019 and 2020) states that Reliant would honor refund requests "for charges within the past 30 days" (Compl., ¶ 44), the CFPB does not allege that any consumer requested a refund "for charges within the past 30 days," had difficulty obtaining a refund of such charges, or sought refunds during the time that this insert was distributed. Refusing to provide a refund to a consumer who was not due one is not an "abusive practice," and the CFPB has not alleged that any consumer who was entitled to a refund experienced "difficulty" obtaining one from Reliant. The CFPB's failure to provide such factual details renders its abusive practices claim deficient as a matter of law. *See Intercept Corp.*, 2017 WL 3774379, at *4.

## C.    *The CFPB's Deceptive And Abusive Practices Claims Against Mr. Kane Fail As A Matter Of Law.*

The CFPB alleges that Mr. Kane is liable under Counts I and II of its Complaint as a "related person." Compl., ¶¶ 56, 66. However, as set forth previously, the CFPB has failed to adequately allege any underlying violation of the CFPA. *See supra.,* pp. 15-25. Thus, to the extent that this Court dismisses Counts I and II against Reliant for failure to state a claim upon which relief can be granted, then it must dismiss the same counts against Mr. Kane.

Moreover, it has long been recognized under both federal and Pennsylvania law that "the appropriate occasion for disregarding the corporate existence occurs [only] when the court must

prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967). Thus, "[t]he general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done, or participated, or cooperated therein." *Zubik*, 384 F.2d at 275. *See also Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 89–90 (Pa. 1983) (same under Pennsylvania law).

This basis of individual liability, known as the participation theory, is predicated on the corporate officer's own actions and participation in the corporation's wrongful conduct, rather than the corporation's status and his relationship to the corporation. Hence, "where … directors or officers are charged with nonfeasance, no individual liability attaches." *Chester-Cambridge Bank & Trust Co. v. Rhodes*, 31 A.2d 128, 131 (Pa. 1943). Accordingly, the law is clear that a defendant is not liable under the participation theory merely because of his status and responsibilities as the corporation's president or because he is the sole individual directing the company's actions and thus charged with general supervision of its affairs. *Chester-Cambridge*, 31 A.2d at 131; *Longenecker v. Commonwealth*, 596 A.2d 1261, 1263 (Pa. Commw. Ct. 1991). The law is also clear that a company officer is not liable on the participation theory for failure to stop or correct conduct of other company employees or contractors where he had no actual knowledge of that conduct. *Wicks*, 470 A.2d at 90; *Shay v. Flight C Helicopter Services, Inc.*, 822 A.2d 1, 19–20 (Pa. Super. Ct. 2003).

Here, the CFPB's Complaint does not allege that Mr. Kane himself committed any of the deceptive or abusive practices that serve as a basis for Counts I and II of the Complaint. Instead, the CFPB merely seeks to hold Mr. Kane personally liable because he is "a director, officer, and controlling shareholder of Reliant" and, generally, "he materially participated in the conduct of the affairs of Reliant." Compl., ¶¶ 56 & 66. As a matter of law, such allegations are insufficient to disregard the corporate entity and impose personal liability upon Mr. Kane. *See, e.g., Zubik*, 384 F.2d at 274-75 (recognizing that "[l]imiting one's personal liability is a traditional reason for a corporation," and absent an allegation that the corporate form was done with the specific intent to escape liability for a specific tort or liability, it cannot be disregarded to impose liability upon a shareholder who made loans to the corporation, had personal expenses paid by the corporation, or otherwise failed to follow corporate formalities); *Longenecker*, 596 A.2d at 1262–63 (only basis on which trial court imposed liability was defendant's status as sole officer and shareholder, defendant was not liable because "there is no evidence that Longenecker intentionally neglected the properties in question"). Thus, on its face, Counts I and II of the CFPB's Complaint fail to state any viable claims against Mr. Kane individually.

