IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-1301-RJC |
| | ) | |
| Reliant Holdings, Inc. and | ) | Judge Robert J. Colville |
| Robert Kane, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR MORE DEFINTIVE STATEMENT**

Table of Authorities ..... iii

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. All Counts in the Complaint state claims upon which relief can be granted. ..... 2

A. Proper Standard of Review ..... 2

B. Count I pleads facts sufficient to support the inference that Reliant engaged in deceptive advertising. ..... 5

C. Count I pleads facts sufficient to support the inference that Reliant made deceptive statements to consumers regarding its cancellation and refund policies. ..... 11

D. Count II pleads facts sufficient to support the inference that Reliant's cancellation process was an abusive practice. ..... 13

E. Counts I and II plead facts sufficient to support the inference that Kane is individually liable for Reliant's deceptive and abusive acts and practices. ..... 16

F. Count III pleads facts sufficient to support the inference that Kane substantially assisted Reliant's CFPA violations. ..... 18

G. Count IV and V plead facts sufficient to support the inference that Reliant violated the Truth in Lending Act (TILA) and Regulation Z. ..... 20

II. None of the Bureau's claims are barred by the applicable statutes of limitations. ..... 24

A. The Bureau's claims for deceptive and abusive conduct in Counts I, II, and III are timely. ..... 25

B. The Bureau's claims for violations of TILA in Counts IV and V are timely. ..... 29

III. The Bureau's funding is valid and provides no grounds for dismissal. ..... 31

IV. Defendants offer no basis for requiring the Bureau to file a more definite statement. ..... 34

CONCLUSION ..... 36

## Table of Authorities

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3, 15

*Badaracco v. Comm'r*,
464 U.S. 386 (1984), *aff'd*, 2022 WL 17958636 (9th Cir. Dec. 27, 2022) .......... 27

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) .......... 25

*Brackenridge Const. Co. v. Doerflein*,
2020 WL 13336748 (W.D. Pa. Dec. 4, 2020). .......... 20

*Carter Prods. v. FTC*,
186 F.2d 821 (7th Cir.1951) .......... 9

*Cent. Contracting Co. v. Md. Cas. Co.*,
367 F.2d 341 (3d Cir. 1966) .......... 9

*CFPB v. 1st All. Lending, LLC*,
2022 WL 993582 (D. Conn. Mar. 31, 2022) .......... 5, 16

*CFPB v. Access Funding, LLC*,
270 F.Supp.3d 831 (D. Md. 2017) .......... 7, 14, 15

*CFPB v. Access Funding, LLC*,
2021 WL 2915118 (D. Md. July 12, 2021) .......... 16

*CFPB v. Active Network, LLC*,
2024 WL 4437639 (E.D. Tex. Oct. 7, 2024) .......... 32

*CFPB v. CashCall, Inc.*,
35 F.4th 734 (9th Cir. 2022) .......... 31

*CFPB v. Certified Forensic Loan Auditors, LLC*,
2020 WL 2556417 (C.D. Cal. May 20, 2020) .......... 13

*CFPB v. Chou Team Realty LLC*,
2021 WL 4077110 (C.D. Cal. Aug. 10, 2021) .......... 27

*CFPB v. Citizens Bank, N.A.*,
504 F.Supp.3d 39 (D.R.I. 2020) .......... 29, 30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) .......... 31, 33

*CFPB v. Commonwealth Equity Grp., LLC,*
554 F.Supp.3d 202 (D. Mass. 2021) .......... 4, 8

*CFPB v. Commonwealth Equity Grp., LLC*,
2024 WL 4362126 (D. Mass. Sept. 30, 2024) .......... 17, 19, 20

*CFPB v. FDATR, Inc.,*
2025 WL 71734 (N.D. Ill. Jan. 10, 2025) .......... 17

*CFPB v. Frederick Hanna & Assocs.,*
114 F.Supp.3d 1342 (N.D. Ga. 2015) .......... 3, 4

*CFPB v. Fifth Third Bank, N.A.,*
2023 WL 7325956 (S.D. Ohio Sept. 26, 2023) .......... 26

*CFPB v. Gordon,*
819 F.3d 1179 (9th Cir. 2016) .......... 5, 9, 10, 16, 29

*CFPB v. Howard,*
2018 WL 4847015 (C.D. Cal. May 3, 2018) .......... 26

*CFPB v. Intercept Corp.,*
2017 WL 3774379 (D. N.D. Mar. 17, 2017) .......... 16

*CFPB v. ITT Educ. Servs*., *Inc.*,
219 F.Supp.3d 878 (S.D. Ind. 2015) .......... 13, 29, 30

*CFPB v. Manseth,*
2023 WL 5400235 (W.D.N.Y. Aug. 22, 2023) .......... 5, 17, 18, 19, 20

*CFPB v. Navient Corp.,*
2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) .......... Passim

*CFPB v. NDG Fin. Corp.,*
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......... Passim

*CFPB v. Nexus Servs., Inc.,*
2024 WL 1461382 (W.D. Va. Apr. 2, 2024) .......... 19

*CFPB v. Ocwen Fin. Corp.,*
2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) *adhered to on denial of reconsideration*,
2019 WL 13211630 (S.D. Fla. Nov. 13, 2019) .......... 29

*CFPB v. Prime Mktg. Holdings, LLC,*
2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ................................................................ 5

*CFPB v. RD Legal,*
332 F.Supp.3d 729 (S.D.N.Y. 2018), *amended*, No. 17-CV-890 (LAP),
2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *and aff'd in part, rev'd in part and remanded*, 828 F. App'x 68 (2d Cir. 2020) ................................................................ 19, 20

*CFPB v. SoLo Funds, Inc.*,
2024 WL 4553110 (C.D. Cal. Oct. 17, 2024) ................................................................ 21, 31, 34

*CFPB v. Think Fin., LLC,*
2018 WL 3707911 (D. Mont. Aug. 3, 2018) ................................................................ 4, 5, 14, 21

*CFPB v. TransUnion,*
641 F. Supp. 3d 474 (N.D. Ill. 2022) ................................................................ 25

*Connelly v. Lane Constr. Corp.*,
809 F.3d 780 (3d Cir. 2015) ................................................................ 3

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
539 F.3d 199 (3d Cir. 2008) ................................................................ 27

*Feldman v. Google, Inc.*,
513 F.Supp.2d 229 (E.D. Pa. 2007) ................................................................ 10

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ................................................................ 3

*FTC v. Am. Fin. Benefits Ctr.*,
324 F.Supp.3d 1067 (N.D. Cal. 2018) ................................................................ 6

*FTC v. Cantkier*,
767 F.Supp.2d 147 (D.D.C. 2011) ................................................................ 6

*FTC v. Chinery*,
2007 WL 1959270 (D.N.J. July 5, 2007) ................................................................ 18

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ................................................................ 8, 10

*FTC v. Fleetcor Techs., Inc.*,
620 F.Supp.3d 1268 (N.D. Ga. 2022) ................................................................ 7

*FTC v. Freecom Commc'n, Inc.*,
401 F.3d 1192 (10th Cir. 2005) ................................................................ 4

*FTC v. Grand Canyon Educ., Inc.*,
2024 WL 3825087 (D. Ariz. Aug. 15, 2024) .......... 6

*FTC v. Grant Connect, LLC*,
763 F.3d 1094 (9th Cir. 2014) .......... 18

*FTC v. Kochava Inc.*,
671 F.Supp.3d 1161 (D. Idaho 2023) .......... 14

*FTC v. Mag. Sols., LLC*,
2008 WL 11383877 (W.D. Pa. Dec. 1, 2008) .......... 12, 16, 17

*FTC v. Moses*,
913 F.3d 297 (2d Cir. 2019) .......... 16

*FTC v. NHS Sys., Inc.*,
936 F.Supp.2d 520 (E.D. Pa. 2013) .......... 12, 16, 17

*FTC v. Partners In Health Care*,
189 F.Supp.3d 1356 (S.D. Fla. 2016) .......... 17

*FTC v. USA Fin., LLC*,
415 F. App'x 970 (11th Cir. 2011) .......... 7

*Fteja v. Facebook, Inc.*,
841 F.Supp.2d 829 (S.D.N.Y. 2012) .......... 10

*G.L. v. Ligonier Valley Sch. Dist. Auth.*,
802 F.3d 601 (3d Cir. 2015) .......... 27

*Hilfirty v. Shipman*,
91 F.3d 573 (3d Cir.1996) .......... 24

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) .......... 9, 35

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir.1997) .......... 9

*In re Nat'l Credit Mgmt. Corp.*, LLC,
21 F.Supp.2d 424 (D. N.J. 1998) .......... 12

*Integrity Advance, LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022). .......... 28, 29

*Joe Hand Promotions, Inc. v. Yakubets*,
3 F.Supp.3d 261 (E.D. Pa. 2014) ..................... 16

*Kirkham v. TaxAct, Inc.*,
2024 WL 1143481 (E.D. Pa. Mar. 15, 2024) ..................... 10

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992) ..................... 12

*Lee v. Conagra Brands, Inc.*,
958 F.3d 70 (1st Cir. 2020) ..................... 8

*Pennsylvania v. Navient Corp.*,
354 F. Supp. 3d 529 (M.D. Pa. 2018) ..................... 4

*Robinson v. Johnson*,
313 F.3d 128 (3d Cir. 2002) ..................... 27

*Schaedler v. Reading Eagle Publ'n*,
370 F.2d 795 (3d Cir. 1967) ..................... 35

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ..................... 9, 24, 26, 35

