**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA (Pittsburgh Division)**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>vs.<br><br>RELIANT HOLDINGS, INC., and ROBERT KANE,<br><br>Defendants. | Civil Action No. 2:24-cv-01301<br><br>The Honorable Robert J. Colville |

**<u>REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, MOTION FOR MORE DEFINITIVE STATEMENT</u>**

Defendants, by their undersigned counsel, hereby submit this Reply Brief in Support of their Joint Motion to Dismiss or, Alternatively, Motion for More Definitive Statement (ECF #26).

Respectfully submitted,

Dated: February 12, 2025

*<u>/s/ Ronald L. Hicks, Jr.</u>*

Ronald L. Hicks, Jr., Esq. (PA #49520)
ronald.hicks@nelsonmullins.com
Thomas S. Jones, Esq. (PA #71636)
thomas.jones@nelsonmullins.com
Benjamin J. Sitter, Esq. (PA #317382)
ben.sitter@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
One PPG Place, Suite 3200
Pittsburgh, Pennsylvania 15222
Tel: 412-730-4050

*Counsel for Defendants*

# TABLE OF CONTENTS


I. INTRODUCTION ..................................................................................................... 1

II. REPLY ARGUMENT ............................................................................................... 6

A. Rule 9(b) Applies To Any Claim Which Sounds In Fraud Including Claims For Violations Of Consumer Protection Statutes.................................................. 6

B. The CFPB Cannot State A Deceptive Practices Claim By Ignoring Key Features Of Reliant's Advertisements And Ignoring Express Written Acknowledgements From Every Reliant Customer That They Understood Reliant's Advertisements Do Not Convey The Impression The CFPB Alleges. ........................................................................................................ 11

C. The CFPB's Deceptive And Abusive Practices Claims Concerning Reliant's Cancellation Process Fail As A Matter Of Law. .................................. 16

D. The CFPB's TILA-Based Claims Fail Because Reliant Imposes No Finance Charge That Is "Computed From Time To Time On The Outstanding Unpaid Balance" Of The $500 Credit Limit....................................................... 21

E. The CFPB's Claims Are Untimely, Especially Those Asserted Against Kane. ...................................................................................................... 23

F. The CFPB Lacks The Funding And The Authority To Pursue This Action, Depriving This Court Of Federal Question Jurisdiction...................................... 27

III. CONCLUSION......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beneficial Corp. v. FTC*,
542 F.2d 611 (3d Cir. 1976)....15

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)....14

*Carson v. HP, Inc.*,
No. 22-208-CJB, 2024 WL 4300653 (D. Del. Sept. 26, 2024)....9

*CFPB v. Active Network, LLC*,
No. 4:22-cv-00898, 2024 WL 443763 (E.D. Tex. Oct. 7, 2024)....28

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022)....27, 30

*CFPB v. CashCall*,
35 F.4th 734 (9th Cir. 2022)....28

*CFPB v. Chou Team Realty LLC*,
No. 8:20-cv-00043, 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021)....24, 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)....28, 29, 30

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015)....17

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....17, 28

*CFPB v. ITT Educ. Servs.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)....17

*CFPB v. Navient Corp.*,
No. 3:17-cv-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)....10

*CFPB v. SoLo Funds, Inc.*,
No. 2:24-cv-04108-RGK-AJR, 2024 WL 4553110 (C.D. Cal. Oct. 17, 2024)....28

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
908 F.3d 872 (3d Cir. 2018)....27

*Coleman v. Greene*,
845 F.3d 73 (3d Cir. 2017)....................28

*Collins v. Yellen*,
594 U.S. 220 (2021)....................27

*Corsale v. Sperian Energy Corp.*,
412 F. Supp. 3d 556 (W.D. Pa. 2019)....................13

*Dietzel v. Costco Wholesale*,
No. 22-cv-0035, 2022 WL 2703612 (E.D. Pa. Jul. 12, 2022)....................29

*Emery v. Third Nat. Bank of Pgh.*,
162 A. 281 (Pa. 1932)....................13

*Ferra Auto. Servs., Inc. v. B&T Express, Inc.*,
No. 2:19-cv-01533-RJC, 2020 WL 6545999 (W.D. Pa. Nov. 7, 2020)....................7, 9, 11

*FTC v. Credit Bureau Ctr., LLC*,
325 F. Supp. 3d 852 (N.D. Ill. 2018), *aff'd in part, vacated in part*
937 F.3d 764 (7th Cir. 2019)....................15

*FTC v. Davison Assocs., Inc.*,
431 F. Supp. 2d 548 (W.D. Pa. 2006)....................17

*FTC v. Magazine Solutions, LLC*,
No. 7–692, 2010 WL 1009442 (W.D. Pa. Mar. 15, 2010)....................17

*FTC v. NHS Sys., Inc.*,
936 F. Supp. 2d 520 (E.D. Pa, 2013)....................17

*Household Credit Servs. v. Pfennig*,
541 U.S. 232 (2004)....................22

*Jablonski v. Pan Am. World Airways, Inc.*,
863 F.2d 289 (3d Cir. 1988)....................27

*Johnson v. Riverside Healthcare Sys., LP*,
534 F.3d 1116 (9th Cir. 2008)....................16, 21

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013)....................28

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010)....................24, 25, 27

*Meserole v. Sony Corp. of Am.*,
No. 08-cv-8987(RPP), 2009 WL 1403933 (S.D.N.Y. May 19, 2009)....................10

*McCullough v. Advest, Inc.*,
No. 17-407, 2017 WL 3675787 (W.D. Pa. Aug. 25, 2017) ....................24

*Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) ....................24, 25

*Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ....................7

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ....................7

*Schmidt v. Ford Motor Co.*,
972 F. Supp.2d 712 (E.D. Pa. 2013) ....................7

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*,
742 F.2d 786 (3d Cir. 1984) ....................7

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ....................7

*Texas v. Colony Ridge, Inc.*,
No. H-24-0941, 2024 WL 4553111 (S.D. Tex. Oct. 11, 2024) ....................28

*Toner v. Allstate Ins. Co.*,
821 F. Supp. 276 (D. Del. 1993) ....................7

*Travelers Indemnity Co. v. Cephalon, Inc.*,
620 Fed. Appx. 82 (3d Cir. 2015) ....................8, 9, 10

*Util. Air Regul. Grp. v. E.P.A.*,
573 U.S. 302 (2014) ....................20

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) ....................7

**Rules**

Fed.R.Civ.P. 8(a) ....................6, 11

Fed.R.Civ.P. 9(b) .................... *passim*

Fed.R.Civ.P. 12(b)(6) .................... *passim*

**Statutes**

5 U.S.C. § 706 ....................30

12 U.S.C. § 5497 ....................................................................29

12 U.S.C. § 5531 ....................................................................4, 18, 19, 20

15 U.S.C. § 1620 ....................................................................4, 21

15 U.S.C. § 8403(3) ....................................................................20

31 U.S.C. § 1341 ....................................................................30

12 C.F.R. § 1026.2 ....................................................................4, 21

**Other Authorities**

D. Ennis, "CFPB's enforcement, supervision chiefs step down," Banking Dive (2/11/25), available online at: *https://www.bankingdive.com/news/cfpb-salas-halperin-resign-enforcement-supervision-vought-paoletta-warren-pressley-rally/739828/* ....................................................................5

FTC, ".com Disclosures: How to Make Effective Disclosures in Digital Advertising" (March 2013), available online at *https://www.ftc.gov/system/files/documents/plain-language/bus41-dot-com-disclosures-information-about-online-advertising.pdf* (last visited on December 23, 2024) ....................................................................12

K. O'Donnell, "Bessent orders halt to consumer bureau activity" Politico (2/3/25), available online at *https://www.politico.com/news/2025/02/03/bessent-consumer-bureau-chief-00202076* ....................................................................5