### D.    *The CFPB Has Not Sufficiently Alleged That Mr. Kane "Substantially Assisted" Violations Of The CFPA To Support Count III.*

The CFPB's claim against Mr. Kane (Count III) for "substantially assisting" Reliant's alleged violations in Counts I and II fares no better. Under the CFPA, it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person" engaging in deceptive, unfair, or abusive practices in violation of 12 U.S.C. § 5531. 12 U.S.C. § 5536(a)(3). "Although relatively few cases have precisely delineated the elements of substantial assistance under the CFPA, courts have required (1) a primary violation of the CFPA; (2) the defendant's knowledge or reckless disregard of the primary violation; and (3) the defendant's substantial

assistance in the primary violation." *CFPB v. Univ. Debt & Payment Sols., LLC*, 2019 WL 1295004, at *7 (N.D. Ga. Mar. 21, 2019). Moreover, the heightened pleading standard of Rule 9(b) applies to this claim because the CFPB alleges "substantial assistance" in conducting "deceptive" acts. Therefore, the CFPB must (but does not) allege the specific who, what, where, why, and when of the purported "substantial assistance." *E.g.*, *Commonwealth Equity,* 554 F. Supp. 3d at 209.

1.      **Its substantial assistance claim must be dismissed because the CFPB has not adequately alleged an underlying violation of the CFPA.**

A claim of substantial assistance under the CFPA requires showing an underlying violation. *Univ. Debt & Payment Sols., LLC*, 2019 WL 1295004, at *7. Because, for the reasons stated previously, the CFPB has not adequately stated a claim against Reliant under Counts I and II of the Complaint, it cannot maintain a claim for "substantial assistance" against Mr. Kane based on the same alleged conduct. Thus, on this basis alone, a motion to dismiss Count III is warranted.

2.      **The CFPB has not pled the requisite scienter for its substantial assistance claim.**

Additionally, to plead substantial assistance, the CFPB must show facts evincing the defendant's knowledge or reckless disregard of the alleged violations. *Univ. Debt & Payment Sols., LLC*, 2019 WL 1295004, at *7. "Recklessness" sufficient to establish substantial assistance involves conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care. *Id.* The CFPB offers no factual allegations on Mr. Kane's "knowledge" or "reckless disregard" of violative conduct beyond legal conclusions that are entitled to no weight. *E.g.*, Compl., ¶ 75 ("Kane knowingly or reckless provided substantial assistance ... .").

More broadly, the CFPB alleges that Mr. Kane "participated in [Reliant's] operations," "provided general oversight of Reliant's day-to-day operations," "had authority to control Reliant's business practices, including its advertising and customer-service conduct." *Id.* ¶¶ 48–49, 75. Yet these allegations do not even establish that Mr. Kane *actually did* control Reliant's advertising and

customer-service conduct, let alone that he did so with knowledge or reckless disregard that Reliant's advertising and customer-service conduct was misleading consumers.

Elsewhere, the CFPB vaguely alleges Mr. Kane has "reviewed consumer complaints and has received reports about chargebacks and credit-line usage." Compl., ¶ 50. But the CFPB does not even allege what those reports or complaints said, when or how frequently Mr. Kane received them, or how those reports or complaints otherwise would have made Mr. Kane aware of issues with the cancellation process, refunds, or purported confusion over whether the Card was a general use credit card. In fact, the CFPB does not specifically allege that Mr. Kane read or knew of any consumer complaints about confusion over the Card's usability, cancellation times, or refunds.

The CFPB's failure to tie these notice allegations to its underlying claims is particularly apparent because the CFPB does not actually base any of its claims on allegations regarding actual "chargebacks" or "credit-line" usage. *See generally* Compl. Instead, the CFPB alleges claims based solely on Reliant's old marketing materials and its cancellation process. Compl., ¶¶ 58, 67.

These allegations fall woefully short of supplying any inference of knowledge or reckless disregard by Mr. Kane. To the contrary, such allegations, if accepted here, would strictly impute scienter to just about every principal in just about every company across the country. Accordingly, the CFPB has not pled knowledge or reckless disregard of CFPA violations.