*Sebelius v. Cloer*,
569 U.S. 369 (2013) ..................... 32

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
742 F.2d 786 (3d Cir. 1984) ..................... 8

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008) ..................... 24

*Texas v. Colony Ridge, Inc.*,
2024 WL 4553111 (S.D. Tex. Oct. 11, 2024), *report and recommendation adopted*,
(S.D. Tex. Nov. 26, 2024) ..................... 31

*Tri-Realty Co. v. Ursinus Coll.*,
2013 WL 6164092 (E.D. Pa. Nov. 21, 2013) ..................... 24

*United States v. Freeman*,
688 F.Supp.3d 1 (D.N.H. 2023) ..................... 14

*United States v. Ret. Servs. Grp.*,
302 F.3d 425 (5th Cir. 2002) ..................... 28

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 14

*Wilson v. United States*,
585 F.Supp. 202 (M.D. Pa. 1984) .......... 35

*Zubik v. Zubik*,
384 F.2d 267 (3d Cir. 1967) .......... 16, 17

Statutes

12 U.S.C. § 289(a) .......... 33
12 U.S.C. § 5390(n)(2) .......... 32
12 U.S.C. § 5465(c) .......... 32
12 U.S.C. § 5497 .......... 31, 32, 33, 34
12 U.S.C. § 5531 .......... 13, 14, 19
12 U.S.C. § 5536 .......... Passim
12 U.S.C. § 5561(5) .......... 25
12 U.S.C. § 5564(g)(1) .......... Passim
15 U.S.C. § 1602(j) .......... 21
15 U.S.C. § 1605(a) .......... 22, 23
15 U.S.C. § 1607 .......... 29, 30, 31
15 U.S.C. § 1637(n) .......... 20, 21, 24
15 U.S.C. § 1640 .......... 30, 31
20 U.S.C. § 1415(f)(3)(C) .......... 27
28 U.S.C. § 1331 .......... 14
31 U.S.C. § 1341 .......... 35
M.G.L. c. 93, § 68B(4) .......... 4

Rules

Fed. R. Civ. P. 8 .......... 2, 5, 9, 15
Fed. R. Civ. P. 9(b) .......... 1, 3, 4, 5
Fed. R. Civ. P. 12(e) .......... 35

Regulations

12 C.F.R. § 1026.2(a)(20) .......... 21, 22, 23
12 C.F.R. § 1026.4(a) .......... 22, 23
12 C.F.R. § 1026.4(b) .......... 22

12 C.F.R. § 1026.4(c)(4) .......... 22, 23
12 C.F.R. § 1026.52(a)(1) .......... 21, 23
12 C.F.R. § 1026.52(a)(2) .......... 23

Other Authorities

Black's Law Dictionary (12th ed. 2024).......................................................................... 32

FTC, *.com Disclosures: How to Make Efficient Disclosures in Digital Advertising*, (March 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf. .................... 10

*In re Integrity Advance, LLC, No.* 2015-CFPB-0029, slip op. (Jan. 24, 2020) (Dkt. No. 249), https://files.consumerfinance.gov/f/documents/cfpb_2015-CFPB-0029_Document-249_2020-01.pdf............................................................................................................................ 29

Oxford English Dictionary (online ed. 2024) .................................................................... 32

S. Rep. No. 111-176 (2010) ............................................................................................ 32

## INTRODUCTION

Robert Kane (Kane) and his wholly owned business Reliant Holdings, Inc. (Reliant) (together, Defendants) deceived thousands of vulnerable consumers into paying for a nearly worthless financial product: a line of credit that could only be used to shop at the "Horizon Outlet," an online store that is barely more than a closet of overpriced, off-brand items. Reliant used misleading advertisements that imitated legitimate credit cards to give consumers the impression that Reliant's cards were general-purpose credit cards. But once consumers signed up for the Horizon Card Membership and realized that it provided little value, they were overwhelmingly dissatisfied and wanted to cancel. Reliant then made cancellation unreasonably difficult: consumers were required to cancel by phone, were passed between multiple agents who read lengthy customer service scripts requiring multiple offers and rebuttals, and were forced to endure end-of-call advertisements for other dubious financial products. The Consumer Financial Protection Bureau (CFPB or the Bureau) filed this action to end Defendants' deceptive and abusive acts and practices in violation of the Consumer Financial Protection Act (CFPA) and to demand the restitution of tens of millions of dollars in unlawful fees.

The arguments presented in Defendants' motion provide no cause to dismiss this action and deny relief to consumers. As an initial matter, Defendants err in their suggestion that the Bureau's claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Courts have routinely rejected that argument in matters involving CFPA claims.

Defendants' argument that the Bureau failed to state a deceptive advertising claim fails because it primarily relies on their assertion that the net impression of their advertisements was not deceptive; but that is a question for summary judgment or trial, not a 12(b)(6) motion. Reliant and Kane further argue that they can't face liability for Reliant's misrepresentations about its cancellation process because the misrepresentations allegedly occurred after the

consumer had purchased the product. But the suggestion that deceptive or abusive acts cannot be committed against a current consumer is simply incorrect legally. And Defendants' arguments regarding Kane's individual liability fare no better. The well-established standards for individual liability and substantial assistance under the CFPA hinge on Kane's knowing control over or participation in Reliant's illegal acts, which the Complaint properly alleges.

The Bureau's Truth in Lending Act (TILA) claim against Reliant seeks to enforce the "fee harvester" protections of the statute, which were enacted by Congress to protect consumers from the kind of excessive credit card fees that Reliant charged here. Reliant claims that TILA does not apply to its product because its 0%-interest line of credit did not impose a finance charge and therefore was not "open-end credit" as defined by TILA. But the junk fees larded onto Reliant's cards—including a card-activation fee and processing fees for every credit transaction at the Horizon Outlet—plainly qualify as "finance charges" under TILA and its implementing Regulation Z.

Finally, Defendants' statute of limitations and constitutional arguments fail to rescue their flawed motion. The ongoing nature of the Defendants' violations and the fact that the Complaint alleges no facts establishing when Bureau discovered Defendants' violations prevents any statute of limitations ruling against the Bureau at this stage. And Defendants' argument that the Federal Reserve had no earnings with which to fund the Bureau ignores the statutory text and context and wouldn't result in the dismissal of this lawsuit in any case.

## ARGUMENT

### I. All Counts in the Complaint state claims upon which relief can be granted.

#### A. Proper Standard of Review

Rule 8 of the Federal Rules of Civil Procedure requires only that the Bureau provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a)(2). Defendants' motion should be denied if the Bureau has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court should assume all the Complaint's "factual allegations to be true, construe those truths in the light most favorable to the [Bureau], and then draw all reasonable inferences from them." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2015); *see also Iqbal*, 556 U.S. at 678. The matter for the Court's determination is not whether the Bureau ultimately will prevail on its claims, but whether the Complaint properly pleads its claims. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). Thus, the Complaint is sufficient if it has "put forth allegations [of fact] that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of the claims. *Id.* (quotation omitted). The Complaint here unquestionably meets this standard.

Defendants argue that the Bureau's claims sound in fraud and therefore the Complaint must meet Rule 9(b)'s heightened pleading standard. *See* Defs.' Br. in Supp. of Mot. to Dismiss 13-14, ECF No. 30 (Defs.' Br.) (arguing that Rule 9(b) applies to complaint in its entirety). Defendants are wrong. Courts have repeatedly confirmed that Rule 9(b) does not apply to the CFPA for three reasons. *See CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *24-25 (M.D. Pa. Aug. 4, 2017); *CFPB v. Frederick Hanna & Assocs.,* 114 F.Supp.3d 1342, 1371-74 (N.D. Ga. 2015). First, Rule 9(b) expressly applies only to claims alleging "fraud or mistake," and consumer protection claims are not claims of fraud even if there is a deceptive dimension to them. *Navient*, 2017 WL 3380530, at *24 (citing *Frederick Hanna*, 114 F.Supp.3d at 1372). Second, "the United States Supreme Court has consistently cautioned against extending this heightened pleading standard beyond claims for fraud or mistake." *Id*. (quoting *Frederick Hanna*, 114 F.Supp.3d at 1372). Third, applying Rule 9(b) "to consumer protection claims is not

only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." *Id*. (quoting *Frederick Hanna*, 114 F.Supp.3d at 1373). *See also FTC v. Freecom Commc'n, Inc*., 401 F.3d 1192, 1203-04 n.7 (10th Cir. 2005) (finding that the heightened pleading standard of Rule 9(b) should not apply to deception claims under the FTC Act);[1] *CFPB v. Think Fin*., *LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *7 (D. Mont. Aug. 3, 2018) (declining to apply Rule 9(b) to CFPA claims and noting that numerous "courts have determined that Rule 9(b) does not apply to consumer protection claims arising under other statutes").