Oxford English Dictionary, Definition of "Select," available online at *https://www.oed.com/search/dictionary/?scope=Entries&q=selecting*; ....................................................................20

Oxford English Dictionary, Definition of "Use," available online at https://www.oed.com/search/dictionary/?scope=Entries&q=using ....................................................................20

L. Wamsley, "New CFPB chief closes headquarters, tells all staff they must not do 'any work tasks,'" NPR (2/10/25), available online at *https://www.npr.org/2025/02/08/nx-s1-5290914/russell-vought-cfpb-doge-access-musk* ....................................................................5

E. Weinberger, "CFPB Fires 70 Enforcement Lawyers, Other Probationary Employees," Bloomberg Law News (2/11/25), available online at *https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees.* ....................................................................5

## I. INTRODUCTION[1]

Often what is not said is more probative than what is said. Here, the CFPB's opposition speaks loudly by what it omits. For example, as for its deceptive acts and substantial assistance claims under Counts I and III of the Complaint, although the CFPB claims that several of Reliant's online advertisements "gave the impression that Reliant offered a general-purpose credit card," the CFPB offers no explanation for how the advertisements supposedly convey that "impression." Rather, the CFPB simply asserts that "the content of the advertisements themselves is sufficient to support [such] an inference." *See* Opposition (ECF #33), pp. 5-6.

Nor does the CFPB contend that the advertisements expressly represent that the Reliant Card is a general-purpose credit card. Indeed, the images in Paragraph 19 of the CFPB's Complaint confirm that none of advertisements maker that representation. *See* Compl. (ECF #1), ¶ 19. Instead, as the CFPB concedes in its opposition, all the advertisements represent is that Reliant was offering, with "no credit or employment check," a "$500 credit (or spending) limit" that "allows you the freedom to spend as you please while building up your credit for future purchases." *See* Opposition (ECF #33), p. 6.

Further, the CFPB cannot, and does not, dispute that the online advertisements included hyperlinks that led not only to the Membership's terms and conditions which expressly stated that the Reliant Card is not a general-purpose credit card but also to the following prominent disclosure which required all consumers to affirmatively acknowledge that they "understand" the limited nature of the $500 credit limit in order to enroll in the Membership and obtain all of its benefits:

[1] Unless otherwise indicated, the acronyms used in Defendants' initial brief (ECF #30) will be used in this reply brief. Also, to the extent any issue raised in Defendants' first brief is not addressed in this brief, Defendants rely on their initial arguments which they view as both persuasive and decisive on those issues.




*See* McDonald Decl. (ECF #28), ¶¶ 7-14. Indeed, in its Complaint, the CFPB concedes the advertisements had hyperlinks that contained the program's terms and conditions and application/enrollment pages which all customers were required to fill out before purchasing a Membership. *See* Compl. (ECF #1), ¶¶ 17-25.

Instead, the CFPB asks this Court to ignore this reality and accept the CFPB's unsubstantiated view that the hyperlinked information and online application/enrollment process are not part of the advertisements but rather constitute only a "subsequent disclosure" which, even if clear and conspicuous, cannot cure any alleged "net impression" that the CFPB surmises exists when one views the advertisements without the hyperlinks. *See* Opposition (ECF #33), pp. 5-11. In the CFPB's authority-free view of the law, if all disclosures are not included in the very first customer impression of an advertisement, then any hyperlinked disclosure or acknowledgement cannot contribute to the customer's net experience but, instead, can only constitute an ineffective "subsequent disclosure." *Id.* at pp. 9-11.

Yet, the advertisements at issue are not print advertisements which contain a materially false statement that is later disclaimed as part of a different, subsequently-disclosed writing. Rather, this case involves a multi-part, online advertisement that one views on a computer, smart phone, or other electronic device and which results in an affirmative acknowledgement by each consumer of exactly what understanding or "impression" they have at the time of their purchasing decision. Thus, because each consumer confirms their understanding prior to their purchase of a Membership that the Reliant Card and its $500 credit limit can be used only at the Horizon online shopping club, no claim of a deceptive practice or substantial assistance therewith on the grounds that the Reliant Card is a general purpose credit card can be stated as a matter of law since, as the customers themselves have confirmed, Reliant never made that representation.

Similarly, as for the CFPB's claims under Counts I, II, and III of its Complaint for deceptive and abusive practices involving Reliant's cancellation process, the CFPB does not dispute that the "Welcome Package" insert was sent after the consumers had already purchased a Membership and only for a limited duration (*i.e.*, March 2019 through October 2020). As such, it is difficult to fathom how any statements in that insert could materially impact or alter the consumer's contract with Reliant which, by its express terms (which the CFPB acknowledges), only provide that a customer can request a refund within thirty days of billing by calling Membership Services, but contain no representation for how long such phone call or other aspects of the cancellation process would take. *See* Compl. (ECF #1), ¶ 43; McDonald Decl., ¶ 43.

Moreover, the CFPB fails to address the argument that the allegations in its Complaint do not plausibly support the CFPB's cursory conclusion that the Welcome Package insert was false. As pointed out in Defendants' Rule 12 Motions, the Complaint merely avers that "at times" the cancellation process "could" take 20 to 40 minutes. *See* Compl. (ECF #1), ¶¶ 46 & 68. However,

the CFPB does not aver that it "always" took that long. Nor does the CFPB show in its Complaint that taking 20 to 40 minutes to cancel a membership "takes unreasonable advantage of … the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product" and, thus, fails to show that it is an abusive act that Congress intended the CFPB to enforce. *See* 12 U.S.C. § 5531(d)(1)(B). In short, the CFPB cannot demonstrate that any consumer was abused, which is why the CFPB objects to identifying any specific customer who was allegedly harmed by having to take 20-to-40 minutes on the phone to cancel their Membership. Therefore, the CFPB has failed to plausibly state a claim for deceptive or abusive practices or substantial assistance therewith regarding Reliant's cancellation process.

As for its TILA claims (Counts IV and V), the CFPB concedes that TILA and its implementing Regulation Z apply only to an "open end credit plan" and that, by definition, that type of plan requires the imposition of "a finance charge ***which may be computed from time to time on the outstanding unpaid balance***." 15 U.S.C. § 1620(j) (emphasis added); 12 C.F.R. § 1026.2(a)(20) (same). In other words, TILA and Regulation Z do not apply to any plan that offers credit without any interest or finance charge being computed on the outstanding balance. *Id.* The CFPB's Complaint, however, does not allege that Reliant charged any fees "computed on the outstanding balance," which is fatal to the CFPB's TILA claims.

The CFPB's TILA claims are also deficient because they, like the CFPB's other claims against Defendants, are untimely. The CFPB does not dispute—and effectively concedes—that the facts alleged in its Complaint were all publicly available for years, some dating back to 2010. Although the CFPB now says that its Complaint covers "ongoing" violations, all the averments in its Complaint are written in the past tense, with the last identified date being 2021. Moreover, while the CFPB references a tolling agreement with *Reliant* covering the period of June 29, 2023,

and September 25, 2024, it cites no similar tolling agreement with *Kane (*because none exists), which only confirms that the claims against him are untimely. Further, any TILA claims, which the CFPB's Complaint concedes arose between January 2015 and January 2021 and are premised solely on publicly available information from Reliant's websites, are on their face untimely under both the 1-year and 3-year statutes of limitations. Thus, the CFPB's Complaint is defective as a matter of law and must be dismissed.