### 3. __The CFPB has not pled "substantial assistance."__

To plead "substantial assistance," the CFPB does not need to show "a direct connection between the assistance and the [underlying law] violations," but it must show "more than [casual] or incidental assistance" for Mr. Kane to be liable. *See, e.g.*, *CFPB. v. Consumer Advoc. Ctr. Inc.*, 2023 WL 5162392, at *9 (C.D. Cal. July 7, 2023) (quoting *CFPB v. Daniel A. Rosen, Inc.*, 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022). Here again, the CFPB offers only that Mr. Kane "participated in [Reliant's] operations," "provided general oversight of Reliant's day-to-day

operations," and "had authority to control Reliant's business practices, including its advertising and customer-service conduct." *Id.* ¶¶ 48–49, 75; *see also, e.g., id.* ¶ 50 ("Kane owns the building that Reliant occupies[.]"). But yet again, these allegations do not even establish that Mr. Kane *actually did* control or oversee Reliant's advertising and customer-service conduct, let alone that he did so in a manner that was beyond "casual" or "incidental." *Consumer Advoc. Ctr. Inc.*, 2023 WL 5162392, at *9. The CFPB's vague and conclusory allegations are insufficient to establish any actual "assistance" by Mr. Kane.

In short, the Complaint fails to supply any tangible facts indicating Mr. Kane "substantially assisted" any alleged violations of the CFPB (*i.e.,* no violations, no assistance, and no scienter). Therefore, Count III of the Complaint must be dismissed for failure to state a claim.

### E.    *The CFPB's TILA Claims Fail Because TILA and Reg. Z Do Not Apply To The Reliant Card As A Matter Of Law.*

The CFPB's claims under TILA (Count IV and V[18] of the Complaint) fail because TILA and its implementing regulation, Reg. Z, do not apply to the credit product that Reliant offers. Specifically, the CFPB has not plausibly alleged that the Reliant Card is an "open end credit plan" subject to either TILA or Reg. Z.

Under both TILA and Reg. Z, the term "open end credit plan" means a plan under which: (1) the creditor reasonably contemplates repeated transactions, (2) which prescribes the terms of such transactions, and (3) *which provides for a finance charge which may be computed from time*

---

[18] The sole basis for the CFPB's CFPA claim under Count V of its Complaint is its assertion that Reliant violated TILA for the reasons stated in Count IV. Compl., ¶¶ 91-92. Thus, if Count IV of the Complaint fails to allege an underlying TILA violation, then Count V must also be dismissed. *See, e.g., Georges v. Bank of Amer., N.A.*, 845 Fed. Appx. 490, 492 (9th Cir. 2021) (affirming dismissal of a derivative consumer protection claim because "when a statutory claim fails, a derivative [consumer protection] claim also fails.").

*to time on the outstanding unpaid balance.* 15 U.S.C. § 1602(j); 12 C.F.R. § 1026.2(15)(ii) (emphasis added). The Complaint does not allege facts to support its conclusion that Reliant charged "finance charges" at all, let alone "finance charges" "computed from time to time on the outstanding unpaid balance."

The CFPB's own allegations show why that is. The CFPB alleges that the Horizon Membership fee violates the fee cap in 12 C.F.R. § 1026.52(a)(1). Compl., ¶¶ 77-85. Specifically, the CFPB alleges that "[f]rom January 2015 until January 2021, Reliant charged customers newly enrolled in a credit card account at least $299.40 a year while its introductory credit line associated with the card was $500." *Id.*, ¶ 83. The CFPB apparently arrived at this figure by multiplying the alleged $24.95 monthly membership fee by twelve months (12 x $24.95 = $299.40). Based on its calculation, the CFPB alleges that "the fees charged to consumers with a new credit card account totaled approximately 60% of the credit line during the first year after a customer's account was opened" ($299.40/500 = 59.9%).[19] *Id.*, ¶ 84. The CFPB therefore concludes that Reliant violated the 25% fee cap under TILA and Reg. Z. *Id.*, ¶ 85.

The fundamental problem with the CFPB's conclusion is that its Complaint affirmatively alleges that the fees used in its calculation are "membership fees" that consumers paid to participate in the Membership and receive the ancillary benefits, such as roadside assistance, or access to legal counseling. *E.g.,* Compl., at ¶ 26 ("Reliant typically charged consumers $24.95 a month or $299.40 annually ***for the membership***."); ¶ 27 ("The ***monthly membership fee*** was auto-