Defendants cite two opinions applying Rule 9(b) in Bureau cases, *see* Defs.' Br. 13-14, but these decisions are either distinguishable or have been disregarded by other courts considering this issue. In *CFPB v. Commonwealth Equity Grp., LLC*, the court found that a complaint filed jointly by the Bureau and the Massachusetts Attorney General satisfied the higher pleading standards of Rule 9(b) without discussing whether the Bureau was required to satisfy Rule 9(b) for its CFPA claims. 554 F.Supp.3d 202, 209 (D. Mass. 2021). The state law at issue prohibited "making or using any untrue or misleading representations . . . *intended to defraud or deceive* a buyer in connection with the offer or sale of [credit] services." *See* Am. Compl. ¶ 78, *CFPB v. Commonwealth Equity Grp., LLC*, No. 1:20-cv-10991-RWZ, 2020 WL 13555393 (filed Sept. 16, 2020), (emphasis added) (internal quotation mark omitted) (alleging violation of M.G.L. c. 93, § 68B(4)). Without considering each violation separately, the court held that the complaint adequately alleged deceptive conduct because the "[p]laintiffs allege that

---

[1] As noted by Defendants, courts apply the body of case law construing the Federal Trade Commission Act when evaluating similar claims brought under the CFPA. *See, e.g., Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016); *Pennsylvania v. Navient Corp*., 354 F. Supp. 3d 529, 562 (M.D. Pa. 2018), *aff'd*, 967 F.3d 273 (3d Cir. 2020).

defendants made false statements on their website and provide examples of the allegedly false statements along with the dates on which the statements were made." 554 F.Supp.3d at 209. But the court never expressly held that Rule 9(b) applied to CFPA claims. And unlike in the *Commonwealth Equity* case, none of the claims in the instant Complaint allege (or are required to allege) an intent to defraud.

Defendants also rely on *CFPB v. Prime Marketing Holdings, LLC*, No. CV-16-07111-BRO, 2016 WL 10516097, at *5-6 (C.D. Cal. Nov. 15, 2016), which applied Rule 9(b) to a CFPA claim. But courts have repeatedly declined to follow this unpublished opinion since it was issued in 2016. *See, e.g., CFPB v. Manseth*, No. 22-CV-29-LJV, 2023 WL 5400235, at *15-16 (W.D.N.Y. Aug. 22, 2023) (declining to follow *Commonwealth Equity* and *Prime Marketing Holdings* decisions and holding that Rule 8 pleading standard applies to CFPA claims); *CFPB v. 1st All. Lending, LLC*, No. 3:21-CV-55 (RNC), 2022 WL 993582, at *6 (D. Conn. Mar. 31, 2022) (declining to follow *Prime Marketing* because "the overwhelming weight of precedent militates against applying Rule 9(b) to CFPA claims" (quotation omitted)); *Think Fin., LLC*, 2018 WL 3707911, at *7-8 (same). This Court should do the same.

**B. Count I pleads facts sufficient to support the inference that Reliant engaged in deceptive advertising.**

A representation, omission, act, or practice is deceptive under the CFPA when: (1) "[it] is likely to mislead consumers acting reasonably under the circumstances," and (2) "the representation, omission, act, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (internal citation omitted). "Deception may be found based on the net impression created by a representation." *Id*. at 1193 (internal quotation marks omitted); *see also Navient Corp.*, 2017 WL 3380530, at *23. The Complaint alleges that Reliant's advertisements gave the net impression that Reliant offered a general-purpose credit card when the company actually

offered a line of credit that could only be used at Reliant's online store. Compl. ¶ 19.

Defendants argue that the Complaint's deceptive advertising claim is too "conclusory" and "unsupported," but this is simply untrue. The Complaint includes images of four Reliant advertisements that the Bureau alleges are a representative sample of advertisements that "did not, or did not adequately, disclose that the credit line was restricted for use only at the Horizon Outlet." Compl. ¶ 19. For instance, the Merit Platinum card advertisement states that the credit limit "allows you the freedom to spend as you please . . . ," which implies that the credit could be used anywhere credit cards are accepted. *Id*. And the three Horizon Gold advertisements each offer a "$500 credit limit" with "no Credit Checks" without disclosing that the credit can only be used at the Horizon Outlet. *Id*.

To the extent that Defendants disagree about the net impression of these advertisements, that is a factual dispute which cannot be resolved on a 12(b)(6) motion. Because the content of the advertisements themselves is sufficient to support an inference that they gave the net impression that Reliant was offering a general-purpose credit card, the Bureau's deceptive advertising complaint satisfies Rule 8(a), and Defendants' attempt to raise a factual dispute should be ignored at this stage of the matter. *See FTC v. Grand Canyon Educ., Inc.,* No. CV-23-02711-PHX-DWL, __ F.Supp.3d __, 2024 WL 3825087, at *19 (D. Ariz. Aug. 15, 2024) ("Evaluating the 'net impression' of an advertisement . . . is an intensely factual inquiry ill-suited for resolution at the pleading stage."); *FTC v. Am. Fin. Benefits Ctr.*, 324 F.Supp.3d 1067, 1078 (N.D. Cal. 2018) (denying motion to dismiss where defendants' advertisements plausibly created a misleading impression); *Navient Corp.*, 2017 WL 3380530, at *24 (denying motion to dismiss because Bureau plausibly alleged a statement could mislead a reasonable consumer); *FTC v. Cantkier*, 767 F.Supp.2d 147, 159 (D.D.C. 2011) (holding that evaluating disclosures to defeat a

claim of deception is improper at the motion to dismiss phase).

Defendants also complain that the Bureau did not allege for each advertisement "how many consumers saw them, or whether there is any evidence that any consumer viewed or was actually misled by the ads." Defs.' Br. 16. But these are not elements of unfair, deceptive, or abusive (UDAAP) claims under the CFPA and thus do not need to be pleaded. The Complaint alleges that Reliant attracted consumers through advertising affiliates and affiliate networks that used websites, emails, push notifications, and text messages to reach consumers. Compl. ¶ 17. It also alleges that Reliant's advertisements were placed on websites where consumers shopped for credit products and were sent to consumers via mass-email marketing. *Id.* ¶ 18. These allegations are sufficient to establish that Reliant used advertising to reach consumers. The Complaint further alleges that Reliant's customer data demonstrates strong and immediate dissatisfaction with the Horizon Card Services membership, *id.* ¶¶ 39-42, which supports an inference that consumers were deceived by Reliant's advertising. However, the Bureau is not required to prove that consumers were actually deceived in order to establish liability (although proof of actual deception may be "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances"). *FTC v. Fleetcor Techs., Inc.,* 620 F.Supp.3d 1268, 1289-90 (N.D. Ga. 2022) (quoting *FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011)); *see also CFPB v. Access Funding, LLC*, 270 F.Supp.3d 831, 849-50 (D. Md. 2017) (holding that the CFPB is not required to identify particular consumers to plead a UDAAP claim); *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016) (same).

To the extent Defendants' position is that the Bureau must meet Rule 9(b)'s heightened pleading standards, the Bureau has already illustrated how that position is unsupported by the

caselaw. But even if Rule 9(b) applied, the Bureau's allegations are sufficient. The Third Circuit has held that Rule 9(b) requires that plaintiffs put defendants "on notice of the precise misconduct with which they are charged," and that, while "allegations of 'date, place or time' fulfill these functions," plaintiffs can "use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

The Complaint's allegations sufficiently put Defendants on notice of the "who, what, where, and when of the allegedly misleading representation." *Commonwealth Equity Grp., LLC*, 554 F.Supp.3d at 209 (quoting *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 74 (1st Cir. 2020)). The Complaint provides specific representative examples of Reliant's deceptive advertising; demonstrates that these ads misleadingly promoted a $500 limit credit card while failing to disclose (or to adequately disclose) that the credit line was restricted for use at the Horizon Outlet; and alleges that these ads have reached consumers since 2010 through websites that advertise credit products as well as mass-email marketing. Compl. ¶¶ 17-20. The Complaint also alleges that Reliant mailed a welcome package containing a deceptive insert to its customers from at least March 2019 to October 2020." *Id.* ¶ 44. These allegations put Defendants on notice of their deceptive conduct even under the heightened standards of Rule 9(b), especially since the further details they seek (such as the precisely when and where these ads were used) are known to Defendants and not the Bureau. *See Commonwealth Equity Grp.*, LLC, 554 F.Supp.3d at 209 (finding that specific examples of allegedly false statements in complaint complied with Rule 9(b)).

Defendants next argue that the Complaint fails to state a claim because it did not sufficiently describe Reliant's application and enrollment process. *See* Defs.' Br. 16-17. But as a

matter of law, the deceptiveness of Reliant's ads cannot be cured by subsequent disclosures encountered by consumers during the application process, even if those subsequent disclosures are clear and conspicuous (which was not the case here). *See FTC v. E.M.A. Nationwide, Inc.,* 767 F.3d 611, 632 (6th Cir. 2014) ("[T]he FTC Act is violated 'if the first contact or interview is secured by deception . . . , even though the true facts are made known to the buyer before he enters into the contract of purchase.'" (quoting *Carter Prods. v. FTC*, 186 F.2d 821, 824 (7th Cir. 1951))); *Gordon*, 819 F.3d at 1194. Defendants proffer an employee declaration to describe Reliant's online application process, but the facts they seek to introduce are incomplete and lack context. Indeed, the Bureau does not agree that Reliant's online enrollment process clearly and conspicuously disclosed the true nature of the Horizon card to reasonable consumers. In any event, these additional facts, and any affirmative defenses that Defendants may raise based on such facts, are not relevant to whether the Compliant sufficiently alleges that Reliant's ads were deceptive.[2] *See Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) ("Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses." (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004))).

Finally, Defendants devote several pages to insisting that "Reliant's marketing closely follows the FTC's recommendations for 'clear and conspicuous online disclosures.'" Defs.' Br.