Finally, the unconstitutional nature of this enforcement action is clear from the recent events in which the CFPB has been stripped of its former director and has had its operations halted. Before these happenings, the CFPB had no legal source of funding. Now, U.S. Treasury Secretary Scott Bessent has ordered a halt to all the CFPB's active litigation. *See* K. O'Donnell, "Bessent orders halt to consumer bureau activity," Politico (2/3/25), available online at *https://www.politico.com/news/2025/02/03/bessent-consumer-bureau-chief-00202076*. And its Washington, D.C., headquarters has been closed, its enforcement and supervision chiefs have resigned, and the employment of about 70 probationary employees, including several enforcement division attorneys, has been terminated. *See* L. Wamsley, "New CFPB chief closes headquarters, tells all staff they must not do 'any work tasks,'" NPR (2/10/25), available online at *https://www.npr.org/2025/02/08/nx-s1-5290914/russell-vought-cfpb-doge-access-musk;* D. Ennis, "CFPB's enforcement, supervision chiefs step down," Banking Dive (2/11/25), available online at: *https://www.bankingdive.com/news/cfpb-salas-halperin-resign-enforcement-supervision-vought-paoletta-warren-pressley-rally/739828/;* E. Weinberger, "CFPB Fires 70 Enforcement Lawyers, Other Probationary Employees," Bloomberg Law News (2/11/25), available online at *https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees.* Although the CFPB cites decisions from other

jurisdictions to support its contention that it is legally funded, none of those courts engaged in any meaningful analysis of the issue. Hence, this action has been brought and/or is being pursued without proper authority, thereby depriving this Court of federal question jurisdiction.

The CFPB's Complaint should be dismissed in its entirety. Alternatively, if any of its claims survive dismissal, then the CFPB should be required to tell the whole truth about them and file a more specific pleading providing greater detail that complies with Federal Rule of Civil Procedure 9(b) and exceeds the CFPB's current style of "it is illegal because we say so."

## II. REPLY ARGUMENT

### A. *Federal Rule of Civil Procedure 9(b) Applies To Any Claim Which Sounds In Fraud Including Claims For Violations Of Consumer Protection Statutes.*

The CFPB's opposition to Defendants' Rule 12 motions relies on the flawed assumption that its Complaint need only comply with Federal Rule of Civil Procedure 8(a)(2), even though its claims are premised on advertisements which it claims are "false and misleading."[2] *See* Opposition (ECF #33), pp. 2-5. According to the CFPB, because its UDAAP claims are "consumer protection" claims under the CFPA, they are not subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b). *Id.* at 3-4. The CFPB is wrong.

To determine whether a particular claim is subject to Rule 9(b)'s heightened pleading

[2] Contrary to the introduction to its opposition, the CFPB's Complaint has not asserted any claim against Defendants for unfair, deceptive, or abusive acts or practices ("UDAAP") based on either the value of the benefits provided by one's enrollment in Reliant's Membership or whether the Horizon Outlet was "barely more than a closet of overpriced, off-brand items." *See* Opposition (ECF #33), p.1. Instead, Counts I through III of the Complaint are specifically limited to allegations that Reliant falsely represented that (1) "Reliant offers and provides a general-purpose credit card to consumers" and (2) "customers could cancel their membership by phone in less than a minute and receive a full refund." *See* Compl. (ECF #1), ¶ 58. Consequently, the CFPB's discussion in its opposition of the value of the Membership benefits or the quality and price of the items at the Horizon Outlet is irrelevant and has no bearing on whether Counts I through III of the Complaint have stated valid UDAAP claims.

requirement, the United States Court of Appeals for the Third Circuit has explained that "where the plaintiff grounds [its] claims in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006); *see also Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161–62 (3d Cir. 2004). Under this approach, there is no requirement that fraud be a necessary element of a prima facie claim for Rule 9(b) to apply. *See Chubb*, 394 F.3d at 161 (discussing this law with respect to a Section 11 Securities Act claim). Instead, "claims that do sound in fraud must be pled with particularity" even when "fraud is not a necessary element of a claim." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 (3d Cir. 1996). *See also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (Rule 9(b) applies when "the wording and imputations of the complaint are classically associated with fraud," citing as examples that a document is "inaccurate and misleading," contains "untrue statements of material facts," or makes "materially false and misleading written statements").

"Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). In other words, as this Court has noted, "[t]he purpose of Rule 9(b) is to provide a defendant with notice of the precise misconduct with which he or she is charged and to prevent false or unsubstantiated charges." *Ferra Auto. Servs., Inc. v. B&T Express, Inc.*, No. 2:19-cv-01533-RJC, 2020 WL 6545999, at *5 (W.D. Pa. Nov. 7, 2020) (quoting *Schmidt v. Ford Motor Co.*, 972 F. Supp.2d 712, 720 (E.D. Pa. 2013)). *See also Toner v. Allstate Ins. Co.*, 821 F. Supp. 276, 283 (D. Del. 1993) ("Four reasons exist for the heightened pleading standard required in fraud

cases. First, it protects defendant from frivolous suits. Second, it puts defendant on notice as to the conduct complained of so defendant will have information adequate to form a defense. Third, it prevents fraud actions in which all the facts are learned after the complaint is filed by way of the discovery process. Finally, it serves to protect defendant from damage to its reputation and goodwill.") (citations omitted). All these justifications apply here, as the CFPB is accusing Defendants of making materially "false and misleading representations" to consumers (*see* Compl. (ECF #1), ¶¶ 59-61); yet, the CFPB fails to provide the time, place, and other pertinent details of the alleged deception that serves as the basis for its claims, subjecting Defendants to a "frivolous suit" and baseless reputational harm while this proceeding continues.

In its opposition, the CFPB argues that Rule 9(b)'s heightened pleading requirement does not apply to CFPA claims because "consumer protection claims are not claims of fraud even if there is a deceptive dimension to them." *See* Opposition (ECF #33), p. 3. However, although it has not yet opined on whether Rule 9(b) applies to CFPA claims, the Third Circuit has applied that rule's heightened pleading requirements in the consumer protection context. *See, e.g., Travelers Indemnity Co. v. Cephalon, Inc.*, 620 Fed. Appx. 82, 85-87 (3d Cir. 2015) (nonprecedential). In *Travelers*, workers' compensation insurance providers brought an action against various pharmaceutical companies for intentional misrepresentation, negligent misrepresentation, violations of state consumer protection laws, and unjust enrichment in connection with the providers' reimbursement of prescriptions for powerful painkillers that pharmaceutical companies marketed for off-label uses. *Travelers*, 620 Fed. Appx. at 83. The federal district court dismissed the plaintiffs' complaint for lack of standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). *Id.* On appeal, the Third Circuit affirmed, ruling that plaintiffs had failed to set out their claims sounding in fraud with sufficient specificity under Rule 9(b). *Id.*

In reaching this result, the Third Circuit recognized that although the complaint contained no fraud claim, "Plaintiffs' claims are premised upon Cephalon's allegedly fraudulent scheme to mislead doctors with respect to the proper use and effectiveness of Actiq and Fentora, thereby causing those doctors to improperly prescribe those drugs to Plaintiffs' claimants" and "[b]ecause this theory sounds in fraud, Plaintiffs' pleadings must satisfy the 'stringent' Rule 9(b) requirements for particularity." *Id.* at 85. Moreover, the Third Circuit held that Rule 9(b)'s heightened pleading requirements applied to "all of Plaintiffs' claims alleging fraudulent activity" even though fraud was not a necessary element of the claim. *Id.* at 85, n.3. Thus, because "Plaintiffs fail[ed] to identify any specific fraudulent statements, omissions, or misrepresentations that were made to doctors who prescribed Actiq and Fentora" and failed to "specify when, where, or to whom any sales pitch was made," the Third Circuit held the district court properly ruled that the Plaintiffs' claims sounding in fraud could not withstand dismissal under Rule 12(b)(6). *Id.* at 86.