_____

[19] While the CFPB alleges that Reliant also charged various other fees, including "a one-time card-issuance-and-account-validation fee of $5" and a "delivery charge" (Compl., ¶¶ 29, 37), it does not include these fees in its calculation. *Id.*, ¶¶ 83-85. Nor does the CFPB allege that any of these other fees were "computed … on the outstanding unpaid balance" such that they could qualify as "finance charges" under either TILA or Reg. Z. *Id.*

debited …") (emphasis added).[20] And "membership fees" do not qualify as "finance charges" under either TILA or Reg. Z. In fact, Reg. Z expressly excludes "participation fees" from the definition of "finance charges." 12 C.F.R. 1026.4(c)(4) ("The following charges are not finance charges: …. (4) Fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis."). The Horizon Membership fees are participation fees assessed on a periodic (monthly) basis, and thus are excluded from the definition of "finance charge."

The CFPB's commentary on the exclusion further supports this conclusion:

> The participation fees described in § 1026.4(c)(4) do not necessarily have to be formal membership fees, nor are they limited to credit plans…. [T]he provision applies to any credit plan in which payment of a fee is a condition of access to the plan itself, but it does not apply to fees imposed separately on individual closed-end transactions. …

CFPB "Official Interpretation of Paragraph 4(c)(4)" of "12 CFR Part 1026," available at *https://www.consumerfinance.gov/rules-policy/regulations/1026/4/#c-3* (last visited Dec. 23, 2024).[21] [22]

The Horizon Membership Fee, as alleged, is a formal membership fee that is charged as "a condition of access to" the Horizon Membership benefits, including the line of credit, as well as the other ancillary benefits included with the Membership, like roadside assistance and legal counseling. Compl., ¶ 24 ("Reliant required consumers to enroll in the Horizon Card Services Membership program to obtain access to one of its branded cards and the credit line."). And the

---

[20] Reliant's membership fee is akin to the membership fees charged by retailers like Costco or Sam's Club that are required to obtain the privilege of shopping at those stores.

[21] *See* Hicks Decl., Ex. 12 (ECF # 27-12).

[22] Again, Reliant does not concede that the CFPB's "Interpretations" are entitled to any deference post-*Chevron*, but the CFPB's failure to follow its own Official Interpretations is nonetheless telling.

CFPB does not allege (nor could it) that the membership fee is charged as interest on the credit extended, is a "closed end transaction," or is only charged if the customer fails to use the line of credit. Accordingly, the membership fee is not a "finance charge" under either TILA or Reg. Z. Accordingly, Counts IV and V of the Complaint must be dismissed.

### F.    *The CFPB's Claims Are Barred By The Applicable Statutes Of Limitations.*

Aside from their substantive deficiencies, the CFPB's claims in its Complaint are time barred. Statute of limitations defenses may be raised in a Rule 12(b)(6) motion if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). Moreover, courts have granted motions to dismiss for failure to exercise "reasonable diligence" in investigating potential claims when the facts giving rise to their claims are publicly available. *See, e.g., Silo Restaurant Inc. v. Allied Prop. & Cas. Ins. Co*., 420 F. Supp. 3d 562, 586 (W.D. Tex. 2019) (a court may "determine reasonable diligence as a matter of law when there is actual or constructive notice, or when information is readily accessible and publicly available.") (applying Texas law); *Bergeron v. Select Comfort Corp*., 2016 WL 155088, at *5 (W.D. Tex. Jan. 11, 2016) ("Reasonable diligence requires that plaintiffs make themselves aware of relevant information available in the public record … The public record can, in appropriate cases, include information available on the internet.") (applying Texas law). Here, the CFPB's Complaint shows that its claims are untimely.

### 1.    <u>The CFPB has failed to bring its deceptive and abusive practices and substantial assistance claims against Defendants in a timely manner.</u>

Claims under the CFPA must be brought no more than "3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The "date of discovery" for purposes of statutes of limitations is "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Disabled in Action of Pa. v. S.E.*

*Pa. Transp. Auth.*, 539 F.3d 199, 209 (3d Cir. 2008). *See also G.L. v. Ligonier Valley School Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015) ("Under the discovery rule, a plaintiff's time to bring suit is not in any way shortened by his or her reasonable ignorance: 'the statutory limitations period begins to run and the plaintiff is afforded the full limitations period, starting from the point of [discovery], in which to file his or her claim.'"). Thus, when a statute of limitation ties the bringing of a claim to its "discovery," that word "refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010). *See also CFPB v. NDG Fin. Corp.,* 2016 WL 7188792, at *19 (S.D.N.Y. Dec. 2, 2016) (the time limit for the bringing of an action for an alleged UDAAP violation under the CFPA is three years after the CFPB "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.").