---

[2] The Court should also deny Defendants' request to take judicial notice of these improperly introduced materials. ECF Doc. No. 29. The Third Circuit has held that factual affidavits, like the McDonald affidavit proffered by Defendants, "clearly may not be considered at this stage." *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Cent. Contracting Co. v. Md. Cas. Co.,* 367 F.2d 341, 343 (3d Cir. 1966)). Nor can Defendants introduce selective screenshots from Reliant's website in an improper attempt to generate a factual dispute at the motion to dismiss stage. These incomplete facts about Reliant's application process are not "integral to or explicitly relied upon" by the Bureau's deceptive advertising claims, so they do not fit into the narrow exception permitting judicial notice or consideration on a motion to dismiss. *See Skolas*, 770 F.3d at 249-50 (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

18. Not only are those arguments improper for a 12(b)(6) motion but they are also meritless. The FTC guidelines that Defendants reference state that limitations and qualifying information should be incorporated into the underlying advertising claim rather than disclosed separately. FTC, *.com Disclosures: How to Make Efficient Disclosures in Digital Advertising*, at i (March 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf (last visited on January 28, 2025). In fact, the guidelines address the type of advertisement Reliant used. "If a disclosure is necessary to prevent an advertisement from being deceptive, unfair, or otherwise violative of a Commission rule, and it is not possible to make the disclosure clearly and conspicuously, then that ad should not be disseminated." *Id.* at iii.

Similarly, Defendants' arguments regarding Reliant's "clickwrap" agreement fail. As previously explained, the deceptiveness of Reliant's ads cannot be cured by subsequent disclosures encountered by consumers during the application process, even if those subsequent disclosures are clear and conspicuous (which was not the case here). Further, none of the cases Defendants cite regarding the appropriateness of a clickwrap agreement concern disclosures that aim to remedy deceptive advertisements. *See Kirkham v. TaxAct, Inc.*, No. CV 23-3303, 2024 WL 1143481 (E.D. Pa. Mar. 15, 2024) (concerning enforcement of contract arbitration clause); *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 232 (E.D. Pa. 2007) (enforcement of contract forum selection clause); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829 (S.D.N.Y. 2012) (same). The enforceability of Reliant's "clickwrap" contract terms has no bearing on whether the Bureau has stated a claim for deceptive advertising, particularly because "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance." *Gordon*, 819 F.3d at 1194; *see also E.M.A. Nationwide*, 767 F.3d at 633 ("Defendants

cannot make considerable material misrepresentations to consumers and then bury corrections and disclaimers in subsequent communications.”).

### C. Count I pleads facts sufficient to support the inference that Reliant made deceptive statements to consumers regarding its cancellation and refund policies.

The Complaint alleges that from at least March 2019 to October 2020, Reliant’s welcome package to new customers contained “an insert instructing dissatisfied customers to call a toll-free number to cancel enrollment and receive a full refund through a process that takes ‘less than a minute’ rather than seeking a bank or credit card chargeback[.]” Compl. ¶ 44. Included in the Complaint is an image of the actual insert sent to customers. But when customers called the company to cancel their membership, Reliant required its customer service employees to:

a. read lengthy scripts to customers who request to cancel their cards, reiterating the “benefits” of the membership and offering the membership at a discounted price;

b. make at least three different offers with rebuttals to customers;

c. transfer customers to supervisors before a membership can be canceled;

d. read multiple end-of-call offers for third-party companies, such as debt-relief companies, auto-title companies, and payday lenders; and

e. provide prorated refunds rather than refunds for the full 30 days unless the customer insists multiple times or uses “red flag language” (e.g., consumers threaten to contact their bank or the Better Business Bureau).

*Id.* ¶ 46. Because of these requirements, customers could spend 20 to 40 minutes just to get the Company to process their cancellation requests. *Id*. This was obviously “much longer than the minute [Reliant] promised.” *Id.* ¶ 59.b. Accordingly, the Complaint pleads facts to support the inference that during a 19-month period Reliant made the false representation that its cancellation process took less than a minute.

In an attempt to challenge this straightforward claim, Defendants first appear to conflate this claim with the Complaint’s deceptive advertising claim discussed above. Defendants argue

that the Complaint fails to state a claim because the Bureau has not alleged "that Reliant made any representations to consumers regarding the ease of cancellation *before* they enrolled in the Membership," Defs.' Br. 20 (emphasis in original), and the "only source" for the representation that cancellation takes less than a minute is the welcome package insert, Defs.' Br. 21. But the Bureau's claim has nothing to do with Reliant's advertisements or representations made to potential customers. Instead, the Complaint alleges that the welcome package insert given to consumers after enrollment contained a false and material representation about the ease and speed of "canceling and getting a full refund" to prevent customers from contacting their bank or credit card company to stop payments for Reliant's membership fees.

Defendants further argue that for a deceptive representation to be material it must contain "information that is important *to a consumer's purchasing decision*." Defs.' Br. 22 (emphasis in original). But this argument is facially inconsistent with the statute: the CFPA prohibits deceptive practices "**in connection with any transaction with a consumer for a consumer financial product or service**, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a) (emphasis added). This clearly indicates that the CFPA's requirements apply throughout the lifecycle of a consumer financial product.

Moreover, materiality is not limited only to representations affecting purchasing decisions. "A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *see also FTC v. Mag. Sols., LLC*, No. CV 7-692, 2008 WL 11383877, at *2 (W.D. Pa. Dec. 1, 2008). And express claims—like the one at issue here—are presumed to be material. *See FTC v. NHS Sys., Inc.*, 936 F.Supp.2d 520, 531 (E.D. Pa. 2013); *Mag. Sols.,* 2008 WL 11383877, at *6; *In re Nat'l Credit Mgmt. Corp*., LLC, 21

F.Supp.2d 424, 441 (D. N.J. 1998). Contrary to the implication of Defendants' argument, a company can be liable for deceptive claims in its communications with current customers. *See, e.g., Mag. Sols., LLC*, 2008 WL 11383877, at *4 (finding a company liable for deceptive claims in form collection letters).

The Complaint alleges that Reliant's express statement about the ease and speed of cancellation was likely to affect consumers' conduct about the Membership. Specifically, the Complaint alleges that this statement was made to discourage dissatisfied consumers from stopping their membership-fee payments by contacting their bank or credit card company to file a chargeback and instead, direct those consumers to contact Reliant to cancel their memberships and get a full refund. Compl. ¶ 44 (including image of actual insert). The Complaint further alleges that consumers who attempted to cancel their memberships through Reliant were subjected to "practices designed to prevent consumers from cancelling enrollment or obtaining refunds." *Id.* ¶ 43. Therefore, the Complaint adequately alleges that Reliant's false statement about the ease of cancellation was likely to affect consumer conduct and thus satisfies the CFPA's materiality requirement.

### D. Count II pleads facts sufficient to support the inference that Reliant's cancellation process was an abusive practice.

The CFPA makes it unlawful for the providers of consumer financial products and services to "engage in any . . . abusive act or practice," and authorizes the Bureau to use its enforcement authority to protect consumers from abusive conduct. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). An act or practice is "abusive" when, in relevant part, it "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B). Courts have upheld abusive practice claims in a variety of cases alleging that a company "derived

'unreasonable advantage' from its conduct" against consumers. *CFPB v. ITT Educ. Servs., Inc.*, 219 F.Supp.3d 878, 918 (S.D. Ind. 2015); *see also CFPB v. Certified Forensic Loan Auditors, LLC,* No. 2:19-cv-07722 ODW (JEMx), 2020 WL 2556417, at *3-4 (C.D. Cal. May 20, 2020); *Navient Corp.*, 2017 WL 3380530, at *19; *Think Fin., LLC*, 2018 WL 3707911, at *8; *Access Funding, LLC*, 270 F.Supp.3d at 849-50; *NDG Fin. Corp.*, 2016 WL 7188792, at *14-15.

Here, the Complaint states facts to show that Reliant took unreasonable advantage of consumers by subjecting them to an unreasonably difficult and time-consuming cancellation and refund process that consumers could not avoid if those consumers wanted to protect their financial interests. Compl. ¶¶ 43-46; *see also supra* at 13. Reliant instructed customers to cancel by phone, Compl. ¶ 44, and thus customers could not avoid this onerous cancellation process if they wanted a fee refund or to stop Reliant from continuing to charge them each month. These allegations sufficiently support the inference that Reliant made it unreasonably difficult for consumers to cancel their Horizon Card Services enrollment and get refunds they were entitled to receive.[3]

---

[3] Defendants separately argue that "federal question jurisdiction is lacking" because "there is nothing in the [CFPA] which reflects that Congress delegated" the Bureau authority to declare Defendants' interference with consumers' ability to cancel their enrollment to be UDAAPs under the Act. *See* Defs.' Br. 38-39. As an initial matter, this challenge has no bearing on the existence of federal question jurisdiction—the Complaint undoubtedly asserts claims under federal law for which federal jurisdiction lies. *See* 28 U.S.C. § 1331. Defendants are also wrong to contend that the Bureau lacks authority to bring these federal claims. The Bureau undeniably has authority to bring claims for violations of the CFPA's prohibitions on deceptive and abusive financial service practices. 12 U.S.C. §§ 5531, 5536. The Bureau seeks to exercise that clear authority here by asking the court to apply well-settled principles of deception and abusiveness to Defendants' particular cancellation policies and practices. Defendants gesture at the major questions doctrine and suggest that these claims involve a "major policy decision" that the Bureau is not authorized to address without a clearer signal from Congress. *See* Defs.' Br. 38-39 (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)). But filing a complaint alleging that it's unlawful for an entity to make cancellation of enrollment in a membership unreasonably difficult is hardly the type of major policy decision of "vast economic and political significance" that implicates the major questions doctrine. *See West Virginia*, 597 U.S. at 721, 723-24. Besides, the major questions

Defendants object that the Bureau's Complaint does not specifically identify the "policies, scripts, and training materials" that defined Reliant's cancellation and refund policies. *See* Defs.' Br. 24-25. This objection is absurd given that the Complaint references Reliant's *own* policy and procedure documents (which Reliant produced to the Bureau during its investigation). In any event, such details are not required to put Defendants on notice of the Bureau's claims under the applicable pleading standards, and these objections provide no basis for granting Defendants' motion to dismiss. *See NDG Fin. Corp*., 2016 WL 7188792, at *13 ("Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations.").