This Court has followed *Travelers* and has dismissed claims sounding in fraud which fail to meet Rule 9(b)'s heightened pleading requirement. *See, e.g.*, *Ferra Auto.*, 2020 WL 6545999, at *5. Moreover, other courts within the Third Circuit faced with consumer protection claims sounding in fraud or alleging deception by false and misleading statements have analyzed those claims under Rule 9(b)'s heightened fraud-pleading standard. *See, e.g., Carson v. HP, Inc.*, No. 22-208-CJB, 2024 WL 4300653, at *8-*14 (D. Del. Sept. 26, 2024) (laptop buyers' generic, boilerplate allegations that, prior to purchasing one of manufacturer's laptops, buyers researched different laptops and viewed multiple advertisements from manufacturer touting the reliability, durability, and superiority of its laptops over competitive offerings, were insufficient under Rule 9(b)'s heightened fraud-pleading standard, precluding buyers' state-law consumer protection claims against manufacturer, to extent such claims were premised on either intentional

misrepresentations or fraudulent omissions, in buyers' class action arising from alleged defect that caused laptop hinges to prematurely crack and fail). *See also Meserole v. Sony Corp. of Am.*, No. 08-cv-8987(RPP), 2009 WL 1403933, at *3 (S.D.N.Y. May 19, 2009) (collecting cases from various jurisdictions where Rule 9(b) was applied to claims of consumer fraud and consumer protection statute violations) (citations omitted).

In its opposition, the CFPB cites three decisions that have not applied Rule 9(b) to cases brought by the CFPB under the CFPA. *See* Opposition (ECF #33), pp. 3-4. However, two of those cases are from other jurisdictions and are inapposite because they fail to analyze the issue utilizing the Third Circuit's broad application of Rule 9(b) to cases "sounding in fraud" even though fraud is not a necessary element of the claim. As for the Middle District of Pennsylvania's decision in *CFPB v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017), that non-precedential decision is not controlling because, although it acknowledged the existence of Third Circuit precedent which applied Rule 9(b) to claims that are "grounded in fraud," the court nonetheless did not cite or otherwise address *Travelers* and the other cases in which the Third Circuit has applied Rule 9(b) to claims "sounding in fraud" even though fraud is not a necessary element of that claim. *Navient*, 2017 WL 3380530, at *25. Instead, the *Navient* court simply concluded that, even with their deceptive dimension, claims under the CFPA are not "claims of fraud" and, thus, refused to apply Rule 9(b) to the CFPB's pleading of those claims. *Id*. However, as the Third Circuit explained in *Travelers*, Rule 9(b) applies to every claim that "sounds in fraud" even when fraud is not a necessary element of that claim. *Travelers*, 620 Fed. Appx. at 85. Thus, the non-precedential decision in *Navient* is not controlling in this case.

Here, the premise of the CFPB's claims under Counts I and III of its Complaint is that Defendants allegedly made "false and misleading representations" about the Reliant Card and the

cancellation process which were "material" and "misled" consumers. *See* Compl. (ECF #1), ¶¶ 59-61. Thus, Counts I and III of the Complaint sound in fraud, and Rule 9(b) requires that those claims comply with its heightened fraud-pleading requirement. Moreover, since the CFPB declined to file an amended complaint and has not sought leave to amend to comply with Rule 9(b)'s requirements, this Court should dismiss those claims under Rule 12(b)(6). *See, e.g.*, *Ferra Auto.*, 2020 WL 6545999, at *5.

### B. *The CFPB Cannot State A Deceptive Practices Claim By Ignoring Key Features Of Reliant's Advertisements And Ignoring Express Written Acknowledgements From Every Reliant Customer That They Understood Reliant's Advertisements Do Not Convey The Impression The CFPB Alleges.*

Even if Rule 9(b) did not apply (although it does) or the Complaint's allegation were sufficient under that rule or Rule 8(a) (which they are not), the CFPB's claims under Counts I and III of its Complaint for deceptive practices concerning whether the Reliant Card is a general-purpose credit card and for Kane's alleged substantial assistance concerning that deceptive practice fail as a matter of law. Simply put, the CFPB wants this Court to accept its unsubstantiated view of how a reasonable consumer viewed the online advertisements even though the reality is completely and utterly different. Moreover, the CFPB contends that "[t]o the extent that Defendants disagree about the net impression of these advertisements, that is a factual dispute which cannot be resolved on a [Rule] 12(b)(6) motion." *See* Opposition (Doc. #33), p. 6. However, just because the CFPB insists on submitting a half-told story that ignores the indisputable truth does not require that this Court do the same.

Initially, the CFPB does not dispute (nor could it) that neither Reliant nor its affiliate networks ever expressly stated that the Reliant Card was a general-purpose credit card. *See* Compl. (ECF #1), ¶ 19; Opposition (ECF #33), pp. 5-6. Moreover, in its opposition, the CFPB never disputes Defendants' position that none of the "representative" advertisements cited by the CFPB

in Paragraph 19 of its Complaint include features one would expect in a "general-purpose" credit card advertisement, such as the display of a Mastercard or Visa logo, the mention of a rewards program, the use of language like "world-wide acceptance," or the inclusion of a statement of an APR or interest rate. *Id.* Instead, the CFPB concedes in its opposition that all the advertisements state is that Reliant offered, with "no credit or employment check," a "$500 credit (or spending) limit" that "allows you the freedom to spend as you please while building up your credit for future purchases." *Id.* at p. 6.

Nor does the CFPB dispute that the advertisements at issue had hyperlinks embedded in them and that those hyperlinks led not only to the Membership's terms and conditions which expressly stated that the Reliant Card was not a general-purpose credit card but also to the prominent disclosure which required all consumers to affirmatively acknowledge the limited nature of the $500 credit limit in order to enroll in the Membership and obtain all its benefits, including without limitation: (1) the Reliant Card; (2) a privacy protection/credit monitoring service; (3) a prescription-discount program; (4) a roadside assistance service; and (5) a 30-minute free consultation with a legal professional. Indeed, the CFPB's Complaint concedes the existence of the advertisements' hyperlinks and that they contained the program's terms and conditions and application/enrollment pages which all customers were required to fill out. *See* Compl., ¶¶ 17-25. And the CFPB's own guidance on online advertising recognizes that disclosures in hyperlinks are an appropriate method for advising consumers of aspects of a product for purchase, especially if, as here, the disclosure is "unavoidable."[3]

---

[3] *See* Hicks Decl., Ex. 9 (ECF # 27-9) (FTC, ".com Disclosures: How to Make Effective Disclosures in Digital Advertising" (March 2013) ), at p. 9 ("[I]deally, the disclosure should be unavoidable—consumers should not be able to proceed further with a transaction, *e.g.*, click forward, without scrolling through the disclosure.").

Nevertheless, the CFPB asks this Court to ignore the content of the mandatory disclosure and of the terms and conditions by refusing to take judicial notice of the various material that the CFPB purposefully chose to exclude from its Complaint and to accept the CFPB's view that the hyperlinked information and online application/enrollment process are not part of the advertisements but instead constitute only a subsequent disclosure that, even if clear and conspicuous, cannot cure any alleged "net impression" that the CFPB surmises exists when one views the advertisements without the hyperlinks. *See* Opposition (ECF #33), pp. 8-11. But this is not a situation where a defendant allegedly makes a misrepresentation through a print advertisement to induce action ("Come to Bob's dealership to get a 50% discount off MSRP") and then at the dealership requires the consumer to sign a separate document that disclaims the representation ("50% discount not applicable to any car sold at Bob's on a day ending in 'Y'"). Rather, this is a situation where there are multiple parts to an online advertisement that one views on a computer, tablet, mobile phone, or other electronic device and which results in an affirmative disclosure by each consumer of exactly what understanding or "impression" they have at the time they decide to purchase the product or service. Thus, since each consumer affirmatively acknowledges, prior to and as a condition of their purchase of a Membership, that they understand that the Reliant Card and its $500 credit limit can be used only at the Horizon online shopping club, no claim of a deceptive practice on the grounds that the Reliant Card is a general-purpose credit card can be stated as a matter of law. As the Pennsylvania Supreme Court aptly stated decades ago: "If a man knows the truth about a representation, he is neither deceived nor defrauded, and any loss he may sustain is in effect self-inflicted." *Emery v. Third Nat. Bank of Pgh.*, 162 A. 281, 284 (Pa. 1932). *See also Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 567 (W.D. Pa. 2019) (dismissal under Rule 12(b)(6) was warranted because no viable claim for deception and

fraud under the Pennsylvania Unfair Trade Practices and Consumer Protection Law can be stated when plaintiffs agreed under the parties' contracts that their terms were subject to change).