The factual allegations concerning the CFPB's deceptive and abusive practices and substantial assistance claims against Reliant and Mr. Kane center on occurrences dating back almost fifteen years. For example, the CFPB includes four advertisements in the Complaint that the CFPB alleges gave consumers "the impression that Reliant offered a general-purpose credit card." Compl., ¶19. Yet each of those advertisements—on their face—predate 2020 and, according to the CFPB's own allegations, date back to 2010. *Id.* Indeed, three of the ads contain pictures of credit cards with expiration dates of 2011 and 2012, suggesting that the ads were published before that. *Id.* Moreover, Reliant's application and enrollments pages and the Membership's terms and conditions are publicly available websites. *Id.*, ¶¶ 20-23. Thus, if there existed anything misleading or false about the contents of this publicly available information (which Reliant vehemently

denies), including without limitation the limited nature of the Reliant Card and the Membership's cancellation process, then all those facts have been known for well over a decade.

Similarly, the Complaint's allegations against Mr. Kane—to the extent they are not veiled legal conclusions—are similarly longstanding and publicly available facts requiring little or no investigation to establish. *E.g.*, Compl., ¶ 12 ("Kane formed Reliant in Pennsylvania in 2005 … ."); *id.*, ¶ 47 ("Kane founded Reliant and serves as its highest officer and sole shareholder."). Again, all factual allegations stated against Kane have been known for more than a decade.

Based on a fair reading of the Complaint, it is not plausible that the CFPB "discovered" or "should have discovered" the facts supporting its claims over fourteen years from when they publicly happened. A reasonable plaintiff exercising due diligence—certainly a government agency charged specifically with conducting such investigations—would have immediately discovered (and likely did discover) the facts alleged in the complaint based on publicly available marketing materials dating back as far as 2010. Yet the CFPB did not file its deceptive and abusive practices claim until September 13, 2024. Because the CFPB's own allegations show that it knew or should have known of the facts that it cites as a basis for its claim, especially publicly available advertising materials and websites, Counts I, II, and III of its Complaint against Defendants are untimely and must be dismissed with prejudice.

2.    **The CFPB's TILA claims under Counts IV and V of the Complaint are subject to a 1-year statute of limitations and are untimely.**

In addition to the CFPB's failure to allege an actual TILA or Reg. Z violation, its claims under Counts IV and V of its Complaint are time-barred. Civil liability claims for alleged violations of TILA must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640. Moreover, the CFPA provisions authorizing the CFPB to enforce TILA and other pre-existing consumer financial laws are crystal clear: "for actions the CFPB brings *in court* under

any of [those] statutes, the CFPB may only 'commence, defend, or intervene in the action in accordance with the requirements of that provision of law, as applicable.'" *PHH Corp. v. CFPB,* 839 F.3d 1, 51 n.28 (D.C. Cir. 2016) (quoting 12 U.S.C. § 5564(g)(2)(B)), *reinstated in relevant part on reh'g en banc,* 881 F.3d 75, *abrogated on other grounds by Seila Law*, 591 U.S. at 213-32. Here, an "applicable" "requirement" is TILA's "statute of limitations." *See id.* at 51. Accordingly, to the extent the CFPB "commence[s] a civil action" for TILA violations, it does so only in accordance with TILA's requirement that any such action be brought "within one year from the date of the occurrence of the violation," 15 U.S.C. § 1640(e). *See, e.g., CFPB v. ITT Educ. Servs., Inc.,* 219 F. Supp. 3d 878, 923 (S.D. Ind. 2015) (declining to read an exception for agency plaintiffs into TILA's one-year statute of limitations).

Here, the Complaint makes clear that the alleged TILA violations occurred – and *ceased* – between January 2015 and January 2021. Compl., ¶ 83. Yet, the CFPB did not commence this action until September 13, 2024. Thus, the CFPB's TILA claims are facially time-barred and subject to dismissal on that independent basis.