Defendants further complain that the Complaint does not satisfy the definition of abusiveness set forth in the CFPA and discussed in the Bureau's Policy Statement, "as it does not allege a single customer was unable to cancel the product or receive a refund." Defs.' Br. 23. But the Complaint sufficiently alleges that Reliant's policies and procedures were designed to frustrate cancellations and refunds. Compl. ¶¶ 6, 45-46, 67-70. And at this stage of the proceedings, the Bureau does not need to identify specific harmed consumers to defeat Defendants' Rule 12(b)(6) motion. *See Access Funding, LLC*, 270 F.Supp.3d at 849-50 (rejecting defendants' argument that the CFPB's complaint was "deficient because it fails to identify any particular consumers who were the subject of abusive acts or practices"); *NDG Fin. Corp*., 2016 WL 7188792, at *13 (denying motion to dismiss UDAAP claims, and holding that "Defendants are incorrect that *Iqbal* and *Twombly* require the CFPB to identify specific consumers targeted by

---

doctrine simply does not apply to agency enforcement actions, even if the agency were extending its legal authority to new contexts. *See FTC v. Kochava Inc*., 671 F.Supp.3d 1161, 1180 (D. Idaho 2023) (rejecting an application where the FTC was "merely asking a court to interpret and apply a statute enacted by Congress"); *United States v. Freeman*, 688 F.Supp.3d 1, 18 (D.N.H. 2023) (similar).

the . . . scheme in order to survive a motion to dismiss").[4]

**E. Counts I and II plead facts sufficient to support the inference that Kane is individually liable for Reliant's deceptive and abusive acts and practices.**

Individuals are liable for a corporation's violation of the CFPA when they (1) "participated directly in the acts or practices or had authority to control them;" and (2) "had or should have knowledge or awareness of the misconduct." *1st All. Lending, LLC*, 2022 WL 993582, at *6 (internal quotation marks removed) (quoting *FTC. v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019) (unfairness); *see also Gordon,* 819 F.3d at 1193 (deception); *CFPB v. Access Funding, LLC*, No. CV ELH-16-3759, 2021 WL 2915118, at *28 (D. Md. July 12, 2021) (abusiveness); *Mag. Sols., LLC*, 2008 WL 11383877, at *10 (applying same standard to find individual liability under FTCA); *NHS Sys., Inc*., 936 F.Supp.2d at 534 (same). Defendants' citation to a Third Circuit admiralty case, and a series of Pennsylvania tort cases holding that corporate officers cannot be held liable for nonfeasance, is clearly inapposite. *See* Defs.' Br. 25-27.

The Complaint alleges sufficient facts under each prong to establish Kane's participation in or control over Reliant's conduct, and that he knew or should have known of the consumer law violations in Counts I and II. *Cf. Zubik v. Zubik*, 384 F.2d 267, 275 (3d Cir. 1967) (explaining that a corporate officer may be held liable when he "takes part in the commission of a tort" or "specifically directed the particular act to be done, or participated, or cooperated therein"); *Joe Hand Promotions, Inc. v. Yakubets*, 3 F.Supp.3d 261, 292 (E.D. Pa. 2014) ("There is no question that an individual can be held jointly liable with his corporation" (citing *Zubik*)). First, courts routinely find that the type of facts alleged in the Complaint are sufficient when

[4] The sole case cited by Defendants, *CFPB v. Intercept Corp.*, No. 3:16-cv-144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017), is contrary to the overwhelming weight of this authority.

proven to establish the control prong. Specifically, an individual's control of a corporate defendant can be established by evidence of "active involvement in business affairs and the making of corporate policy." *Mag. Sols., LLC*, 2008 WL 11383877, at *10 (finding company's owner and sole officer liable "as the individual who formulated, directed, controlled and / or had the authority to control [defendant company's] acts and practices"); *see also NHS Sys., Inc.*, 936 F.Supp.2d at 534 (finding individual defendants liable "due to their knowledge of the deceptive schemes employed within the . . . corporations in which they had substantial control"). Here, the Complaint alleges that Kane managed, directed, and controlled or had authority to control Reliant, Compl. ¶¶ 11, 47-52, and that he specifically had the authority to control Reliant's advertising practices and scripts used by customer service employees, *id.* ¶ 49. Additionally, as is the case here, "[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held [sic] corporation." *FTC v. Partners In Health Care*, 189 F.Supp.3d 1356, 1367 (S.D. Fla. 2016) (citation omitted); *see also id.* at 1368 ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." (citation omitted)).

Second, the Complaint states facts sufficient to support the inference that Kane at least should have known about Reliant's deceptive advertising and its abusive cancellation policies and procedures. *See Manseth*, 2023 WL 5400235, at *17 (finding that defendants' review of consumer complaints established that they knew about or recklessly disregarded the underlying violations); *CFPB v. FDATR, Inc.*, No. 20 CV 6879, 2025 WL 71734, at *5 (N.D. Ill. Jan. 10, 2025) (finding individual liability where corporate officer knew that company's representations were deceptive); *see also CFPB v. Commonwealth Equity Grp.*, LLC, No. 1:20-CV-10991-IT, __ F.Supp.3d __, 2024 WL 4362126, at *10 (D. Mass. Sept. 30, 2024) (finding that creating

documents, overseeing the company, and reviewing sales scripts established that defendant "knew or should have known" his company was engaging in unlawful practices for purpose of substantial assistance claim). The Complaint alleges that Kane had day-to-day oversight of Reliant's operations, Compl. ¶ 48, had the authority to control Reliant's advertising practices and customer-service scripts, *id.* ¶ 49, and reviewed consumer complaints, *id.* ¶ 50. It also alleges that "consumers routinely complained that they had signed up for a standard, general-purpose credit card and did not realize that they could only use Reliant's card at the Horizon Outlet." *Id.* ¶ 41. Further, Reliant's policies, scripts, and training materials show that the cancellation process was time consuming and obtaining full refunds was difficult, *id.* ¶ 45, and Kane received reports about chargebacks, *id.* ¶ 50. These allegations are sufficient to plead that Kane should have known about Reliant's unlawful acts and practices. *See, e.g., FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014) (finding owner of a company whose credit scheme was nearly identical to Reliant's personally liable for the company's misconduct, including because he supervised the company's operation, conducted hiring and directed the activities of the company); *FTC v. Chinery*, No. CIV.05-3460 GEB, 2007 WL 1959270, at *7 (D.N.J. July 5, 2007) (denying motion to dismiss individual liability claims against corporate officer where FTC alleged knowledge of the company's misrepresentations).

**F. Count III pleads facts sufficient to support the inference that Kane substantially assisted Reliant's CFPA violations.**

The Complaint's allegations as to individual liability under the CFPA also sufficiently state a claim that Kane substantially assisted Reliant's CFPA violations. The CFPA prohibits "any person" from "knowingly or recklessly provid[ing] substantial assistance to a covered person . . . in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder." 12 U.S.C. § 5536(a)(3). The elements of substantial assistance are (1) a primary

violation of the CFPA; (2) the defendant's knowledge or reckless disregard of the primary violation; and (3) the defendant's substantial assistance in the primary violation. *Manseth*, 2023 WL 5400235, at *16.

The allegations that support an inference of Kane's knowledge to state a claim under Counts I and II, *supra* at 17-18, also support the inference that he had the requisite scienter (knowledge or recklessness) to sufficiently state a claim that he substantially assisted Reliant's deceptive and abusive acts and practices. *See Manseth*, 2023 WL 5400235, at *17 ("CFPB has sufficiently alleged that the [individual] defendants either knew about or recklessly disregarded the underlying violations" by alleging they "held high-level leadership positions," monitored company's activities and "dealt with consumer complaints."); *CFPB v. RD Legal*, 332 F.Supp.3d 729, 775 (S.D.N.Y. 2018), *amended*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *and aff'd in part, rev'd in part and remanded*, 828 F. App'x 68 (2d Cir. 2020) (CEO's authority over corporate defendant and approval of the contents of its website were sufficient to satisfy "the 'knowing' or 'reckless' requirement of 12 U.S.C. § 5536(a)(3)").

Similarly, the allegations that support an inference of Kane's control to state a claim under Counts I and II, *supra* at 16-17, also support the inference that Kane provided substantial assistance to Reliant's deceptive and abusive acts and practices. The "threshold for what constitutes substantial assistance is low . . . and requires showing only more than 'mere causal or incidental' assistance." *Commonwealth Equity Grp., LLC*, 2024 WL 4362126, at *9, *11 (internal citation omitted). As described above, Kane was deeply involved in Reliant's operations, including the design, implementation, and oversight of the Company's policies and practices, Compl. ¶¶ 47-50, all of which are sufficient to establish that Kane substantially assisted in Reliant's deceptive and abusive acts. *See CFPB v. Nexus Servs., Inc.*, No. 5:21-CV-

00016, 2024 WL 1461382, at *6 (W.D. Va. Apr. 2, 2024) (holding that individual defendant provided substantial assistance by approving policies and practices, exercising authority over employees, reviewing reports, and overseeing training and consumer complaints); *Commonwealth Equity Grp.*, LLC, 2024 WL 4362126, at *10 (overseeing operations, being involved in marketing and customer service was substantial assistance).