Moreover, contrary to the CFPB's contentions, this Court most certainly can and should take judicial notice of and examine the materials that Defendants have attached to their Rule 12 motion. As the Third Circuit explained years ago, a district court ruling on a motion to dismiss may consider matters extraneous to a complaint when they are "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). This exception is particularly pertinent where a plaintiff's complaint asserts a claim for misrepresentation or fraud because "[w]hat the [exception] seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id.* Hence, a "[p]laintiff[] cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

Here, although the CFPB concedes in its Complaint that the advertisements identified in Paragraph 19 are online website advertisements that include hyperlinks to the Membership's terms and conditions and application/enrollment pages that all customers were required to complete prior to any purchasing decision by them (*see* Compl. (ECF #1), ¶¶ 17-25), the CFPB argues that this Court should not review the materials included in Defendants' Rule 12 motions because they are "selective screenshots from Reliant's websites" that "are not 'integral to or explicitly relied upon' by [the CFPB]'s deceptive advertising claims[.]" *See* Opposition (ECF #33), p. 9, n. 2. Yet, if they are not integral to the CFPB's deceptive practices claims, then why does the CFPB's Complaint include seven paragraphs explaining the online advertisements and the hyperlinked

information imbedded in them? Indeed, the material provided to the Court evidences the very agreement to purchase the product that the CFPB claims was deceptively obtained.

Patently, the CFPB understands that the materials included in Defendants' Rule 12 motions completely undermine its "net impression" theory. The materials included confirm that every consumer who chose to purchase a Membership from Reliant expressly acknowledged, before making that decision, that they understood the Reliant Card is not a general-purpose credit card and can only be used online at the Horizon Outlet. Consequently, because the CFPB's claim is premised solely on a "net impression" theory and not an express misrepresentation one, this Court is obligated to view the entirety of the online advertisements, including their hyperlinked terms and conditions and consumer acknowledgment, to determine whether the CFPB can state a valid claim of deceptive practices based on the assertion that a reasonable consumer would understand the Reliant Card is a general-purpose credit card. *See, e.g., Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976) (under Section 5 of the FTC Act, "the tendency of the advertising to deceive must be judged by ***viewing it as a whole, without emphasizing isolated words or phrases apart from their context***") (emphasis added); *FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 860 (N.D. Ill. 2018) ("In determining what messages or claims [the website] communicates to reasonable consumers, the Court looks to the overall, net impression made by the advertisement[.]"), *aff'd in part, vacated in part* 937 F.3d 764 (7th Cir. 2019).

Viewing the entirety of the online advertisements, including their hyperlinks, the CFPB cannot state a valid deceptive practices claim that Defendants represented or Kane substantially assisted Reliant in representing that the Reliant Card is a general-purpose credit card as Reliant never made any such representation and each and every consumer who purchased a Membership affirmatively confirmed this undisputed fact before they made that purchase. Accordingly, to the

extent that Counts I and III of the Complaint are premised on that claim, they fail as a matter of law, warranting the granting of Defendants' Rule 12(b)(6) motion. *See, e.g., Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (a Rule 12(b)(6) dismissal is properly granted when based on either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory.").

### C. *The CFPB's Deceptive And Abusive Practices Claims Concerning Reliant's Cancellation Process Fail As A Matter Of Law.*

As for the CFPB's claims under Counts I, II, and III of its Complaint for deceptive and abusive practices involving Reliant's cancellation process and Kane's alleged substantial assistance involving the same, these claims face similar problems. In its opposition, the CFPB doesn't dispute that the "Welcome Package" insert was sent *after* the consumers had decided to purchase a Membership and only for a limited duration (*i.e.*, March 2019 through October 2020). Instead, the CFPB says that this fact is immaterial because the CFPB's deceptive practices claim on this issue is simply that the Welcome Package insert contained a "false and material representation" that "prevent[ed] customers from contacting their bank and credit card company to stop payments for Reliant's membership fees." *See* Opposition (ECF #33), pp. 11-12. But the CFPB's Complaint fails to aver any facts which would support the inference that any statements in the Welcome Package insert were false, material, or had the alleged effect of preventing customers from "contacting their bank" "to stop payments."

In short, the CFPB's theory is that because Section 5531(a) of the CFPA prohibits deceptive practices "in connection with any transaction with a consumer for a consumer financial product or service," then any representation made "throughout the lifecycle of a consumer financial product" can serve as a basis for a deceptive acts or practices claim. *See* Opposition

(ECF #33), p. 12. Notably, the CFPB cites no legal authority for this remarkably broad proposition.

As noted in Defendants' initial brief and not disputed by the CFPB in its opposition, "[t]he standard for a CFPA deception claim is the same standard under Section 5(a) of the Federal Trade Commission Act." *See, e.g., CFPB v. Gordon,* 819 F.3d 1179, 1193 n.7 (9th Cir. 2016)*; CFPB v. ITT Educ. Servs.,* 219 F. Supp. 3d 878, 903 (S.D. Ind. 2015); *CFPB v. Frederick J. Hanna & Assocs., P.C.,* 114 F. Supp. 3d 1342, 1369-70 (N.D. Ga. 2015).. Under Section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce," an act or practice is deceptive only if "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances; and (3) the representation was material." *FTC v. Magazine Solutions, LLC*, No. 7–692, 2010 WL 1009442, at *11 (W.D. Pa. Mar. 15, 2010) (citations omitted). For purposes of FTC Act Section 5(a), "[a] practice or statement is material if it contains information that is important to a consumer's purchasing decision ...." *FTC v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 559 (W.D. Pa. 2006). Further, materiality includes not only whether the representation would have affected the consumer's purchasing decision but also whether "the consumers would have justifiably relied on the information." *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 531 (E.D. Pa. 2013). Hence, contrary to the CFPB's opposition, not all statements made throughout the lifecycle of a consumer financial product can serve as a basis for a deceptive acts or practices claim. Instead, it is only those representations that are important to a consumer's purchasing decision and are justifiably relied upon by a reasonable consumer that can serve as the basis for a viable deceptive acts claim.

Here, it is difficult to understand how any statements in the Welcome Package insert could materially impact or alter a consumer's purchasing decision with Reliant which, by its express

terms and conditions (which the CFPB itself acknowledges), only provide that a customer can request a refund within thirty days of billing by calling Membership Services, but contain no representation for how long such phone call or other aspects of the cancellation process with take. *See* Compl. (ECF #1), ¶ 43; McDonald Decl., ¶ 43. Given that is it undisputed that the Welcome Package insert was sent after the consumers had already decided to purchase a Membership, the CFPB's Complaint provides no facts or other averment which reflects that any consumer justifiably relied on the statements in the Welcome Package. And absent such averments, the CFPB's Complaint under Counts I and III fails to state a viable claim concerning any statement in the Welcome Package.