### G.   This Court Lacks Federal Question Jurisdiction.

Although the CFPB's claims fail as a matter of law, this action should also be dismissed because the CFPB lacks the requisite authority to pursue it. As a result, this action is ultra vires and unconstitutional, and renders this Court without federal question jurisdiction.

### 1.   The CFPB's current funding method violates both the Appropriations Clause and the Dodd-Frank Act.

As the United States Supreme Court recently explained, the CFPB's "funding is … subject to the requirements of the Appropriations Clause," which requires executive agencies to be funded by "Appropriations made by Law." *Cmty. Fin. Servs.,* 601 U.S. at 425 (quoting U.S. Const. Art. I, § 9, cl. 7). The relevant "Law" providing the funding for the CFPB is the Dodd-Frank Act which, as the

Supreme Court has explained, "authorizes the [CFPB] to draw public funds from a particular source – 'the combined *earnings* of the Federal Reserve System.'" *Cmty. Fin. Servs.,* 601 U.S. at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)-(B)) (emphasis added). Further, the Dodd-Frank Act "specifies the objects for which the [CFPB] can use those funds—to 'pay the expenses of the [CFPB] in carrying out its duties and responsibilities.'" *Cmty. Fin. Servs.,* 601 U.S. at 435 (quoting 12 U.S.C. § 5497(c)(1)). Furthermore, the "combined earnings" which the CFPB can use to carry out its duties and responsibilities are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Cmty. Fin. Servs.,* 601 U.S. at 435 (quoting 12 U.S.C. § 289(a)(3)(B)).

It is undisputed that the Federal Reserve has been operating at a loss and has had no earnings since 2022. *See supra.*, pp. 11-13. Moreover, it is undisputed that this situated is unlikely to change until 2027 at the earliest. *Id.* As such, since 2022, no "surplus funds" have been "otherwise destined for the general fund of the Treasury that could qualify as an appropriation. *Cmty. Fin. Servs.,* 601 U.S. at 425. Instead, the CFPB is being funded from the Federal Reserve's *deficit*.

Congress presumably could have constitutionally funded the CFPB from only Federal Reserve "net earnings," as it did when establishing the surplus mechanism that funds payments to the Treasury. *See* 12 U.S.C. § 289(a)(2). But, because Congress instead funded the CFPB through the Federal Reserve's "combined earnings," 12 U.S.C. § 5497(a)(1), the operating funds the CFPB has obtained since the fall of 2022 (and the funds the agency will obtain until likely 2027) contravene the agency's authorizing statute and the very funding mechanism that the Supreme Court has held conforms to the Appropriations Clause. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,* 665 F.3d 1339, 1342, 1347 (D.C. Cir. 2012) ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority.") (citations omitted).

-37-

Any CFPB action which requires the expenditure of funds from its current funding mechanism is voidable as an "exercise of power that the actor did not lawfully possess." *See Collins v. Yellen*, 141 S. Ct. 1761, 1787-88 (2021); *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (en banc) (Jones, J., concurring) (invalidation of the unlawful action flows "directly from the government actor's lack of authority to take the challenged action in the first place"). And because an unconstitutionally funded CFPB cannot lawfully take any action, the CFPB therefore has brought this action using funds obtained in contravention of its clear constitutional and statutory authorization, and this action must be dismissed for lack of federal question jurisdiction.

2. <strong><u>The CFPB's Lacks Any Statutory Authority To Declare Cancellation And Refund Call Times A UDAAP.</u></strong>

Although under the Dodd-Frank Act includes a new prohibition on UDAAPs by certain participants in the consumer-finance sector, there is nothing in that statute which reflects that Congress delegated to the CFPB unfettered discretion to declare any practice, including the amount of time or manner it takes to process a refund or cancel a membership, a CFPA violation and thereby impose potentially crippling penalties for engaging in that otherwise commercially acceptable business practice, as the CFPA seeks to do here under Counts I and II. *See, e.g., Chamber of Commerce of US of Am. v. CFPB*, 691 F. Supp. 3d 730, 740-43 (E.D. Tex. 2023) (rejecting the CFPB's attempt to declare discriminatory conduct a UDAAP under the CFPA). Defendants are not aware of any case where a federal court has endorsed the application of the CFPA's prohibition on UDAAPs to reach customer service call wait times that, in the opinion of the CFPB, are too long as a permissible exercise of the agency's statutory authority. In the absence of clear instruction from Congress that this type of customer service practice is within the scope of the CFPA, this Court should prevent the CFPB from asserting a sweeping new construction of

that statute here by again ruling that federal question jurisdiction is lacking. *See, e.g., West Virginia v. Envir. Prot. Agency*, 597 U.S. 697, 723 (2022) (a court must "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.") (citations omitted).