Finally, Defendants argue that Rule 9(b) applies to substantial assistance claims. Defs.' Br. 28. But just as they are incorrect about Rule 9(b) applying to the Complaint more generally, *see supra* at 3-5, they are also incorrect as it applies to substantial assistance. "[T]he 'knowledge or recklessness' standard required for substantial assistance liability under 12 U.S.C. § 5536(a)(3) does not transform a substantial assistance claim into the sort of fraud-based claim that would trigger Rule 9(b)." *Manseth*, 2023 WL 5400235, at *16; *see also*, *RD Legal Funding, LLC*, 332 F.Supp.3d at 770 (denying motion to dismiss substantial assistance claim because company's owner and founder had significant responsibilities for establishing company's policies and practices). And even if 9(b) did apply, the rule expressly states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Complaint's allegations meet that standard. *See, e.g., Brackenridge Constr. Co. v. Doerflein*, No. 2:20-CV-305, 2020 WL 13336748, at *3 (W.D. Pa. Dec. 4, 2020).

### G. Count IV and V plead facts sufficient to support the inference that Reliant violated the Truth in Lending Act (TILA) and Regulation Z.

Reliant (from at least January 2015 through January 2021) charged customers membership and other fees that exceeded 25% of their opening credit limit. Compl. ¶ 83; *see also id.* ¶¶ 13, 19, 26, 29-31 (describing these fees and the $500 opening credit limit for Horizon credit cards). As alleged in Counts IV and V of the Complaint, this practice violated the restrictions on "fee harvester" cards imposed by TILA and its implementing Regulation Z. *See*

15 U.S.C. § 1637(n); 12 C.F.R. § 1026.52(a)(1).[5]

Because this is a motion to dismiss, the Bureau's well-pleaded assertion that Reliant charged its customers "credit . . . subject to a finance charge" (Compl. ¶ 80) should be the end of the inquiry, because this factual allegation must be taken as true at this stage. *See CFPB v. SoLo Funds, Inc*., No. 2:24-CV-04108-RGK-AJR, 2024 WL 4553110, at *3, *5 (C.D. Cal. Oct. 17, 2024) (denying motion to dismiss where CFPB had alleged "ample facts" to support its claim that certain consumer payments "may be defined as finance charges" under TILA); *Think Fin., LLC*, 2018 WL 3707911, at *9 (Bureau's allegation that companies were alter egos, as well as the legal implications of that factual assertion, must be accepted by court when considering motion to dismiss). But in addition, Defendants' argument that TILA's "fee harvester" protections do not apply to their credit cards fails as a matter of law.

As Defendants concede, TILA's fee limitations apply to any open-end credit card account. *See* 15 U.S.C. § 1637(n); 12 C.F.R. § 1026.52(a)(1). Defendants argue that Counts IV and V fail because the Reliant credit cards do not satisfy the definition of an "open end credit plan" found in TILA and Regulation Z. But they are wrong.

Under TILA and Regulation Z, an "open end credit plan" means "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(j); 12 C.F.R. § 1026.2(a)(20). TILA and Regulation Z define a "finance charge" to include "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as

[5] The Bureau agrees that its CFPA claim in Count V relies on the same analysis of TILA and Regulation Z that support Count IV. *See* Defs.' Br. 30 n.18. Because there is no basis to dismiss Count IV, Count V should survive as well.

an incident to the extension of credit." 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a). Examples of finance charges include interest, transaction charges, and other fees that are required to access credit. 12 C.F.R. § 1026.4(b) (listing "examples of finance charges").

Defendants argue that their credit cards do not meet the definition of "open-end credit" because they do not "impose a finance charge from time to time on an outstanding unpaid balance." The fatal flaw in Defendants' analysis is that it only considers whether the Horizon monthly membership fee was a "finance charge," while ignoring all the other fees that Reliant charged to its credit card customers. Even assuming that the membership fees were "participation fees" excluded from the Regulation Z definition of "finance charge," *see* 12 C.F.R. § 1026.4(c)(4), other fees charged by Reliant plainly were finance charges. For example, Reliant charged processing fees every time a customer used a Horizon card to purchase a product from the Horizon Outlet. Compl. ¶¶ 30, 37. These processing fees (which are ignored by Defendants' brief) were plainly "finance charges" because they were charged to consumers as a condition of accessing credit. *See* Official Interpretation of 12 C.F.R. § 1026.4(a), comment 4, available at https://www.consumerfinance.gov/rules-policy/regulations/1026/4/#4-a-Interp-4 (providing, with inapplicable exceptions, that "any transaction charge imposed on a cardholder by a card issuer is a finance charge, regardless of whether the issuer imposes the same, greater, or lesser charge on withdrawals of funds from an asset account such as a checking or savings account"). In addition, "[u]pon account activation, cardholders were charged a one-time card-issuance-and-account-validation fee of $5." Compl. ¶ 29. Because this fee was charged only to consumers who received a Horizon credit card, it was imposed "directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *see also* 15 U.S.C.

§ 1605(a).[6]

In short, consumers who used Reliant's line of credit paid finance charges to the company. Reliant, as the creditor, would not be able to calculate the amount of the total finance charge at account opening because some of these finance charges (e.g., the processing fees) depended on consumers' use of the account. These are exactly the types of finance charges that define a line of credit as "open-end credit." *See* 12 C.F.R. § 1026.2(a)(20).[7] Accordingly, Reliant's credit card meets the definition of "open-end credit," and it is subject to the "fee harvester" limitations of TILA and Regulation Z.

Having established that Reliant's credit was open-end under TILA and Regulation Z, *all* fees paid by consumers—including Horizon's monthly membership fees—must be included when considering whether Reliant violated the 25% cap. This is because the fee restriction is not limited to fees that also qualify as "finance charges;" it covers "the *total amount of fees* a consumer is required to pay with respect to a credit card account under an open-end (not home-secured) consumer credit plan during the first year after account opening," with the exception of "(i) Late payment fees, over-the-limit fees, and returned-payment fees; or (ii) Fees that the consumer is not required to pay with respect to the account." 12 C.F.R. § 1026.52(a)(1)-(2)

[6] This one-time account activation fee is also not a "participation fee," which would be excluded from the finance charge under 12 C.F.R. § 1026.4(c)(4), because participation fees are defined as fees "assessed on an annual or other periodic basis." *See* Official Interpretation of 12 C.F.R. § 1026.4(c)(4), *available at* https://www.consumerfinance.gov/rules-policy/regulations/1026/4/#c-4 ("[A] one-time, non-recurring fee imposed at the time an account is opened is not a fee that is charged on a periodic basis, and may not be treated as a participation fee.").

[7] Official Interpretation of 12 C.F.R. § 1026.2(a)(20), comment 4, *available at* https://www.consumerfinance.gov/rules-policy/regulations/1026/2/#2-a-20-Interp-4, explains that "open-end credit" is defined in part by "[t]he requirement that a finance charge may be computed and imposed from time to time on the outstanding balance [which] means that there is no specific amount financed for the plan for which the finance charge, total of payments, and payment schedule can be calculated."

(emphasis added); *see also* 15 U.S.C. § 1637(n)(1).

As alleged by the Complaint, Reliant clearly violated the 25% cap on credit card fees. "Reliant charged customers newly enrolled in a credit card account *at least* $299.40 a year while its introductory credit line associated with the credit card was $500." Compl. ¶ 83 (emphasis added). For the purpose of this motion to dismiss, these allegations are more than sufficient to establish the claims described in Counts IV and V.[8]

**II. None of the Bureau's claims are barred by the applicable statutes of limitations.**

"A statute of limitations defense can only be decided on a Rule 12(b)(6) motion "if the defense 'is clear from the face of the complaint.'" *NDG Fin. Corp.*, 2016 WL 7188792, at *19 (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425 (2d Cir. 2008)); *see also Skolas*, 770 F.3d at 249 ("In this circuit . . . we permit a limitations defense to be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. However, if the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." (internal citations and punctuation omitted)). Furthermore, "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims;

[8] As explained above, the Court should not take judicial notice of facts that are outside the allegations of this Complaint at this juncture. Nonetheless, the "terms and conditions" screenshots attached to the McDonald Declaration demonstrate the facts relevant to the Bureau's TILA claim in Count IV (and the derivative claim brought under the CFPA in Count V). For example, the Freedom Gold and Horizon Card Services Membership Agreement states that Reliant's cards include an "Unsecured $500 Credit Limit"; discloses that "Processing Fees" will vary "per item purchased"; discloses the "One Time Card Issuance and Account Validation Fee" of $5.00; and states that "the $24.95 benefits plan membership fee will be auto-debited monthly" for new customers. *See* McDonald Decl. Ex. 11, at 3-4, ECF No. 28-11. These facts are sufficient for the Court to find Reliant liable under Counts IV and V and grant partial summary judgment in favor of the Bureau (after giving the parties notice and an opportunity to supplement the record). *See Tri-Realty Co. v. Ursinus Coll.*, No. CIV.A. 11-5885, 2013 WL 6164092, at *10 (E.D. Pa. Nov. 21, 2013) (citing *Hilfirty v. Shipman*, 91 F.3d 573, 578 (3d Cir.1996)).

the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *CFPB v. TransUnion*, 641 F. Supp. 3d 474, 482 (N.D. Ill. 2022) (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original)).

All the claims in this case (including claims for violation of TILA) are governed by the CFPA's statute of limitations, which states that a Bureau action is timely when it is filed up to "3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). Because the facts alleged in the Complaint do not demonstrate when the Bureau discovered Defendants' violations, and because at least some of the conduct alleged in the Complaint was ongoing, the motion should be denied.