Moreover, the CFPB fails to address Defendants' argument that no representation in the Welcome Package insert was false. The Complaint merely avers that "at times" the cancellation process "could" take 20 to 40 minutes. *See* Compl. (ECF #1), ¶¶ 46 & 68. However, the CFPB does not aver that it "always" or even "often" or "usually" took that long. Thus, on its face, the Complaint fails to state a viable claim for deceptive practices and substantial assistance thereto concerning any statement in the Welcome Package.

Nor does the CFPB show in its Complaint that taking 20 to 40 minutes to cancel a membership is a practice which "takes unreasonable advantage of … the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product" and, thus, the CFBP fails to show that it is an abusive act that Congress intended the CFPB to enforce. *See* 12 U.S.C. § 5531(d)(1)(B). In short, the CFPB cannot demonstrate that any consumer was abused, which is why the CFPB objects to identifying any specific customer who was alleged harmed by having to take 20-to-40 minutes on the phone to cancel their Membership, a Membership which involves more than the $500 credit limit but also non-financial products or

services, such as roadside assistance, a prescription-discount program, free legal consultations, and a privacy protection/credit monitoring service. As such, the CFPB has failed, as a matter of law, to plausibly state a claim for deceptive or abusive practices or substantial assistance therewith under Counts I, II, and II of the Complaint regarding Reliant's cancellation process.

Finally, as for its abusive practices claim under Count II of the Complaint, the CFPB acknowledges, albeit implicitly, that it has limited authority to declare an act or practice abusive. *See* Opposition (ECF #33), pp. 13-16. Specifically, Section 5531(d) of the CFPA provides that the CFPB "shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice - …(2) takes unreasonable of -- … (B) the inability of the consumer to protect the interests of the consumer in selecting or suing a consumer financial product or service[.]" 12 U.S.C. § 5531(d)(2)(B). Although it cites cases where courts have upheld abusive practices claims brought by the CFPB, none of those cases involves a declaration of an abusive practice because a company's phone cancellation process took possibly 20-to-40 minutes and/or involved the making of offers or other attempts to convince a calling customer to change their mind and retain their benefits of the already purchased product or service. *See* Opposition (ECF #33), p. 14. Further, none of the cases that the CFPB cites involve a cancellation process for a membership which involves both a financial product (*i.e.*, a $500 credit limit) and non-financial products or services (*i.e.*, roadside assistance, prescription-discount program, privacy protection/credit monitoring service, and legal consultation service). Consequently, this enforcement action represents the first time the CFPB has sought to declare a company's cancellation process as an abusive practice.

Moreover, the CFPB cites nothing in the CFPA suggesting that Congress intended to make the CFPB the arbiter of what constitutes an abusive cancellation process in connection with the

provision of a consumer financial product or service. CFPA Section 5531(d)(2)(B) mandates that the only acts or practices which the CFPB has authority to declare abusive are those which "take unreasonable advantage of … the inability of the consumer to protect the interest of the consumer ***in selecting or using a consumer financial product or service***." 12 U.S.C. § 5531(d)(2)(B) (emphasis added). By definition, cancelling one's Membership is not "selecting or using a consumer financial product or service." *See* Oxford English Dictionary, Definition of "Select," ("to choose or pick out in preference to another or others"), available online at *https://www.oed.com/search/dictionary/?scope=Entries&q=selecting*; *id*., Definition of "Use," ("to put to practical or effective use, esp. as a material or resource; to utilize"), available online at https://www.oed.com/search/dictionary/?scope=Entries&q=using. Thus, based on the only statute upon which the CFPB relies for its abusive practices claim, the CFPB has failed to demonstrate that Congress delegated to the CFPB the authority to declare Reliant's cancellation process, which is consistent with the Membership's terms and conditions, an abusive practice.[4]

Counts I, II, and III of the Complaint that seek to declare Reliant's cancellation process a

---

[4] In a footnote, the CFPB argues that it has authority to bring an enforcement action challenging Reliant's cancellation process as a UDAAP violation and that filing a complaint alleging that it is unlawful for a company to make cancellation of enrollment in a membership over the telephone lengthy or difficult is not the type of major policy decision of "vast economic and political significance" that implicates the major question doctrine. *See* Opposition (ECF #33), p. 14, n.3. Yet, what the CFPB ignores is that Congress has enacted legislation to regulate the cancellation process faced by online consumers. *See, e.g.*, Restoring Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403(3) (a company selling goods and services through negative option features must "provide[ ] simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."). Thus, since the CFPA contains no similar provision concerning the cancellation process for consumer financial products or services, the CFPB lacks the statutory authority to declare a company's cancellation process a UDAAP violation under the major questions doctrine. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (under the major questions doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance").

deceptive or abusive practice and attempt to hold Kane liable for substantially assisting in that alleged abusive practice fail to state a claim as a matter of law. Accordingly, contrary to the CFPB's opposition, these claims are subject to dismissal under Rule 12(b)(6). *See Johnson*, 534 F.3d at 1121.

### D. *The CFPB's TILA-Based Claims Fail Because Reliant Imposes No Finance Charge That Is "Computed From Time To Time On The Outstanding Unpaid Balance" Of The $500 Credit Limit.*

As for Counts IV and V of its Complaint, the CFPB concedes that both of these claims are premised on its assertion that the Reliant Card is an "open-end credit plan" that is subject to the 25% cap on finance charges under TILA and its Reg. Z. *See* Opposition (ECF #33), pp. 20-24. Moreover, the CFPB acknowledges that for the Reliant Card to be an "open end credit plan," it must be "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." *Id.* at p. 21 (citing 15 U.S.C. § 1620(j); 12 C.F.R. § 1026.2(a)(20)). But, according to the CFPB, so long as Reliant imposes any charge that individually or collectively exceeds 25% of the $500 opening credit limit, then a valid claim for violation of TILA and Reg. Z has been stated. *Id.* at 20-24. The CFPB is wrong.

The fallacy in the CFPB's position is that the definition of "open-end credit plan" mandates that the plan meet three requirements: (1) "the creditor reasonably contemplates repeated transactions;" (2) the plan "prescribes the terms of such transactions;" and (3) the plan "provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1620(j); 12 C.F.R. § 1026.2(a)(20). Under this definition, a credit card that imposes no finance charge computed from time to time on the outstanding unpaid balance does not qualify as an "open-end credit plan" even though it meets the other two requirements.

In its opposition, the CFPB chooses to ignore the third requirement. Instead, the CFPB

identifies all the fees that a Reliant customer might pay for its Membership if that consumer utilized all of its benefits, including the $500 credit limit, and asserts that because these fees exceed 25% of the initial $500 credit limit, TILA is violated. *See* Opposition (ECF #33), pp. 22-24. However, what the CFPB fails to aver is any fact which shows that *any* of fees that Reliant imposes for its Membership (which include benefits beyond the $500 credit limit) are ones that are "computed from time to time on the outstanding unpaid balance." In fact, the averments in the CFPB's Complaint confirm that such fees are not so computed and instead apply to everyone whether they use the $500 credit limit or not.[5] Moreover, the CFPB is well aware from its pre-complaint investigation that for those who used the Membership's $500 credit limit and did not pay it off in full every month, Reliant has *never* charged interest or other finance charge computed from time to time on that outstanding unpaid balance. Instead, Reliant provides that short term credit without any interest or charge being computed on any outstanding unpaid balance.

Because the CFPB's Complaint fails to include any averment that the Reliant Card provides for a finance charge which is computed from time to time on the outstanding unpaid balance of the $500 credit line offered to Reliant's customers, the CFPB's complaint fails to state a viable TILA or Reg. Z violation. Therefore, Counts IV and V of the Complaint must be dismissed.[6]

---

[5] It should go without saying that the term "outstanding unpaid balance" means that a purchase has been made against the credit line but not fully repaid within the time provided, generally 30-days. Here, the CFPB's Complaint asserts that the Membership's $500 credit limit was rarely used by consumers; but, it contains no statement whether those that used the credit limit maintained an unpaid balance. *See* Compl. (ECF #1), ¶¶ 39-40.