### H.    *Alternatively, The CFPB Should File A More Definitive Statement.*

Federal Rule of Civil Procedure 10(b) provides that "each claim founded upon a separate transaction or occurrence ... be stated in a separate count ... whenever a separation facilitates the clear presentation of the matter set forth." Fed.R.Civ.P. 10(b). The requirement that a plaintiff allege separate causes of action in separate counts becomes even more compelling when a plaintiff confronts multiple defendants. *See, e.g., Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1270–72 (W.D. Pa. 1983) (when faced with multiple defendants, courts generally require a plaintiff to specify facts showing each defendant's potential liability). Thus, when a pleading states multiple counts against multiple defendants without setting forth facts pertinent to each defendant, a Rule 12(e) motion for a more definite statement is warranted. *Boyer v. LeHigh Valley Hosp. Ctr., Inc.*, 1990 WL 94038, at *7 (E.D. Pa. Jul. 2, 1990).

Here, as noted previously, the CFPB's Complaint fails to set forth the precise time periods for any of its claims. Instead, the Complaint makes only vague references to time periods which are all beyond the statute of limitations. Thus, if the CFPB seeks to assert timely claims against each of the Defendants under any of its claims, then the CFPB should precisely identify those time periods in its Complaint.

Also, as for Counts I and II of its Complaint, the CFPB lumps together both Defendants and fails to identify the precise representations that each of them allegedly made to consumers regarding Reliant's credit product or its cancellation process. Nor does the CFPB's Complaint provide any of the other facts which would identify the who, what, where, and how a reasonable consumer was allegedly misled, including how many potential consumers declined to check the

box on Reliant's enrollment application pages or otherwise declined to enroll in a Membership following receipt of Reliant's advertisements. Indeed, the Complaint does not identify any actual consumer who was purportedly deceived by Defendants' conduct.

Accordingly, to the extent that Defendants' Rule 12(b)(6) motion is denied, the CFPB should be required to file a complaint with a more definitive statement against each of the Defendants.

## V.    <u>CONCLUSION</u>

As Senator Scott correctly surmised about the CFPB: "[W]e see a common theme from the left, that somehow lower income families lack the wherewithal to manage their own affairs and determine what's best for their families without some sort of government intervention. While the federal government ought to protect consumers from unscrupulous practices, bureaucrats in Washington should not dictate what families can and cannot have simply by regulating products out of existence and pricing people out." Senator Scott's 11/30/23 Statement.

Here, the CFPB has not sued Defendants under the CFPA for "unfair" practices, thereby tacitly admitting that no Reliant customer has been harmed. But, as demonstrated above, the CFPB has failed to plead any actionable claim against Defendants, even for these lesser CFPA prongs for abusive and deceptive practices.

The CFPB's Complaint represents an unconstitutional and unwarranted overreach. Accordingly, the Complaint should be dismissed in its entirety and with prejudice. Alternatively, to the extent that any of the Complaint's claims survive, the CFPB should be required to file a more definitive statement of such claims against each of the Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document using the Court's CM/ECF system on December 27, 2024, which will send notification of such filing to all counsel of record.

Respectfully submitted,

Dated: December 27, 2024

_/s/ Ronald L. Hicks, Jr._
Ronald L. Hicks, Jr., Esq. (PA #49520)
ronald.hicks@nelsonmullins.com
Thomas S. Jones, Esq. (PA #71636)
thomas.jones@nelsonmullins.com
Benjamin J. Sitter, Esq. (PA #317382)
ben.sitter@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
One PPG Place, Suite 3200
Pittsburgh, Pennsylvania 15222
Tel:     412-730-4050

_Counsel for Defendants_