It would be improper for the Court to look past the allegations in the Complaint at this stage—including because Defendants' motion papers fail to acknowledge the series of tolling agreements that suspended the statute of limitations for any action brought by the Bureau against Reliant from June 29, 2023, until September 25, 2024. Any consideration of Defendants' limitations defenses should be based on a full record, which would include those tolling agreements. If the Court desires to address that full record now (despite the Bureau's argument that only the allegations in the Complaint are relevant at this stage), the Bureau requests leave to amend in order to allege facts concerning these tolling agreements and other matters relevant to the statute of limitations.

### A. The Bureau's claims for deceptive and abusive conduct in Counts I, II, and III are timely.

Each unlawful action taken by Defendants constitutes a discrete violation with its own statute of limitations. *See* 12 U.S.C. § 5561(5) (defining "violation" as "any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law"); *see also TransUnion*, 641 F. Supp. 3d at 481 (holding that "the limitations period runs separately for

each violation" of the CFPA). Here, the Complaint alleges an ongoing course of deceptive and abusive conduct without any known end date.[9] That alone is sufficient to defeat Defendant's statute of limitations challenge at this stage. *See TransUnion*, 641 F.Supp.3d at 481-82 (rejecting statute-of-limitations argument raised on motion to dismiss because "[t]he complaint sufficiently alleges violations occurring within the limitations period (or at least does not establish that each violation occurred outside that period)"); *CFPB v. Howard*, No. 8:17-cv-00161, 2018 WL 4847015, at *2 (C.D. Cal. May 3, 2018) (rejecting statute of limitations argument raised in a motion to dismiss "because at least some of the alleged conduct occurred within the three-year statute of limitations period") (quotation marks omitted); *NDG Financial*, 2016 WL 7188792, at *20 (denying motion to dismiss where the Bureau's complaint plausibly alleged "a continuing course of conduct" that included violations within the statute of limitations period).

Furthermore, there are no allegations on the face of the Complaint that indicate when the Bureau discovered Defendants' deceptive and abusive conduct (as compared to when that conduct took place). Therefore, the Court cannot conclude that the Bureau's filing was untimely based on the date of discovery. *See CFPB v. Fifth Third Bank, N.A.*, No. 1:21-CV-262, 2023 WL 7325956, at *5 (S.D. Ohio Sept. 26, 2023) ("Nothing contained in the [Complaint or Answer] allows the Court to divine with any confidence when the Bureau learned or had reason to learn of Fifth Third's alleged consumer protection violations. Absent those allegations, the Court cannot dismiss the Bureau's claims based on the statute of limitations at this stage of the litigation."); *see also Skolas*, 770 F.3d at 250-51 (complaint may only be dismissed as untimely if the claims

---

[9] The Complaint cites some dates that are relevant to specific practices that may have been time-limited, such as Reliant's use of a deceptive "welcome package" until October 2020. Compl. ¶ 44. But these details are not intended to suggest—and the Complaint does not allege—that Defendants' overall pattern of deceptive and abusive conduct ceased after January 2021, as Defendants inaccurately suggest. *See* Defs.' Br. 9.

are time-barred based on the dates and facts alleged in the complaint itself); *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) ("If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." (citation omitted)).

Defendants attempt to circumvent this clear legal standard by arguing that the Bureau "should have discovered" their legal violations when they were taking place. But that is not the standard; § 5564(g)(1) does not include the phrase "should have discovered" or anything similar. And the two Third Circuit cases on which Defendants rely are inapposite. In both cases the appellate court was discussing the discovery rule, which courts apply "absen[t] . . . a contrary directive from Congress." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015); *see also Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 209 (3d Cir. 2008). But that rule does not apply here as Congress *did* supply such a contrary directive: the statute of limitations for a CFPA claim runs from the "date of discovery." 12 U.S.C. § 5564(g)(1). If Congress wanted to impose a "should have known" or "should have discovered" standard in the CFPA, it knew how to do so. For example, the *G.L.* case cited by Defendants addressed the Individuals with Disabilities Education Act, in which Congress explicitly provided a statute of limitations that started when a party "knew or should have known" of a violation. *G.L.*, 802 F.3d at 604 (quoting 20 U.S.C. § 1415(f)(3)(C)). The CFPA does not contain any such "constructive knowledge" standard. *See CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043, 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021) ("[T]here is no 'constructive discovery' rule set forth in [§ 5564(g)(1)]—and [the defendant] has not shown that the Court is free to engraft one onto it, especially when the Supreme Court has cautioned against any such enlargement in construing such statutes against the government." (citing *Badaracco v. Comm'r*, 464 U.S. 386,

391 (1984) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.")), *aff'd*, 2022 WL 17958636 (9th Cir. Dec. 27, 2022); *see also United States v. Ret. Servs. Grp.*, 302 F.3d 425, 433 (5th Cir. 2002) (holding that "a strict construction in favor of the government requires us to understand 'discovers' to require some degree of actual knowledge").

Further, Defendants' argument does not even support their claim that the Complaint establishes that the Bureau should have "immediately discovered" Reliant's legal violations when they first occurred. Defs.' Br. 35. Defendants rely on the fact that Reliant's advertisements and terms and conditions were publicly available. But just because that material was public does not mean that the Bureau should have known it was evidence of unfair, deceptive, or abusive practices violating the CFPA. For example, while it was public that Reliant advertised and gave the impression that its product was a general-purpose credit card, Defendants point to no facts in the Complaint that show (even under Defendants' mistaken view of the proper statute of limitations standard) when the Bureau should have discovered that those representations were deceptive.

The same is true for Kane's individual liability. As Defendants emphasize, the Bureau could not have asserted claims against Kane based solely on the fact that he is Reliant's owner and CEO. The Bureau also needed evidence that he knew of and participated in or had authority to control his company's unlawful conduct. *See Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1172-74 (10th Cir. 2022) ("Before the limitations period would commence, the Bureau needed to know not only that [a defendant was a company's CEO] but also that he had sufficient knowledge of those violations." (citing *Gordon*, 819 F.3d at 1193)). Defendants point to no facts in the Complaint which would suggest the Bureau failed to file within three years of learning

facts sufficient to prove Kane's knowledge and involvement with Reliant's misconduct. *Cf. Integrity Advance*, 48 F.4th at 1173-74 (holding that the limitations period for CFPA claims against a company's CEO "wouldn't have commenced" until "the Bureau received [the company's] responses to the CIDs and deposed [its CEO]").

**B. The Bureau's claims for violations of TILA in Counts IV and V are timely.**

Defendants misstate the relevant limitations period for Bureau actions brought for violations of the Truth in Lending Act (TILA). Bureau actions under TILA are brought under 15 U.S.C. § 1607(a)(6), which explicitly states that the Bureau enforces TILA through subtitle E of the CFPA. Further, § 1607 specifies that a violation of TILA "shall be deemed to be" a violation of the CFPA. *See* 15 U.S.C. § 1607(b). As a result, the TILA claims brought by the Bureau here are governed by the CFPA's three-year date-of-discovery limitations period found in 12 U.S.C. § 5564(g)(1). *See CFPB v. Citizens Bank, N.A.*, 504 F.Supp.3d 39, 49 (D.R.I. 2020); *CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *28 (S.D. Fla. Sept. 5, 2019) (unpublished), *adhered to on denial of reconsideration*, No. 17-80495-CIV, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019); *see also In re Integrity Advance, LLC*, No. 2015-CFPB-0029, slip op. at 28 (Jan. 24, 2020) (Dkt. No. 249), https://files.consumerfinance.gov/f/documents/cfpb_2015-CFPB-0029_Document-249_2020-01.pdf.[10] While Defendants cite the sole case finding that the Bureau was subject to TILA's one-year statute of limitations under 15 U.S.C. § 1640(e), *see* Defs.' Br. 36 (citing *ITT Educ. Servs., Inc.*, 219 F.Supp.3d 878), that holding has been consistently rejected since. *See, e.g., Citizens*, 504 F.Supp.3d at 48 (D.R.I. 2020) ("[T]his Court does not find the agency interpretations on which the *ITT* court relied to be persuasive."); *Ocwen*,

[10] The Tenth Circuit affirmed the Bureau Director's final (2021) order in this administrative matter in *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161 (10th Cir. 2022).

2019 WL 13203853, at *28 n.9.

Defendants' argument for a one-year statute of limitations also fails as a matter of unambiguous statutory interpretation. The provision cited by Defendants defines the scope of an "individual or class action for damages" that a private party may bring against a creditor for certain violations of TILA. 15 U.S.C. § 1640(a). It then states that "any action *under this section* may be brought . . . within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e) (emphasis added). But the Bureau is authorized to enforce TILA by an entirely separate section of the Act, 15 U.S.C. § 1607 ("Administrative Enforcement"). And as explained above, § 1607 adopts the Bureau's enforcement authority—including the applicable statute of limitations—from the CFPA. *See Citizens Bank, N.A.*, 504 F.Supp.3d at 49 ("TILA's plain language dictates that § 1640 governs civil suits brought by individuals and state attorneys general, while § 1607 provides the cause of action for federal enforcement agencies such as the CFPB.").[11]

The Complaint alleges that Reliant collected fees above TILA's "fee harvester" cap until January 2021. Compl. ¶ 83. And Defendants make no argument that the Bureau discovered or should have discovered (under Horizon's mistaken view) these TILA violations before the applicable statute of limitations period (which consists of three years, plus the periods tolled by agreement). Therefore, Defendants' motion to dismiss Counts IV and V as untimely should be denied.