[6] Contrary to the CFPB's contentions in footnote 8 of its opposition, summary judgment is not warranted in the CFPB's favor under Counts IV and V of its Complaint. TILA's definition of "open end credit plan" clearly requires the credit plan impose a finance charge "computed from time to time on the outstanding unpaid balance" in order for that credit plan to qualify as an "open end credit plan" subject to TILA's 25% cap. *See Household Credit Servs. v. Pfennig*, 541 U.S. 232, 235 n.1 (2004) (acknowledging that an "open end credit plan" under TILA is "a plan under which a creditor 'reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to

**E. *The CFPB's Claims Are Untimely, Especially Those Asserted Against Kane.***

The CFPB makes several unavailing arguments for why this Court should not dismiss its claims, even though they are untimely on their face. *See* Opposition (ECF #33), pp. 24-30. However, none of its arguments have merit.

For example, the CFPB contends (without citing any specific paragraphs in the complaint) that "the Complaint alleges an ongoing course of deceptive and abusive conduct without any known end date." *See* CFPB's Opposition, p. 26. Yet, there is not one allegation in the Complaint which states that. Instead, the CFPB chose to allege all the factual averments in the Complaint in the past tense and to include references to a start date of either 2007 or 2010 and an end date of 2021. *See* Compl. (ECF #1), ¶¶ 12-46. Moreover, as for its deceptive practices claim premised on the "Welcome Package," the CFPB's Complaint clearly states that this particular conduct was limited in time (*i.e.*, "from at least March 2019 to October 2020"). *Id.* at ¶ 44. Thus, the Complaint contains no averment which indicates that the deceptive and abusive practices claims under Counts I through III of the Complaint extend beyond 2021.

Also, the CFPB argues that there is no allegation on the face of the Complaint which indicates when it discovered the practices or violations that serve as the basis for its claims, and that absent an averment of its actual knowledge, this Court cannot dismiss any of its claims as untimely. *See* Opposition (ECF #33), pp. 26-29. Although the CFPB relies upon various district court decisions from other jurisdictions which impose an actual knowledge requirement with respect to the "date of discovery" language in Section 5564(g)(1) of the CFPA, the CFPB does not

---

time on the outstanding unpaid balance.'"). Neither the averments in the CFPB's Complaint nor the materials attached to the McDonald Declaration establish this crucial element of the CFPB's TILA-based claims. Thus, if summary judgment is to be entered on Counts IV and V of the Complaint in any party's favor, it must be for the Defendants, not the CFPB.

mention or otherwise attempt to refute the guidance provided by the United States Supreme Court in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010). In that case, which focused on whether a securities fraud complaint under Section 10(b) of the Securities Exchange Act of 1934 was timely, the United States Supreme Court explained that a federal statute's use of the word "discovery" "refers not only to a plaintiff's actual discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." *Merck*, 559 U.S. at 644. In reaching this conclusion, the Supreme Court explained that "[l]egislatures have codified the discovery rule in various contexts" by "writ[ing] the word 'discovery' directly into the statute[,]" [a]nd when they have done so, state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know." *Id.* at 645. Additionally, the Supreme Court emphasized that "when Congress enacts statutes, it is aware of relevant judicial precedent," such that "[g]iven the history and precedent surrounding the use of the word 'discovery' in the limitations context generally," it must be assumed that when "discovery" is used in a federal statute it "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Id.*

The Third Circuit has applied *Merck* to other federal statutes which set forth a statute of limitations which incorporate the word "discovery." *See, e.g.*, *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013). Also, this Court has applied *Merck* to dismiss claims where the facts show that the statute of limitations began to run "once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation – *whichever comes first.*" *McCullough v. Advest, Inc.*, No. 17-407, 2017 WL 3675787, at *4 (W.D. Pa. Aug. 25, 2017).

The CFPB cites cases from other jurisdictions that impose an actual knowledge

requirement for the CFPA's 3-year statute of limitations. *See, e.g., CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043, 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021). However, not only had the district court in *Chou Team* determined that defendant's statute of limitation argument was procedurally improper, thus making its ruling on the substantive issue *dicta*, the *Chou Team* court never mentioned nor otherwise considered the Supreme Court's decision in *Merck*. *Id.* Instead, it simply declared "there is no 'constructive discovery' rule set forth in the statute," despite the Supreme Court's contrary ruling in *Merck.* Thus, the CFPB's argument that its Complaint cannot be dismissed because there is no averment of its actual knowledge is without merit.

The Third Circuit has recognized that a complaint can be dismissed at the Rule 12 stage when "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" reveal that the claims in the complaint are untimely. *See Pension Trust Fund*, 730 F.3d at 271. Here, the matters that serve as the basis for all five Counts of their Complaint are all matters within the public realm, including without limitation that Kane is the sole shareholder and officer of Reliant which controlled its operations. Although the CFPB feigns ignorance over the extent of Kane's alleged control until it received Defendants' responses to the civil investigative demands issued by the CFPB and it deposed Kane, the issue is not when the CFPB actually learned of these facts but when inquiry notice of the "storm warnings" from all of Reliant's websites and other public activity[7] "would have prompted a reasonably diligent plaintiff to begin investigating." *Merck*, 559 U.S. at 653.

In its Complaint, the CFPB acknowledges that Reliant began offering its Membership to consumers "in 2007," and that "since 2010," Reliant and its advertising affiliates have used the

[7] On its publicly accessible website, Reliant publishes the names and employment titles of the principal employees who work for it. *See https://www.reliantholdings.com/corp/v3/team.html*. Kane has always been identified as Reliant's "Founder, President and CEO." *Id.*

online advertisements that serve as the basis for Counts I, II, and III of the CFPB's Complaint. *See* Compl. (ECF #1), ¶¶ 12 & 19. Moreover, any issue with the Welcome Package occurred solely between March 2019 and October 2020. *Id.* at ¶ 44. Further, as to any alleged TILA violation, those occurred from January 2015 to January 2021.[8] *Id.* at ¶ 83. Thus, because all facts underlying the claims in the CFPB's Complaint are matters of public record, a reasonably diligent plaintiff would have begun investigating any claims well before the three years prior to the time the Complaint was filed on September 13, 2024. Consequently, as a matter of law, the claims in the CFPB's Complaint are untimely and must be dismissed.

Finally, in its opposition, the CFPB suggests that there are facts which it has yet to aver involving when it actually learned of the conduct that serves as the basis of its Complaint, including "the series of tolling agreements that suspended the statute of limitations for any action brought by the [CFPB] against Reliant from June 29, 2023, until September 25, 2024,"[9] and that if this Court is inclined to address the issue now, then the CFPB "requests leave to amend in order to allege facts concerning these tolling agreements and other matters relevant to the statute of limitations." *See* Opposition (ECF #33), p. 25. However, the CFPB's actual knowledge is not the controlling factor on when the statute of limitations expired. Instead, since Section 5564(g)(1) of the CFPA imposes a 3-year statute of limitation premised upon "the date of discovery of the violation to which the action relates," and the term "discovery" "refers not only to a plaintiff's

[8] As stated in their initial brief, Defendants assert that the CFPB's TILA claims are subject to a 1-year statute. *See* Defendants' Brief (ECF #30), pp. 35-36. But, even if the 3-year statute applies for the reasons articulated by the CFPB in its opposition, all of the CFPB's TILA claims in this case would have expired by January 2024, well before the CFPB filed its lawsuit.