[11] As noted by the court in *Citizens Bank*, § 1607(e) also authorizes State attorneys general to file suit to address certain TILA violations "not later than 3 years after the date on which the violation occurs," further indicating that the sentence quoted by Defendants is limited to private civil actions.

### III. The Bureau's funding is valid and provides no grounds for dismissal.

Defendants last contend that the Court should dismiss this case under Rule 12(b)(1) for lack of jurisdiction because the Bureau lacks a valid source of funding. *See* Defs.' Br. 11-12, 36-38. As an initial matter, the Court should reject this argument because any defect with the Bureau's funding source would not affect this Court's jurisdiction. That's because any such defect would at most go to the Bureau's authority to bring the case—not the court's ability to hear it. *See CFPB v. CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022) (rejecting argument that challenge to Bureau's funding affects court's jurisdiction). To avoid "erroneously conflat[ing]" the two, the Court should reject the challenge as Defendants raised it under Rule 12(b)(1). Even if the Court were to construe the argument as raised under Rule 12(b)(6) and consider its merits, the Court should again reject it because the Bureau's funding is valid and provides no grounds for dismissing the Bureau's well-pled complaint.

By statute, the Bureau is funded from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). That reference to the Federal Reserve's "earnings" means the System's income, or money earned. In an effort to find fault with the Bureau's funding despite the recent Supreme Court decision upholding it, *see CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) (*CFSA*), Defendants insist otherwise. In their view, "earnings" as used in § 5497 really means the surplus funds left over after covering the Federal Reserve System's obligations (for some reason, other than its obligation to fund the Bureau)—a surplus that, by statute, must be remitted to the Treasury. *See* Defs.' Br. 11, 36-38. Because the System has not consistently remitted excess earnings to the Treasury since late 2022, Defendants say the Bureau lacks the funds and thus the authority to pursue this case. The Court should reject this argument, which has been easily discarded by every court to consider it. *See SoLo Funds, Inc.*, 2024 WL 4553110, at *2; *Texas v. Colony Ridge, Inc.*, No. H-24-0941, 2024 WL 4553111, at *4 (S.D.

Tex. Oct. 11, 2024), *report and recommendation adopted* (S.D. Tex. Nov. 26, 2024); *CFPB v. Active Network, LLC*, No. 4:22-CV-00898, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024).

Because "earnings" is not "otherwise defined," the Court should interpret it "in accordance with [its] ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The ordinary meaning of "earnings" is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets."); *Earnings*, Oxford English Dictionary (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."). Thus, the "combined earnings" of the Federal Reserve System is simply the total revenue generated by the System's components, which amounted to more than $160 billion in 2023 alone. *See* Fed. Reserve Bd., *Federal Reserve Board Releases Annual Audited Financial Statements* (Mar. 26, 2024), Hicks Decl. Ex. 4, ECF No. 27-4.

That "ordinary" meaning is consistent with statutory context. Other provisions of the Dodd-Frank Act refer to "earnings" simply as income or money earned. *See, e.g.*, 12 U.S.C. § 5390(n)(2)); 12 U.S.C. § 5465(c). Applying that definition consistently to the Bureau's funding mechanism also makes the overall statutory scheme work. When Congress created the Bureau after the 2008 financial crisis, it deemed "the assurance of adequate funding" "absolutely essential." S. Rep. No. 111-176, at 163 (2010). Under Defendants' approach to "earnings," Congress would have instead funded the agency to be intermittently unable to oversee the financial markets, often at times of economic disruption when its work would be most needed.

To support their claim that "earnings" means something other than money earned, Defendants represent that the Supreme Court held in *CFSA* that the "combined earnings" referenced in § 5497(a) "are 'surplus funds in the Federal Reserve System [that] would otherwise

be deposited into the general fund of the Treasury.'" Defs.' Br. 37 (quoting *CFSA*, 601 U.S. at 425, 435). But Defendants misread *CFSA*, which did not weigh in on the meaning of "combined earnings" at all—let alone construe the term the way Defendants wish. Rather, the Court discussed the fact that the Bureau's funds come from the Federal Reserve's earnings only to address the "threshold" question of whether its funding is even "subject to the requirements of the Appropriations Clause[,]" given that the Clause limits use of money "'drawn from *the Treasury*.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7) (emphasis added). The Court confirmed that, "whatever the scope of the term 'Treasury' in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies." *Id.* The Bureau's funding was therefore subject to the Appropriations Clause's strictures, the Court explained—because the Bureau "draws money from the Federal Reserve System," and any "surplus funds" in the System would otherwise go to the Treasury. *Id.* In so holding, the Court did not hold that the phrase "combined earnings of the Federal Reserve System" referred to the surplus funds the System sends to the Treasury after the rest of its obligations have been satisfied, nor did the Court suggest the Bureau can only be funded when such a surplus exists.

Beyond having no support in *CFSA*, Defendants' attempt to read "combined earnings" that way fundamentally misunderstands how the Federal Reserve System's finances work under the relevant statutory scheme. By statute, Federal Reserve Banks send excess net earnings to the Treasury's general fund after (1) paying for "all necessary expenses," (2) issuing required dividends to stockholders, and (3) putting funds up to a set cap into each Bank's surplus fund. *See* 12 U.S.C. § 289(a). Those "necessary expenses" include semiannual assessments by the Federal Reserve Board to pay its expenses, *id.* § 243, which in turn include required transfers from the Federal Reserve System to meet the Bureau's funding needs, *id.* § 5497(a)(1). There is

thus no support for Defendants' claim that, at times when the Federal Reserve System is not consistently sending surplus funds to the Treasury, the Bureau's "operations are being funded by the Federal Reserve's deficit, not its combined earnings." Defs.' Br. 12. Rather, assessments to fund the Bureau—as "necessary expenses" of the Federal Reserve Banks—are part of what determines whether the System as a whole has excess earnings to send to the Treasury.

The Federal Reserve financial documents that Defendants rely on only confirm that the System's "earnings" consist of all the money its components generate—not what's transmitted to Treasury after paying for expenses, dividends, and deposits in the banks' surplus funds. For instance, those documents describe the surplus transferred to the Treasury as "*excess* earnings." Hicks Decl. Exs. 3 at 1, 4 at 2, 5 at 25 (emphasis added). And they discuss the amount by which "expenses exceeded earnings"—a sensible statement only if "earnings" refers to the income generated, not what's left once expenses are paid. *See, e.g.*, Hicks Decl. Ex. 4, at 1 (explaining that banks' "sum total of expenses exceeded earnings" in 2023).

Finally, even if Defendants were correct that the Federal Reserve System does not have "earnings" to fund the Bureau's operations, dismissal would not be warranted. *See SoLo Funds*, 2024 WL 4553110, at *2 (court was "not persuaded" that "the Bureau's source of funding—even if illegitimate—is grounds for dismissal"). Congress—which has the power of the purse—has not provided that actions taken without proper funding must be undone. *See generally* Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.*

## IV. Defendants offer no basis for requiring the Bureau to file a more definite statement.

Federal Rule of Civil Procedure 12(e) permits a party to "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." This rule "is directed to the rare case where because of the vagueness or ambiguity of the pleading the answering party will not

be able to frame a responsive pleading." *Navient*, 2017 WL 3380530, at *26 (quoting *Schaedler v. Reading Eagle Publ'n*, 370 F.2d 795, 798 (3d Cir. 1967)). "Motions for a more definite statement are not viewed with favor and should be granted only if the allegations contained in the complaint are so vague that the defendant cannot reasonably be expected to frame a response to it." *Id.* (quoting *Wilson v. United States*, 585 F. Supp. 202, 205 (M.D. Pa. 1984)).

Defendants provide no basis to grant such a motion here. The cases they cite concerning multiple defendants are inapposite; the only two defendants in this litigation are a company and its sole shareholder and CEO, and the Complaint places those Defendants on notice of the corporate conduct that forms the basis of the Bureau's legal claims, as well as the facts supporting individual liability based on Kane's knowledge and control over Reliant. *See generally supra*.

Similarly, Defendants' objection that the Complaint "fails to set forth the precise time periods for any of its claims," Defs.' Br. 39, is irrelevant. As explained above, all the Bureau's claims are timely; to the extent that Defendants' practices changed over time in a way that could affect the relief owed to consumers, those are facts known to the Defendants and can be addressed in their Answer, and that the parties can probe further in discovery. *See, e.g., Skolas*, 770 F.3d at 251 ("[A] plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense.") (citing *In re Adams Golf, Inc. Sec. Litig*., 381 F.3d 267, 277 (3d Cir. 2004)).

## CONCLUSION

For the reasons stated in this brief, the Court should deny Defendants' motion to dismiss or, alternatively, for a more definite statement of the Complaint (ECF No. 26), as well as Defendants' request to take judicial notice (ECF No. 29).

Date: January 30, 2025

Respectfully submitted,

Attorneys for Plaintiff,
Consumer Financial Protection Bureau

ERIC HALPERN
Enforcement Director

ALUSHEYI J. WHEELER
Deputy Enforcement Director

JADE A. BURNS
Assistant Litigation Deputy

*_/s/ Mark Ladov_*
Mark Ladov
Email: mark.ladov@cfpb.gov
Phone: 212-328-7026
Bar No. NY 4477550 (admitted pro hac vice)

Colleen Fewer
Email: colleen.fewer@cfpb.gov
Phone: 202-435-5291
Bar No. CA 323808 (admitted pro hac vice)

Kristina D. Betts
Email: kristina.betts@cfpb.gov
Phone: 202-834-2723
Bar No. AZ 024859 (admitted pro hac vice)

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
Facsimile: (202) 435-7722