[9] Notably, the CFPB does not make mention of any tolling agreements for any action or claim against Kane individually. Instead, the CFPB concedes that any tolling agreements executed from June 29, 2023 until September 25, 2024, concern only "action[s] brought by the [CFPB] against Reliant." *See* Opposition (ECF #33), p. 25.

actual discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered" *see Merck*, 559 U.S. at 644, evidence of the CFPB's actual knowledge is irrelevant. Hence, the CFPB's request for leave to amend should be denied. *See, e.g., City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018) ("Leave to amend is properly denied if amendment would be futile, *i.e.*, if the proposed complaint could not "withstand a renewed motion to dismiss."); *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988) (leave to amend was properly denied because 2-year statute of limitations barred negligent breach of contract claim).

All the CFPB's claims in this case are untimely as a matter of law. Accordingly, this Court should grant Defendants' Rule 12(b)(6) motion.

**F. *The CFPB Lacks The Funding And The Authority To Pursue This Action, Depriving This Court Of Federal Question Jurisdiction.***

In its opposition, the CFPB does not refute the general proposition that an action is void when it involves a government actor's exercise of power that it did not lawfully possess. *See Collins v. Yellen*, 594 U.S. 220, 258 (2021). As the Honorable Edith H. Jones of the United States Court of Appeals for the Fifth Circuit succinctly stated in her concurrence:

> … Just as a government actor cannot exercise power that the actor does not lawfully possess, so, too, a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend. Indeed, a constitutionally proper appropriation is as much a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority. Accordingly, as in cases involving Appointments Clause defects or other separation of powers problems with a government actor's authority to act, the proper remedy here is to disregard the government action. Because the CFPB has prosecuted this enforcement action using funds derived without a constitutionally footed appropriation or oversight, the court should dismiss the enforcement action against the appellants.
> …

*CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 242 (5th Cir. 2022) (J. Jones, concurring)

(citations omitted).

Instead, the CFPB contends that to the extent there exists any defects with the CFPB's funding source, those defects do not affect this Court's ability to hear this case, citing *CFPB v. CashCall*, 35 F.4th 734, 743 (9th Cir. 2022). *See* Opposition (ECF #33), p. 31. However, in *CashCall*, the United States Court of Appeals for the Ninth Circuit rejected the funding argument because the defendant in that case had "forfeited that argument twice over by failing to present it to the district court or in its briefing before us on appeal." *CashCall*, 35 F.4th at 743. Admittedly, the Ninth Circuit then went on to say that defendant's argument "erroneously conflates 'the [Bureau's] authority to execute the laws (Article II) with the United States' interest in the case (Article III)." *CashCall*, 35 F.4th at 743. However, this latter statement is *dicta* which is not controlling. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 548 (2013) (*dicta* is not controlling); *Coleman v. Greene*, 845 F.3d 73, 76 (3d Cir. 2017) ("A *dictum* is 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'").

Further, in its opposition, the CFPB cites three cases which it contends represent cases where the courts have "discarded" the same funding argument Defendants have raised in their Rule 12(b) motions. *See* Opposition (ECF #33), pp. 31-32. Yet, in all three cases, the courts engaged in little to no analysis of the "combined earnings" issue. *See CFPB v. Active Network, LLC*, No. 4:22-cv-00898, 2024 WL 443763, at *2 (E.D. Tex. Oct. 7, 2024); *CFPB v. SoLo Funds, Inc.*, No. 2:24-cv-04108-RGK-AJR, 2024 WL 4553110, at *2 (C.D. Cal. Oct. 17, 2024); *Texas v. Colony Ridge, Inc.*, No. H-24-0941, 2024 WL 4553111, at *4 (S.D. Tex. Oct. 11, 2024). Moreover, in *Colony Ridge*, the court held that the United States Supreme Court in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) ("*CFSA*"), had already ruled on the issue when, in fact,

the only question the Supreme Court decided in that case was whether the Dodd-Frank Act's language allowing the CFPB to be funded out of the "combined earnings" of the Federal Reserve violated the Appropriations Clause of the United States Constitution. Thus, because these rulings set forth little to no reasoning, or are otherwise inaccurate, they are not persuasive and/or are entitled to any weight by this Court. *See, e.g., Dietzel v. Costco Wholesale*, No. 22-cv-0035, 2022 WL 2703612, at *5 (E.D. Pa. Jul. 12, 2022) (ruling that a one-sentence order that fails to disclose its reasoning is not persuasive).

The CFPB also argues that the term "combined earnings" in 12 U.S.C. § 5497(a)(1) is broader than how the United States Supreme Court interpreted it in *CFSA* and that Defendants have misread CFSA. *See* Opposition (ECF #33), pp. 32-34. However, the CFPB is wrong.

In *CFSA*, the Supreme Court was clear that, for the CFPB's funding to be constitutional, it had to comply with the Appropriations Clause. *Cmty. Fin. Servs.*, 601 U.S. at 425. Moreover, the Supreme Court explained:

> The Appropriations Clause applies to money "drawn from the Treasury." Art. I, § 9, cl. 7. ***The Bureau draws money from the Federal Reserve System. 12 U.S.C. § 5497(a)(1). And, surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury. § 289(a)(3)(B).*** Whatever the scope of the term "Treasury" in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies. The Bureau's funding is therefore subject to the requirements of the Appropriations Clause.

*Id*. (emphasis added).[10] Then, the Supreme Court explained that the CFPA "authorizes the Bureau to draw public funds from a particular source—'the combined earnings of the Federal Reserve System,' in an amount not exceeding an inflation-adjusted cap. 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)" that such authorization is "an 'Appropriatio[n] made by Law,'" and "therefore we hold that

[10] On page 37 of their initial brief, Defendants miscite the page number for the "surplus funds" quotation. It should have been "601 U.S. at 425," not "435."

the requirements of the Appropriations Clause are satisfied." *Id.* at 435. Thus, a fair reading of the *CFSA* decision is that the "combined earnings" that the CFPB can use to carry out its duties are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury."

Finally, the CFPB asserts that regardless of whose interpretation is correct, "Congress – which has the power of the purse – has not provided that actions taken without proper funding must be undone," citing the Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.*" *See* Opposition (ECF #33), p. 34. However, the Anti-Deficiency Act does not displace a court's authority to set aside agency action carried out with unlawfully obtained funds. *See, e.g.*, 5 U.S.C. § 706(2)(A), (B), & (C). Moreover, even if the Anti-Deficiency Act itself does not require dismissal, it most certainly prohibits the CFPB from continuing to prosecute it. *See* 31 U.S.C. § 1341(a)(1). *See also All Am. Check Cashing*, 33 F.4th at 242.

## III. CONCLUSION

By its own admission, the CFPB's Complaint in this action represents a half-told story by which the CFPB seeks to extract tens of millions of dollars from Defendants, even though every single one of Reliant's customers affirmatively checked an online disclosure that confirmed they understood the Reliant Card they were purchasing could only be used at the Horizon Outlet shopping club. Also, this same disclosure included all the terms and conditions of the Membership, including that the Reliant Card was not a general-purpose credit card and that any cancellation had to be accomplished over the phone by calling Membership Services. The CFPB finds it hard to believe that any consumer would purchase a Membership. But that does not render Defendants liable under the CFPA or TILA. This Court should grant Defendants' Rule 12 motions.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document using the Court's CM/ECF system on February 12, 2025, which will send notification of such filing to all counsel of record.

Respectfully submitted,

Dated: February 12, 2025

*/s/ Ronald L. Hicks, Jr.*

Ronald L. Hicks, Jr., Esq. (PA #49520)
ronald.hicks@nelsonmullins.com
Thomas S. Jones, Esq. (PA #71636)
thomas.jones@nelsonmullins.com
Benjamin J. Sitter, Esq. (PA #317382)
ben.sitter@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
One PPG Place, Suite 3200
Pittsburgh, Pennsylvania 15222
Tel: 412-730-4050

*Counsel for Defendants*